## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Jessica Lynn Preston,

                Plaintiff,        Case No. 18-12158

v.                             Judith E. Levy
                                United States District Judge

County of Macomb, Sheriff
Anthony M. Wickersham, Correct    Mag. Judge Mona K. Majzoub
Care Solutions, LLC, Lawrence
Sherman, David Arft, Temitipe
Olagbaiye, Monica Cueny, Cynthia
Deview, Amanda Bishop, Jaclyn
Lubanski, and Jeffrey Rattray,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DIMISS [27]

Plaintiff Jessica Preston alleges that her due process rights under the Fourteenth Amendment of the United States Constitution were violated by defendants based on the medical care she received during the labor and delivery of her son while in pretrial detention. She brings these claims against Macomb County, Sheriff Anthony Wickersham, corrections officer ("CO") Jeffrey Rattray, and Correct Care Solutions ("CCS") and its employees: Lawrence Sherman, David Arft, Temitipe

Olagbaiye, Monica Cueny, Cynthia Deview, Amanda Bishop, and Jaclyn Lubanski. CCS's and its employees' ("defendants") motion to dismiss is before the Court.

## I. Background[1]

### A. March 15, 2016

Plaintiff was arrested for driving on a suspended license and she was ordered detained at the Macomb County Jail by a state district court judge. (Dkt. 1 at 13.) At 5:00 p.m., she was medically screened by Cynthia Deview, a registered nurse. (*Id.*) Deview noted that plaintiff was eight months pregnant and designated her pregnancy as a "Supplementary Normal Pregnancy" and "Acute." (*Id.* at 13–14.) Plaintiff's pregnancy was "high risk" because she had placentae abruption during her first pregnancy, requiring a C-section. (*Id.* at 25.) She was scheduled for a C-section on April 26, 2016, at a local hospital. (*Id.*) Plaintiff was placed in the general population at the jail. (*Id.* at 14.)

Around 6:00 p.m., plaintiff believed she was having contractions one minute apart. (*Id.*) Deview and an unnamed nurse examined her in the medical unit. (*Id.* at 14–15.) Plaintiff said the contractions lasted for

---

[1] These facts are drawn from the complaint and plaintiff's medical records. *See infra*, Section II.

fifteen to thirty seconds. (*Id.* at 15.) Ultimately, Deview and the unnamed nurse determined that plaintiff was not having contractions and did not need further medical attention. (Dkt. 39 at 73.) Deview recommended that plaintiff "drink fluids and report to a nurse if contractions changed." (Dkt. 1 at 14.)

An hour and a half later, plaintiff thought her water broke. (Dkt. 39 at 72.) Amanda Bishop, a Licensed Practical Nurse ("LPN"), examined her in the medical unit. (Dkt. 1 at 15.) Bishop found no amniotic fluid, and a litmus test confirmed there was none (*id.*), and therefore that her water had not broken.

### B.   March 17, 2016

Three days later, Temitipe Olagbaiye, a nurse practitioner, examined plaintiff with Bishop present. (*Id.*) Plaintiff had "ongoing whitish vaginal discharge," and presumably other symptoms that led Olagbaiye to diagnose "'false contractions' and 'adequate fetal kicking.'" (*Id.* (quotations in original).) Olagbaiye created what plaintiff calls a "treatment plan," which stated: "[p]atient pregnancy will be uneventful while in incarceration 'till delivery." (*Id.* (same).)

### C.   March 20, 2016

3

Three days later at 6:45 a.m., plaintiff requested that she be taken to the medical unit by using an intercom buzzer in her unit. (*Id.* at 17.) Bishop and Deview examined her between 7:07 a.m. and 7:25 a.m. (*Id.*) Plaintiff "told Defendants Bishop and Deview that her pain was intense and the time between her contractions was decreasing." (*Id.*) Deview told plaintiff "that she was not impressed with Plaintiff's contractions" and sent plaintiff back to her cell. (*Id.* at 17–18.) Deview determined that plaintiff was not having contractions because her abdomen was not tightening, her skin was "warm and dry," and she was not visibly in pain. (*See* Dkt. 39 at 55.)

After plaintiff was escorted back to her cell at 7:30 a.m., she remained "in severe pain" and had contractions that lasted longer and were shorter in time apart than before. (Dkt. 1 at 19.) Around noon, plaintiff requested via intercom that she be examined "by a physician or be sent to the hospital" because her pain had increased. (*Id.*) Plaintiff was escorted by corrections officer ("CO") Jeffrey Rattray to the medical unit at about 12:20 p.m. (*Id.*)

Jaclyn Lubanski, an LPN, sat with plaintiff outside of the medical unit while plaintiff described her intensifying pain and more frequent contractions. (*Id.*) She did not examine plaintiff but put a medical device

4

on plaintiff's finger. (*Id.*) Bishop was also present and again said "that she was 'not impressed' with Plaintiff's contractions." (*Id.* at 20 (quotations in original).) She also warned plaintiff that she could be reprimanded for making false complaints if she came down to the medical unit again claiming to be in labor. (*Id.*) Rattray escorted plaintiff back to her cell at 12:35 p.m. (*Id.*)

At 1:00 p.m., plaintiff's pain level became "a ten . . . out of ten. . ." and she had "intense" vaginal bleeding. (*Id.*) Plaintiff requested via intercom that she be taken to the hospital. (*Id.*) Lubanski and Rattray were in plaintiff's unit passing out medications, and plaintiff told them she was bleeding and asked to be taken to the hospital. (*Id.* at 20–21.) She also showed them a bloody tissue that she had used as a sanitary pad. Thirty minutes later, after Lubanski and Rattray finished passing out medications, Rattray escorted plaintiff to the medical unit.[2] (*Id.*) While plaintiff was waiting, her pain worsened. (*Id.*)

---

[2] At oral argument, defense counsel stated that his records showed plaintiff notified Lubanski at 1:28 p.m. and that plaintiff arrived at the medical unit at 1:32 p.m., meaning she only waited for four minutes for medical attention. At the motion to dismiss stage, the Court accepts as true all of plaintiff's well-pleaded factual allegations.

Deview examined plaintiff in the medical unit and confirmed that she was having her "bloody show"[3] and called Dr. Lawrence Sherman, the doctor in charge, to notify him of this development. (*Id.* at 21–22.) At this point, plaintiff told Bishop and Deview that she needed to be taken to the hospital. (*Id.* at 22.) Deview told her: "[W]e will not allow your baby to be born in the jail." (*Id.*) Plaintiff was then put in a medical unit cell that was not cleaned after another inmate had been in it. (*Id.*) She insisted that she be taken to the hospital several times, but Bishop, Deview, and Lubanski ignored her requests. (*Id.*) Plaintiff was scared for her life and her child's as well. (*Id.*) Between 1:35 p.m. and 1:56 p.m., she was left in the cell unmonitored. (*Id.* at 23.)

Then, plaintiff's labor accelerated. At 1:58 p.m., her water broke, and she yelled for assistance. (*Id.*) Deview entered the cell, and plaintiff again begged to be taken to the hospital. (*Id.*) Once more, Deview assured her that she would not deliver her baby in jail. (*Id.* at 24.) Staff called Dr. Sherman, who ordered them to time plaintiff's contractions and call him back. (*Id.* at 23.) Deview timed plaintiff's contractions and manually

---

[3] A "bloody show" is a medical term for when the mother passes the cervical mucus plug and it is one of the signs that labor is imminent. *See* Christine Stewart, MD & Betty Brutman, MD, JD, 9 Attorney's Medical Advisor § 14:143, Westlaw (database updated Sept. 2018).

palpated plaintiff's abdomen, but neither Deview, Bishop, nor Lubanski called Dr. Sherman back. (*Id.* at 24.) At 2:25 p.m., Deview saw the child's head was crowning. (*Id.*) Two minutes later, Deview, Bishop, or Lubanski called Dr. Sherman to request an ambulance, and he called for one. (*Id.*) An ambulance arrived at 2:35 p.m., but emergency personnel would not transport plaintiff to the hospital (*id.* at 24–25), presumably because she was too close to delivery.

Plaintiff's son was born at 2:40 p.m. (*Id.* at 24.) She gave birth on the floor of her medical unit cell on a mat. (*Id.*; Dkt. 39 at 47.) Staff also used an obstetric "kit" during her labor and delivery. (Dkt. 39 at 47.) Plaintiff's son's face was wiped with a dirty blanket, which he was then swaddled in. (*Id.*)

### D.    Procedural History

Plaintiff alleges that defendants violated her Fourteenth Amendment due process rights. She claims that the individual defendants were deliberately indifferent to her serious medical needs and subjected her to inhumane conditions of confinement. She also argues that Macomb, Wickersham, and CCS are liable for maintaining unconstitutional policies that caused plaintiff's constitutional rights to be

violated by the individual CCS defendants. Plaintiff claims that defendants' actions led to her "pain, panic, and emotional distress," which caused her labor and delivery to become an emergency. (*Id.* at 30.) She also asserts that these events caused her to deliver her placenta at the hospital an hour later and to experience "bilateral peri-urethral tears during delivery." (*Id.* at 30.) And finally, she alleges that defendants breached a promise "to Plaintiff made by Defendants Deview and Bishop not to allow the birth to occur in jail," causing the same injuries. (*Id.* at 30–31.)

In response to this complaint, Macomb County filed an answer (Dkt. 13), Rattray filed a motion to dismiss and for summary judgment (Dkts. 11, 31), Wickersham filed a motion to dismiss (Dkt. 6), and CCS and its employees filed the motion to dismiss that is now before the Court. (Dkt. 27.) Plaintiff agreed to dismiss CO Rattray (Dkt. 33), and the Court granted Wickersham's motion to dismiss. (Dkt. 41.)

## II. __Legal Standard__

On a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It need not contain "detailed factual allegations," but must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Courts may consider documents a plaintiff quotes in her complaint without converting a motion to dismiss into one for summary judgment, even if defendant attaches them, when it is clear plaintiff relies on the document in the complaint. *Watermark Senior Living Ret. Cmtys., Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 425–26 (6th Cir. 2018). Plaintiff quotes the medical records throughout the complaint (*e.g.* Dkt. 1 at 12), and so the Court will consider them although they were provided by defendants.[4]

## III.  **Analysis**

Plaintiff brings her claims under 42 U.S.C. § 1983. To succeed, she must establish "(1) the deprivation of a right secured by the Constitution

---

[4] At oral argument, plaintiff's counsel stated that he did not oppose the Court considering the medical records at this stage of the litigation.

or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). It is undisputed that CCS and its employees were acting under color of state law. *Winkler v. Madison Cty.*, 893 F.3d 877, 904 (6th Cir. 2018) (corporate entity); *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (corporate employees). Here, plaintiff's complaint is deficient in many ways, and ultimately fails to state a claim for inadequate medical care against CCS, Arft, Cueny, Olagbaiye, and Dr. Sherman. However, plaintiff states a claim for inadequate medical care against Deview, Bishop, and Lubanski for their conduct once they knew plaintiff was bleeding on March 20.

### A. Breach of Promise

Plaintiff fails to state a claim against defendants for breach of promise. Plaintiff argues that Deview and Bishop broke their promise to plaintiff that her son would not be born in jail, amounting to a breach of promise. (*Id.* at 31.) Plaintiff does not plead the elements of this claim. It is frivolous and is now dismissed.

### B. Inadequate Medical Care

The remaining claims are for inadequate medical care against the individual defendants. Though pretrial detainee claims "sound in the

10

Due Process Clause of the Fourteenth Amendment," such claims "are analyzed under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 566 (6th Cir. 2013). This includes deliberate indifference claims alleging inadequate medical care. *Id.* at 569. Inadequate medical claims are based on deliberate indifference and have two components: objective and subjective. *Id.* at 568 (citing *Harrison*, 539 F.3d at 518). The complaint adequately pleads that plaintiff had an objectively serious medical need, but fails to allege facts that could establish the subjective component for all individual defendants except Deview and Bishop after 1:00 p.m. on March 20 and Lubanski after 12:00 p.m. on March 20.[5]

### 1. *Objective Component*

---

[5] Within plaintiff's inadequate medical care claim, she argues that defendants violated her constitutional right to give birth in a hospital. (*E.g.* Dkt. 1 at 17.) The Court can find no such right. *See Havard v. Wayne Cty.*, 436 F. App'x 451, 454 & n.5 (6th Cir. 2011) (noting the right at issue is "[a] prisoner's right to adequate medical care" and noting that hospitals are appropriate places for births in defining what is a serious medical risk—the objective component of the deliberate indifference test). Plaintiff also points to *Estelle v. Gamble*, arguing that "contemporary standards of decency," 429 U.S. 97, 102 (1976), require a hospital birth to avoid the Eighth Amendment's prohibition on cruel and unusual punishment. But more than forty years of precedent have since interpreted *Estelle*, and the proper analysis for an inadequate medical claim is the objective and subjective component test articulated here. *See Havard*, 436 F. App'x at 454 (applying the objective and subjective component test).

11

The objective component of a due process claim requires that "the medical need at issue is sufficiently serious." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896 (6th Cir. 2004)). A serious medical need is "one 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (quoting *Harrison*, 539 F.3d at 518). The parties do not dispute that plaintiff had a serious medical need when she began to bleed and was obviously in labor beginning at noon on March 20. However, the parties dispute whether plaintiff had a serious medical need before that point.

"[T]he general condition of being pregnant does not necessarily constitute a serious medical need at any given moment in time during incarceration . . . ." *Patterson v. Carroll Cty. Det. Ctr.*, No. 05-101-DLB, 2006 U.S. Dist. LEXIS 92057, at *12 n.5 (E.D. Ky. Dec. 20, 2006) (citing *Smith v. Franklin Cty.*, 227 F. Supp. 2d 667, 667 n.10 (E.D. Ky. 2002); *Coleman*, 114 F.3d at 784–85); *Hogan*, 2013 U.S. Dist. LEXIS 35841, at *22 (citing *Webb*, 802 F. Supp. 2d at 878). Typically, it requires "a development that 'must require immediate attention.'" *Patterson*, 2006 U.S. Dist. LEXIS 92057, at *12 n.5 (quoting *Smith*, 227 F. Supp. 2d t 677

12

n.10). Labor is an example of such a development. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (finding pre-term labor, including symptoms such as a bloody show, was a serious medical risk); *Hogan v. Wellstar Health Network, Inc.*, No. 1:12-CV-1418-RWS, 2013 U.S. Dist. LEXIS 35841, at *22 (N.D. Ga. Apr. 15, 2015) (citing *Webb v. Jessamine Cty. Fiscal Court*, 802 F. Supp. 2d 870, 878 (E.D. Ky. 2011)) (finding labor was a serious medical risk); *see also Bingham v. Webster Cty.*, No. 1:05CV220-D-D, 2007 U.S. Dist. LEXIS 7333, at *23 (N.D. Miss. Oct. 1, 2007) (finding bleeding absent labor during pregnancy was a serious medical risk).

"The question is, at what point does it become obvious to a layperson that a woman is in labor?" *Hogan*, 2013 U.S. Dist. LEXIS 35841, at *23. In *Coleman*, the Eight Circuit looked at "(1) an increase in vaginal discharge; (2) a 'bloody show'; (3) uterine contractions six minutes apart; and (4) abdominal pain possibly attributable to a tightening of her pelvis and earlier complaints of lower back pain." 114 F.3d at 784. The district court in *Webb* examined more general factors: "the amount of time left before a pregnant inmate reaches the full term of her pregnancy, the symptoms of labor that she has exhibited, [and] any previous or

prenatal complications with respect the inmate's pregnancy . . . ."[6] 802 F. Supp. 2d at 880 (citing cases).

Initially, when plaintiff was screened on March 15, she did not have a serious medical need because there was no development, such as labor, in her pregnancy. The complaint does not detail any of the factors from *Coleman* or *Webb* at that time. Instead, plaintiff was eight-months pregnant, though admittedly, her pregnancy was high-risk.

Afterwards, however, plaintiff plausibly pleads that she had a serious medical need. At all times during her detention, plaintiff was eight months pregnant, scheduled for a C-section about a month later, and had a history of labor complications, resulting in a high-risk designation. During each incident, plaintiff exhibited symptoms of labor. These developments to her late-stage, high-risk pregnancy, including contractions, plaintiff's water breaking, vaginal discharge, and pain were either considered explicitly by *Coleman* or amount to a symptom of labor

---

[6] The court also considered "the reaction of jail officials." *Id.* Here, the individual defendants are medical professionals, not lay people, and so their reaction does not inform the objective component analysis as the corrections officers did in *Webb*. Relatedly, the "layperson" standard of the objective component also counsels the Court to consider the medical records under the subjective component. The records are not an indication that a layperson would not believe plaintiff was in labor, but a record of the thoughts, impressions, and conduct of the defendants.

as noted in *Webb*. Plaintiff pleads sufficient facts so that a layperson would think her labor had begun and that she needed medical attention given her late-term, high-risk pregnancy.

## 2. *Subjective Component*

A plaintiff can satisfy the subjective component of the deliberate indifference test by pleading that the defendant "(1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Jones*, 625 F.3d at 941. "Circumstantial evidence" and "that the risk was obvious" can support the inference that an official was aware of a risk and that it was substantial. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

Conscious disregard amounts to recklessness, which is more than negligence and "something less than acts or omissions for the very purpose of causing" or knowing harm is the likely result. *Winkler*, 893 F.3d at 891. Negligence, carelessness, ineffectiveness, or misdiagnoses do not meet this standard. *Id.* Because "'[c]ourts are generally reluctant to second guess the medical judgment of prison officials' . . . this court has found deliberate indifference on the part of medical staff . . . only where

'medical care . . . is so cursory as to amount to no treatment at all.'" *Id.* at 892 (citations omitted) (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014)); *see also Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Dominguez*, 555 F.3d at 551). An unreasonable delay in treatment can also be deliberate indifference. *See Blackmore*, 390 F.3d at 899. Plaintiff offers two deliberate indifference claims against the individual defendants: failure to provide adequate medical care and failure to provide timely medical care.[7]

i.      Olagbaiye

Plaintiff fails to plead any facts that would satisfy the subjective prong for her claim against Olagbaiye. Plaintiff successfully pleads that Olagbaiye knew of a substantial medical risk. He knew she had a late-term, high-risk pregnancy, and his medical training is circumstantial evidence that he would have made the inference that the risk to plaintiff was substantial. *See Dominguez*, 555 F.3d at 550 (quoting *Terrance*, 286 F.3d at 843). Plaintiff fails to state a claim that he consciously disregarded a substantial risk to her.

---

[7] Plaintiff also claims that defendants failed "to make the safest decision" to transfer her to the hospital (Dkt. 1 at 27–28), but this argument fails on its own terms. *See Winkler*, 893 F.3d at 891 (describing deliberate indifference as recklessness).

Plaintiff's complaint is conclusory as to whether Olagbaiye consciously disregarded the risk when he did not follow-up and monitor plaintiff after he treated her on March 17 "in contravention of Defendant Olagbaiye's own treatment plan to make sure that Ms. Preston's pregnancy was uneventful prior to the child's birth." (Dkt. 1 at 17.) It is not per se conscious disregard of a substantial medical risk to deviate from a treatment plan. *E.g.*, *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (determining that a failure to follow a treatment plan amounted to a medical provider's disagreement with plaintiff on the appropriate course of treatment, not deliberate indifference.) Rather, courts analyze a defendant's interference with a treatment plan to determine if the defendant consciously disregarded a substantial risk. For example, in *Byrd v. Wilson*, a defendant was deliberately indifferent when he interfered with a prisoner's treatment plan that included a prescribed medication and a special diet for cirrhosis of the liver. *Byrd v. Wilson*, 701 F.2d 592, 594–95 (6th Cir. 1983); *see also Villegas*, 708 F.3d at 569–70 (citing *Byrd*, 701 F.2d at 594).

Here, Olagbaiye's comment is not a treatment plan in the same way that the prescribed medication and diet was in *Byrd*. Moreover, plaintiff does not plead that Olagbaiye interfered with the plan because the

comment did not set forth a specific plan to monitor plaintiff or that staff on duty were insufficient to monitor her. It is doubtful that Olagbaiye's comment is a treatment plan at all. Plaintiff is straining to create a duty for Olagbaiye to monitor her as she alleges that he should have. Even if he had a duty to do so, plaintiff fails to plead that Olagbaiye was reckless when he did not abide by that plan. He determined that plaintiff was not yet in labor, did not have a urinary tract infection, and was not currently using any drugs. (Dkt. 39 at 3.) Plaintiff fails to plead that Olagbaiye was negligent, much less reckless, when he did not continuously follow up with her.

ii.     Deview

Deview was involved in several stages of plaintiff's care after her screening. On March 15, she examined plaintiff an hour after her screening when plaintiff believed she was having contractions. Three days later, she examined plaintiff on March 20 around 7:00 a.m. when plaintiff alleges that she was in intense pain and her contractions were becoming more frequent. Later that day at 1:30 p.m., Deview examined plaintiff, determined that she had a bloody show, and called Dr. Sherman. She also left plaintiff alone in a medical unit cell for twenty

minutes during which time plaintiff's water broke. Then, she assisted plaintiff and started timing her contractions. She also seems to have participated in the decision to call or she called Dr. Sherman again herself to tell him about plaintiff's water breaking. At 2:25 p.m., Deview saw the baby crowning and, although plaintiff does not expressly plead so, presumably assisted plaintiff with her delivery. Deview may also have been part of the decision to call Dr. Sherman a third time when he authorized an ambulance.

The complaint states a claim against Deview based on her conduct after plaintiff had a bloody show on March 20. As with Olagbaiye, plaintiff sufficiently pleads that Deview knew plaintiff had a medical risk and inferred that the risk was substantial. Deview knew plaintiff had been complaining of what she believed were to be contractions for days and, later, that she had her "bloody show," her water broke, her contractions were closer together, and that the baby's head was crowning.

The only remaining question is whether Deview consciously disregarded the risk at any point. When Deview examined plaintiff on March 15 and March 20 in the morning, she did not consciously disregard the risk to plaintiff. Plaintiff alleges that Deview violated her rights by not immediately transferring her to a hospital at these times. (Dkt. 1 at

14, 19.) This was not a delay in adequate medical treatment or inadequate medical treatment. The medical records show that Deview examined plaintiff and ultimately concluded that she was not in labor. She then recommended rest, fluids, and keeping staff updated on her condition. Plaintiff pleads no facts that show this care was cursory such that it was the equivalent of no medical treatment at all. *See Winkler*, 898 F.3d at 892. Even if Deview misdiagnosed plaintiff as not being in labor, it would still be insufficient to show deliberate indifference. *Id.* at 891. Deview may have been negligent or not overly cautious when she did not initiate a hospital transfer on these occasions, but she was not deliberately indifferent.

It is a closer question whether Deview consciously disregarded a substantial risk by failing to contact the hospital or call an ambulance when plaintiff had a bloody show and was left in a medical unit cell, or when her water broke. The question boils down to whether the delay and neglect resulted in plaintiff's labor not being treated within a reasonable timeframe. *See Blackmore*, 390 F.3d at 899. Courts consider the seriousness of the medical need, the effect of the delay, and the reason for the delay. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1189 (11th Cir.

1995)). In *Goebert*, the court found that when the plaintiff's transfer to
the hospital for labor and delivery was delayed, an earlier transfer would
have been successful, there was no reason for a delay, and the transfer
would have reduced the chance of infection, there was deliberate
indifference. *Id.* at 1329.

Here, plaintiff pleads that she had a very serious medical need once
she began to bleed, a transfer would have been successful, the effect of
the delay in calling the ambulance plausibly led to at least some of her
injuries, and there was no reason for the delay in treatment. Plaintiff was
in labor or imminently close to it; her pregnancy was high-risk and late-
term; she was scheduled for a C-section; and her contractions were last
recorded as lasting for one minute and two minutes apart. If Deview had
called an ambulance at 1:30 p.m., it would likely have arrived within ten
minutes based on the ambulance's travel time in the complaint.
Presumably, she would have made it to a hospital an hour before
delivery, though perhaps not before her water broke. Plaintiff may not
have been able to have her planned C-section, but she would have had a
less emergent delivery and avoided the pain and suffering from giving
birth under the conditions she experienced. If Deview had called the
ambulance when plaintiff's water broke, plaintiff still would have made

it to the hospital before delivering her son. Deview therefore unreasonably delayed treatment by not calling an ambulance when plaintiff had a bloody show and when her water broke.

In her response, plaintiff argues that Deview was deliberately indifferent because she did not examine plaintiff's cervix or apply a fetal monitor to assess what stage of labor she was in when she examined plaintiff before placing her in a medical unit cell. (Dkt. 36 at 29–30.) However, plaintiff did not raise this claim in her complaint. Therefore, the Court cannot consider it on the motion to dismiss.

Finally, plaintiff fails to plead an inadequate medical care claim against Deview for permitting Lubanski to assist in plaintiff's labor and delivery. She does not plead any facts that would satisfy the subjective component of the deliberate indifference test. She simply concludes it was deliberate indifference to allow an LPN who had never participated in a delivery to assist. Therefore, her claim against Deview fails here.

### iii.    Bishop

Plaintiff appears to allege several instances where Bishop was deliberately indifferent. First, she examined plaintiff after her screening on March 15 when plaintiff believed her water had broken. Then, Bishop was present while Deview examined plaintiff on March 20 around 7:00

22

a.m. when plaintiff alleges that she was in intense pain and her contractions were becoming more frequent. Bishop was also involved at 1:35 p.m. when plaintiff was brought to the medical unit for the last time and placed in the medical cell alone. Bishop may have been part of the decision to call Dr. Sherman after the baby was crowning. And finally, it appears that Bishop assisted with the birth.

As with Deview, plaintiff successfully pleads that Bishop was deliberately indifferent to plaintiff's serious medical needs after plaintiff had a bloody show. Plaintiff makes sufficient factual allegations that Bishop knew of a substantial medical risk to plaintiff for the same reasons she did so for Deview. As to whether Bishop consciously disregarded this risk, the same analysis set forth above with Deview applies to Bishop after plaintiff arrived at the medical unit bleeding.[8] However, here plaintiff does not claim Bishop examined plaintiff or made the decision that Lubanski could assist with the delivery. Thus, the only

---

[8] Defendant's counsel clarified at oral argument that any time a detainee or prisoner is "down," meaning injured or in a serious medical emergency, any medical staff member could call an ambulance. But plaintiff offered a caveat that here, only a nurse, such as Deview, or doctor, such as Dr. Sherman, would have been permitted to call an ambulance for labor. This, however, is a factual dispute, and the Court infers from the complaint that Bishop and Lubanski were able to call an ambulance.

new question is whether Bishop consciously disregarded a substantial risk to plaintiff before she had a bloody show on March 20.

When Bishop examined plaintiff on March 15 and March 17, and during the morning of March 20, she did not consciously disregard a serious medical risk to plaintiff. On March 15, Bishop treated plaintiff; she found plaintiff was dry and a litmus test she administered did not show that plaintiff's water had broken. And on March 17, she assisted Olagbaiye and helped reach the determination that plaintiff was not in labor or in need of any additional medical treatment. The same is true of her assessment of plaintiff on March 20, when Bishop helped Deview treat plaintiff. This was not a conscious disregard of a substantial medical risk to plaintiff.

### iv.    Lubanski

Lubanski was involved in plaintiff's medical treatment in the following instances on March 20, 2016. At about 12:30 p.m., Lubanski spoke with plaintiff outside of the medical unit and placed a device on her finger. Then, around 1:00 p.m., Lubanski was passing out medications when she learned that plaintiff was bleeding. She did not address plaintiff in any way until about 1:30 p.m. when plaintiff was

24

escorted to the medical unit. Then, Lubanski was involved in placing plaintiff in the medical cell, unmonitored, and the delivery of her baby.

Plaintiff successfully pleads that Lubanski was deliberately indifferent to plaintiff's medical needs at certain times. She pleads that Lubanski knew of a substantial medical risk to plaintiff and consciously disregarded the risk for the same reasons she did so for Deview and Bishop after plaintiff arrived at the medical unit bleeding. The only way in which the analysis differs is that plaintiff does not claim Lubanski examined her in the medical unit at that point, and Lubanski did not participate in the decision that she, herself, could assist with the delivery. Thus, the only new question is whether Lubanski consciously disregarded a substantial risk to plaintiff before she had a bloody show on March 20.

Plaintiff pleads facts that would prove Lubanski also consciously disregarded a substantial risk to plaintiff in two instances before she arrived at the medical unit bleeding. First, at 12:30 p.m. on March 20, Lubanski did not examine plaintiff or admit her to the medical unit when plaintiff stated she was in severe pain. In fact, there is no medical record of this incident. Moreover, in response to plaintiff's complaints of painful contractions, she placed what the Court assumes is a portable pulse

oximeter on her finger. Under the circumstances, this is treatment that is so cursory it amounts to no medical treatment at all. *See Winkler*, 893 F.3d at 892 (citations omitted).

Second, Lubanski also consciously disregarded a substantial risk when she failed to examine plaintiff, send plaintiff to the medical unit, call an ambulance, or even speak with plaintiff when Lubanski knew plaintiff was bleeding while Lubanski was passing out medication. Given Lubanski's knowledge of the late stage of plaintiff's high-risk pregnancy and that plaintiff had been in pain, possibly with contractions, just an hour before, it was reckless not to respond to her serious medical need in any way for thirty minutes. *See id.*

v.      Doctor Sherman

Dr. Sherman was involved in plaintiff's care through three telephone calls. Plaintiff does not allege that he was at the jail when staff called him. First, when plaintiff was taken to the medical unit because she had a bloody show, Dr. Sherman was called. Then, he was called when plaintiff's water broke. During this call, Dr. Sherman ordered the staff to time contractions and call him back with changes. Finally, he was called when plaintiff's child was crowning. In response, Dr. Sherman

26

authorized an ambulance. Plaintiff fails to state a claim against Dr. Sherman as an individual and as a supervisor.

Under an individual liability theory, plaintiff pleads that Dr. Sherman knew of a substantial medical risk to plaintiff. For the same reasons the other defendants knew of a substantial medical risk to plaintiff, Dr. Sherman did as well. However, plaintiff does not state a plausible claim against him in his personal capacity because there are no facts indicating that he consciously disregarded the risk to plaintiff. For the first call, she fails to plead any facts regarding his actions—she merely states that he was called. In response to the second call, Dr. Sherman responded by ordering the staff to time plaintiff's contractions and call him back. At this stage, he was collecting more information before deciding how to treat plaintiff. Dr. Sherman did not know the progress of plaintiff's labor because he did not know the frequency of her contractions, so it was not reckless for him not to call an ambulance at this stage. And finally, Dr. Sherman responded the best way he could to the third call—he authorized an ambulance.

For similar reasons, Dr. Sherman is not liable as a supervisor. He must actively participate in the unconstitutional conduct to be liable as a supervisor under § 1983. *Peatross v. City of Memphis*, 818 F.3d 233,

241–42 (6th Cir. 2016). The supervisor must have "encouraged" or "directly participated" in the misconduct, which requires the plaintiff to show "at a minimum" that defendants "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* at 242 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

Here, plaintiff makes no allegations that Dr. Sherman actively participated in the alleged unconstitutional conduct of Deview, Lubanski, and Bishop. There are no allegations about his conduct during or in response to the first call, so it is impossible to tell from the face of the complaint what he may have done. During the second phone call, Dr. Sherman ordered the staff to call him back with more information so that he could make a decision about plaintiff's care. Unlike in *Peatross*, where the complaint stated that the supervisor knew there had been a series of police officer shootings, that he acknowledged the need for change, and then made no changes, 808 F.3d at 243, there are no such facts here. Dr. Sherman did not acknowledge a problem and then decline to act—he was assessing a problem by attempting to gather more information. And with respect to the third phone call, he ordered the ambulance, which halted the alleged unconstitutional delay in plaintiff's transfer to the hospital.

28

For these reasons, plaintiff's allegations against Dr. Sherman are dismissed.

vi.    Arft and Cueny

Plaintiff fails to state a claim against David Arft and Monica Cueny for supervisory liability. She fails to allege any specific conduct by Arft and Cueny and relies on a *respondeat superior* theory alone, assuming Arft and Cueny are liable for the actions of their subordinates because they are their supervisors. Neither Arft nor Cueny appears in the complaint other than where plaintiff notes they are supervisors and summarily concludes they actively participated in their subordinates' allegedly unconstitutional conducts. (Dkt. 1 at 35–36.) Without any facts about their conduct, plaintiff fails to state supervisory claims against Arft and Cueny. Therefore, the claims against Arft and Cueny are dismissed.\

3.    *Causation and Injury*

Defendants argue that plaintiff cannot prove she suffered harm beyond not giving birth in a hospital or giving birth in sanitary conditions. (Dkt. 27 at 20.) They also state that she does not plead defendants caused her early and rapid delivery. (*Id.*) Plaintiff has alleged

29

harm: emotional pain and suffering,[9] bilateral peri-urethral tears, and delivering her placenta at the hospital an hour after delivery. The Eighth Circuit in *Coleman*, moreover, recognized plaintiff's emotional injury when it found "physical pain and suffering and mental anguish and suffering . . . . [was] a compensable injury under § 1983" in nearly identical circumstances—delivering a baby on the floor of a penal institution. 114 F.3d at 787. Accepting plaintiff's well-pleaded facts as true, defendants' conduct caused her to deliver her son in an emergency birth on the floor of a dirty jail cell, which led to these injuries. Therefore, plaintiff adequately pleads the causation and injury requirements of her § 1983 claims.

### C. Conditions of Confinement Claims

Plaintiff argues that defendants violated her right to humane conditions of confinement when they caused her to give birth in a dirty medical unit cell on a mat on the floor. (Dkt. 1 at 22, 26.) But plaintiff's inhumane conditions of confinement claim is properly construed as part

---

[9] The Court construes plaintiff's mention of her son's treatment, specifically that he was wiped with and swaddled in a dirty blanket, as part of her psychological injuries. To the extent plaintiff argues that her son's rights were violated, she lacks standing to bring that claim, and it is dismissed.

of her inadequate medical care claims. *See, e.g.*, *Johnson v. Lee*, No.: 3:17-cv-00095-CAB-BLM, 2017 U.S. Dist. LEXIS 178719, at *8–10 (S.D. Cal. Oct. 27, 2017) (considering an unsterilized medical instrument as part of an inadequate medical care claim); *Hawkins v. Shapiro*, No. 9:06-CV-1518, 2009 WL 909838, at *5–6 (N.D.N.Y. Apr. 2, 2009) (characterizing the cleanliness of the surgical operating environment as part of an inadequate medical care claim); *cf. Villegas*, 709 F.3d at 570 (describing a typical conditions of confinement claim as "deprivations of 'adequate food, clothing, shelter, [medical care and safety']" (alteration in original) (quoting *Farmer v. Bennan*, 511 U.S. 825, 832 (1994))). However, both claims are premised on deliberate indifference, *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011); *Villegas*, 709 F.3d at 568 (citing *Harrison*, 539 F.3d at 518), and so the framing of this claim has minimal impact on its merits. *See also Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

Regardless of how this claim is construed, plaintiff does not plead any facts that would satisfy the objective and subjective components of the deliberate indifference test. Under the objective component, she makes no allegations that the "dirty cell" was a serious medical risk or presented a serious risk as a condition of confinement. And plaintiff

makes no attempt to plead that defendants knew of any risk from the dirty cell, inferred it was substantial, and then recklessly disregarded it.

### D. Correct Care Solutions

Plaintiff alleges that CCS violated her constitutional rights to adequate medical care and humane conditions of confinement. Here, "'[l]ike a municipality, a government contractor cannot be held liable on a *respondeat superior* theory,' but rather 'for a policy or custom *of that private contractor*.'" *Winkler*, 893 F.3d at 904 (citing and quoting *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005) (emphasis in original)). Regardless of the underlying constitutional violation, a policy or custom can be established if "a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Id.* at 901 (quoting *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)). Under any approach, plaintiff must plead facts that would prove the policy is the "'moving force' behind the violation of the plaintiff's constitutional rights." *Maxwell v. Corr. Med. Servs., Inc.*, 538 F. App'x 682, 691 (6th Cir. 2013) (quoting *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)).

32

Plaintiff's theory of municipal liability is difficult to discern. Although her complaint appears to allege that CCS had unconstitutional official policies for managing "late-term high risk pregnanc[ies]" and communication amongst staff (Dkt. 36 at 31; *see also* Dkt. 1 at 3), at oral argument, plaintiff's counsel stated that plaintiff was not pursuing such a claim. Instead, counsel clarified that plaintiff is only pursuing the failure to train allegation set forth in her complaint. At the same time, counsel appeared to be asking the Court to infer a policy of inaction based on the events in this case and to examine the conduct of Dr. Sherman, Arft, and Cueny as policymakers for CCS. Plaintiff fails to state a claim against CCS under all of these theories.

## 1.    *Official Policies*

If plaintiff is pursuing an official policy claim, she must plead that a policy is facially unconstitutional or facts that indicate the government contractor acted pursuant to those policies "with 'deliberate indifference' as to its known or obvious consequences." *Winkler*, 893 F.3d at 901–02. The complaint here contains only legal conclusions. Plaintiff does not plead any facts that indicate these official policies exist, what the policies

are, or that CCS knew of the constitutional deficiencies and deliberately disregarded the known or obvious consequences.

### 2. *Custom of Acquiescence or Inaction*

To plead that there is a custom of acquiescence or inaction, plaintiff must allege

> (1) "a clear and persistent" pattern of unconstitutional conduct by [ ] employees; (2) the [government contractor's] "notice or constructive notice" of the unconstitutional conduct; (3) the [government contractor's] "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction'; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the [government contractor's] rather than simply by the conduct of the [ ] employee.

*D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014) (quoting *Doe v. Claiborne Cty.*, 103 F.3d 496, 508 (6th Cir. 1996)) (some alterations in original). Plaintiff does not allege facts that would satisfy these elements.

First, plaintiff does not plead a clear and consistent pattern of unconstitutional conduct. Although she argues that each isolated occurrence during her detention is a part of a pattern, her detention is considered a "single instance," not a pattern of alleged unconstitutional conduct. *Gregory v. City of Louisville*, 444 F.3d 725, 763 (6th Cir. 2006).

34

As to the second and third elements, plaintiff again fails to plead that CCS had any knowledge of the alleged inadequate medical treatment or that it tacitly approved of such conduct. There is nothing in the complaint that would permit a reasonable inference that CCS knew of the constitutional violations and then tacitly approved of them by failing to act.

Finally, plaintiff provides no facts that indicate a policy or custom of inaction was the moving force behind the violations of her rights. She only states that "[a]s a direct and proximate result . . . Preston experienced [various harms]." (Dkt. 1 at 38.) This allegation is conclusory. Plaintiff fails to state a claim that CCS had a custom of acquiesce or inaction.

### 3.    *Failure to Train or Supervise*

Plaintiff must plead facts that would "prove . . . (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the [government contractor's] deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Deliberate indifference can be shown "where the [government contractor] fails to act

in response to repeated complaints of constitutional violations by its [employees]," *id.* at 903 (quoting *Ellis*, 455 F.3d at 700–01), or through "a single violation of federal rights, accompanied by a showing that [the government] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation," *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). Plaintiff fails to plead facts that would prove the first and third elements. She does not plead what training CCS provided or how it was inadequate, nor does she assert what training would be adequate. As to causation, plaintiff only offers legal conclusions.

Plaintiff also fails to plead deliberate indifference. First, the complaint does not indicate that CCS knew of any other complaints of constitutional violations, much less that they failed to act. Moreover, she fails to plead deliberate indifference through single-incident liability. Instead, plaintiff only offers a bare legal assertion that the alleged constitutional violations she suffered were the obvious and predictable consequence of a failure to train.[10] In contrast, the Sixth Circuit in

---

[10] The Court understands the information asymmetry between plaintiff and defendants, and how this can make it difficult to determine whether policies exist and

*Shadrick* found single incident liability where the plaintiff explained that the basic training of an LPN was necessarily deficient such that an LPN could not meet his or her constitutional obligations. 805 F.3d at 42–43. Plaintiff does not allege what the basic training of the LPNs, RNs, or nurse practitioners in this case was or that they did not receive training such that a predictable and obvious consequences would be the violation of constitutional rights, i.e. something more than medical malpractice. *See Winkler*, 893 F.3d at 903.

### 4. *Policymakers*

To the extent plaintiff alleges that Dr. Sherman, Arft, and Cueny were policymakers with final decision-making authority who failed to train employees, this claim fails for similar reasons as the failure to train claim against CCS directly. To succeed under this theory,

> plaintiff must establish that the [entity], through its policymakers, failed to train or supervise employees despite: 1) having actual or constructive knowledge of a pattern of similar constitutional violations by untrained employees; or

---

what they are. However, the Sixth Circuit provides two avenues for plaintiffs to pursue that permit a court to draw the reasonable inference that a policy or custom of a failure to train exists, which are discussed here: repeated reports of constitutional violations and a single-incident where the constitutional violation is a highly predictable and obvious result of a failure to train. *See Winkler*, 893 F.3d at 903. Moreover, plaintiff need only plead a *plausible* claim, not prove that a policy of a failure to train exists at the pleading stage. *See Iqbal*, 556 U.S. at 678. Critically, the Sixth Circuit has affirmed that *Monell* claims are subject to the same pleading standard. *Bailey v. City of Ann Arbor*, 860 F.3d 382, 388–89 (6th Cir. 2017).

2) the fact that the constitutional violation alleged was a patently obvious and 'highly predictable consequence' of inadequate training.

*Essex v. Cty. of Livingston*, 518 F. App'x 351, 355–56 (6th Cir. 2013) (citations omitted). Plaintiff's focus on policymakers does not change the outcome of her failure to train claim because she still fails to plead the essential elements. Plaintiff never alleges what knowledge Arft, Cueny, and Dr. Sherman had regarding a pattern of constitutional violations or a single constitutional violation, nor does she plead anything more than legal conclusions regarding causation. Therefore, plaintiff has failed to state a claim that would render CCS liable for the alleged constitutional violations.

## IV.   <u>Conclusion</u>

For the reasons set forth above, plaintiff fails to state a plausible claim against CCS, Dr. Sherman, Arft, Cueny, and Olagbaiye. However, she states a claim for inadequate medical care against Deview and Bishop after plaintiff she arrived at the medical unit bleeding and against Lubanski after she saw plaintiff at noon on March 20.

Accordingly, defendants' motion to dismiss is **GRANTED IN PART** as to CCS, Sherman, Arft, Cueny, and Olagbaiye, and they are

dismissed. Defendant's motion to dismiss is **DENIED IN PART** as to

Deview, Bishop, and Lubanski.

IT IS SO ORDERED.

Dated: February 19, 2019            s/Judith E. Levy
Ann Arbor, Michigan                 JUDITH E. LEVY
                                    United States District Judge

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 19, 2019.

                                    s/Kristen C. MacKay on behalf of
                                    SHAWNA BURNS
                                    Case Manager