# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Jessica Lynn Preston,

               Plaintiff,

v.

County of Macomb, Sheriff Anthony M. Wickersham, Correct Care Solutions, LLC, Lawrence Sherman, David Arft, Temitipe Olagbaiye, Monica Cueny, Cynthia Deview, Amanda Bishop, Jaclyn Lubanski, and Jeffrey Rattray,

               Defendants.

Case No. 18-12158

Judith E. Levy
United States District Judge

Mag. Judge Mona K. Majzoub

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION SEEKING LEAVE TO AMEND COMPLAINT [46]

This is a civil rights case about a pretrial detainee's right to adequate medical care. Plaintiff Jessica Lynn Preston alleges that defendants were deliberately indifferent to her serious medical needs during the labor and delivery of her son while she was in detention at the Macomb County Jail. Preston originally brought her claims against defendants Macomb County, Sheriff Anthony M. Wickersham,

Corrections Officer ("CO") Jeffrey Rattray, Correct Care Solutions, LLC ("CCS"), which is Macomb County's medical care contractor, and its employees Dr. Lawrence Sherman, David Arft, Temitipe Olagbaiye, Monica Cueny, Cynthia Deview, Amanda Bishop, and Jaclyn Lubanski. All defendants except Deview, Bishop, Lubanski, and Macomb County were dismissed due to earlier motions to dismiss and by stipulation of the parties. Now before the Court is Preston's motion seeking leave to amend her complaint to bring CCS and Dr. Sherman back into this litigation, add CO Holmes and John Doe COs, and expand upon her earlier allegations against Deview, Bishop, Lubanski, and Macomb County.

## I.    Background

### A. March 15, 2016 to March 20, 2016

On March 15, 2016, Preston was arrested for driving on a suspended license, and a state district judge ordered her to be detained at the Macomb County Jail, despite the fact that she was eight months pregnant.[1] (ECF No. 46-1, PageID.558–59.) At 5:00 p.m. that day, she was medically screened by defendant Cynthia Deview, a registered

---

[1] At the hearing on January 14, 2019, Preston's attorney clarified that the state judge inexplicably set her bail at $10,000, even though this was her first offense. Because Preston was unable to afford bond, she was ordered detained until the hearing on her suspended-license charge.

nurse. (*Id.* at PageID.558.) Deview noted that Preston used heroin daily, had been treated for substance abuse previously, and was eight months pregnant. (*Id.* at PageID.558–59.) Deview designated Preston's pregnancy as a "Supplementary Normal Pregnancy" and "Acute" medical condition. (*Id.*) Preston's pregnancy was "high risk" because she had placentae abruption during her previous pregnancy, which required a C-section. (*Id.* at PageID.560.) For this pregnancy, she was scheduled for a C-section just over a month later on April 26, 2016, at a local hospital. (*Id.*) Preston was placed in the general population. (*Id.* at PageID.559.)

Around 6:00 p.m., Preston believed she was having contractions that were lasting for one minute. (*Id.*) Deview and another registered nurse, Monica Franks, examined her in the medical unit. (*Id.*) Franks documented that Preston's contractions lasted for fifteen to thirty seconds. (*Id.*) Ultimately, Deview and Franks determined that Preston was not having contractions and did not need further medical attention. (ECF No. 39, PageID.434.)[2] Deview recommended that she "drink fluids and report to a nurse if contractions changed." (*Id.*)

---

[2] Preston did not object to the Court considering her medical records at the motion to dismiss stage (ECF No. 42, PageID.454 & n.4), and so the Court considers them here.

An hour and a half later, Preston thought her water broke. (*Id.* at PageID.343–44.) Defendant Amanda Bishop, a Licensed Practical Nurse ("LPN"), examined her in the medical unit. (ECF No. 46-1, PageID.559–60.) Bishop found no amniotic fluid, and a litmus test confirmed there was none. (*Id.* at PageID.560.) Bishop determined that Preston's water had not broken, and Preston was sent back to her cell in the general population "without difficulty" and "appeared to be in no distress." (ECF No. 39, PageID.433.)

Two uneventful days passed. Then, on March 17, 2016, Temitipe Olagbaiye, a nurse practitioner, examined Preston with Bishop present. (ECF No. 46-1, PageID.560.) Plaintiff had "ongoing whitish vaginal discharge" and what Olagbaiye diagnosed as "abnormal false contraction[s]." (ECF No. 39, PageID.364.) He noted that Preston had been feeling "adequate" "fetal kick." (*Id.*) Olagbaiye also recorded that Preston's urinalysis was not positive for opiates at the time of her incarceration. (*Id.*) Olagbaiye created what plaintiff calls a "treatment plan," which stated: "[p]atient pregnancy will be uneventful while in incarceration 'till delivery." (ECF No. 46-1, PageID.560–61. (quotations in original).)

4

## B. March 20, 2016

Three days later, on March 20, 2016, at 6:45 a.m., Preston used a medical emergency intercom to request that she be taken to the medical unit. (*Id.* at PageID.561–62.) Bishop and Deview examined her between 7:07 a.m. and 7:25 a.m. (*Id.* at PageID.562.) She told Bishop and Deview "that her pain was intense and the time between her contractions was decreasing." (*Id.*) Deview told Preston "that she was not impressed with Plaintiff's contractions" and sent her back to her cell. (*Id.*) Deview determined that Preston was not having contractions because her abdomen was not tightening, her skin was "warm and dry," and she was not visibly in pain. (*See* ECF No. 39, PageID.416.)

From when Preston was escorted back to her cell at 7:30 a.m. until noon, she alleges that she remained "in severe pain" and continued to have contractions that were lasting longer and occurring more frequently. (ECF No. 46-1, PageID.563.) Around noon, she requested via intercom that she be examined "by a physician or be sent to the hospital." (*Id.*) During this time, Preston was not actively monitored or supervised by medical staff. (*Id.*) At 12:20 p.m., a John Doe CO escorted her to the medical unit. (*Id.*)

Defendant Jaclyn Lubanski, an LPN, sat with Preston outside of the medical unit while she described her intensifying pain and more intense and frequent contractions. (*Id.* at PageID.564.) Lubanski did not bring Preston inside the medical unit or examine her in any manner except for putting a medical device, likely a pulse oximeter, on her finger. (*Id.*) Bishop was also present. (*Id.*) She did not examine Preston either, but said "that she was 'not impressed' with Plaintiff's contractions" and told her to stop making false medical complaints, otherwise she could be charged for doing so. (*Id.* (quotations in original).) Bishop also warned Preston that she could be reprimanded for making false complaints if she came down to the medical unit again claiming to be in labor. (*Id.*) This interaction lasted fourteen minutes. (*Id.*) A John Doe CO escorted Preston back to her cell at 12:35 p.m. (*Id.*) The CO warned her to "knock her shit off or they wouldn't believe her if something really happened." (*Id.* at PageID.564–65.)

At 1:00 p.m., Preston's pain level became "a ten . . . out of ten. . ." and she had "intense" vaginal bleeding. (*Id.* at PageID.565.) Preston used the medical emergency intercom to tell the medical control tower that she was bleeding and to request that she be taken to the hospital. (*Id.*) At the

same time, Lubanski and a second John Doe CO were in Preston's unit passing out medications, and she told them she was bleeding and asked to be taken to the hospital. (*Id.*) She also showed them a bloody tissue that she had used as a sanitary pad. (*Id.*) The CO told her, "sit your ass down" because "they [are] not ready to deal with [you] now." (*Id.*)

For the next thirty minutes, Preston's contractions intensified, her pain worsened, and her bleeding continued. (*Id.* at PageID.566.) After Lubanski and the John Doe CO finished passing out medications, the CO told her to "pack up all of your shit because you're going to be housed in medical." (*Id.*) Then CO Holmes escorted her to the medical unit. (*Id.*) During this time, Preston told Holmes that she was in great pain and her bleeding was getting worse. (*Id.*)

At 1:30 p.m., Preston arrived in the medical unit. (*Id.*) Deview looked at Preston and saw that she had blood covering her upper thighs and determined that Preston was having her "bloody show."[3] (*Id.* at PageID.566–67.) She or another nurse made a telephone call to Dr. Lawrence Sherman, the Chief Medical Director of Macomb County Jail,

---

[3] A "bloody show" is a medical term for when the mother passes the cervical mucus plug and it is one of the signs that labor is imminent. *See* Christine Stewart, MD & Betty Brutman, MD, JD, 9 Attorney's Medical Advisor § 14:143, Westlaw (database updated Sept. 2018).

to notify him of this development. (*Id.* at PageID.10, PageID.566–67.) Dr. Sherman took no action and provided no instructions to the nurses. (*Id.* at PageID.567.) Again, Preston told Bishop and Deview that she needed to be taken to the hospital. (*Id.*) Deview told her: "[W]e will not allow your baby to be born in the jail." (*Id.*) The nurses put Preston in a medical unit cell that had not been cleaned after another inmate occupied it. (*Id.*) Between 1:35 p.m. and 1:56 p.m., she was left unmonitored in the cell. (*Id.* at PageID.567–68.)

Then, Preston's labor accelerated. She felt extreme pressure, and her bleeding worsened. (*Id.* at PageID.568.) At 1:58 p.m., her water broke, and she yelled for assistance. (*Id.*) Deview entered the cell to assist her. (*Id.*) One of the three nurses called Dr. Sherman to tell him that Preston's water had broken and that she was still bleeding. (*Id.*) Dr. Sherman ordered the nurses to time her contractions and call him back. (*Id.* at PageID.569.) Deview timed Preston's contractions, which were one minute long and two minutes apart. (ECF No. 39, PageID.408.) Nothing in the record indicates that Deview, Bishop, or Lubanski called Dr. Sherman back or that Dr. Sherman called them for a report on Preston's labor.

At 2:25 p.m., Deview saw the child's head crowning. (ECF No. 46-1, PageID.569.) Two minutes later, either Deview, Bishop, or Lubanski called Dr. Sherman, and he called for an ambulance.[4] (*Id.*) An ambulance arrived at 2:35 p.m., but emergency personnel would not transport Preston to the hospital (*id.* at PageID.569–70), presumably because she was too close to delivery. At some point, Preston was moved to the floor of the cell, and her son was born at 2:40 p.m. on a floor mat. (*Id.* at PageID.569; ECF No. 39, PageID.408.) Based on her medical records, it appears that Preston was sent back to Macomb County as early as three days after the birth of her son and that she remained detained there until at least May 28, 2016. (ECF No. 39-, PageID.369, 371-78.)

Preston alleges that defendants violated her Fourteenth Amendment due process rights. (ECF No. 46-1, PageID.588–92.) She claims that the individual defendants were deliberately indifferent to her serious medical needs, and that Dr. Sherman, as a supervisor, violated her rights. (*Id.* at PageID.589, PageID.591.) She also argues that Macomb County and CCS are liable for maintaining unconstitutional

---

[4] At the hearing on the motion to dismiss, CCS's counsel clarified that any CCS or Macomb personnel can call an ambulance when an inmate is in obvious distress.

policies that caused plaintiff's constitutional rights to be violated by the individual defendants. (*Id.* at PageID.588–89.) Preston claims that defendants' actions led to her physical injuries, "pain, panic, and emotional distress" (*id.* at PageID.592), including delivering her placenta at the hospital over an hour after her son was born, and bilateral peri-urethral tears. (*Id.* at PageID.575.) Preston states that to this day she suffers from nightmares and emotional pain caused by the events surrounding her labor and delivery. (*Id.*)

## C. Procedural History

Earlier in the litigation, Macomb County filed an answer (ECF No. 13), the parties agreed to dismiss CO Jeffrey Rattray for mistaken identity (ECF No. 33), and Sheriff Wickersham was dismissed (ECF No. 41). CCS and its employees filed a motion to dismiss, which was granted in part and denied in part. (ECF No. 42.) The Court dismissed all but Deview, Bishop, and Lubanski. (*Id.* at PageID.483–84.) The Court determined that Preston had stated a claim of deliberate indifference to her right to adequate medical care against Deview, Bishop, and Lubanski. (*Id.* at PageID.463–71.)

Now, Preston seeks to reinvigorate her claims against Dr. Sherman and CCS, add CO Holmes and John Doe COs as parties, and add allegations against the defendant nurses and Macomb County. (ECF No. 46, PageID.523–28.) Macomb County opposes her proposed amendments regarding CO Holmes, but is silent as to the John Doe COs and Macomb County itself. (ECF No. 48.) CCS defendants oppose her amendments as to Dr. Sherman and CCS on the grounds that such amendments are futile or fail to satisfy Federal Rule of Civil Procedure 8 and that they should be stricken under Federal Rule of Civil Procedure 12(f). (ECF No. 51.) They also move for a more definite statement under Rule 12(e). (*Id.*)

## II.    Legal Standard

A party seeking to amend a claim, when such an amendment would not be permitted as a matter of course, "may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave should be denied where the amendment demonstrates defects "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

the amendment, futility of amendment, etc." *Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Parchman v. SLM Corp.*, 896 F.3d 728, 738 (6th Cir. 2018) (quoting *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017)).

When deciding a motion to dismiss under Federal Rule of Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff's claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, "to survive a motion to

dismiss, the 'complaint must contain . . . allegations respecting all material elements to sustain a recovery under some viable legal theory.'" *Bishop v. Lucent Tech.*, 520 F.3d 516, 519 (6th Cir. 2006) (quoting *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005.))

## III. Analysis

In her proposed amended complaint, Preston pursues claims for inadequate medical care under 42 U.S.C. § 1983. To succeed, she must establish "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing cases). It is undisputed that CCS and its employees were acting under color of state law. *See Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018). The only issue is whether defendants violated Preston's right to adequate medical care under the Fourteenth Amendment.

Preston offers amendments that address the individual liability of Deview, Bishop, Lubanski, Dr. Sherman, CO Holmes, and the John Doe COs; supervisory liability of Dr. Sherman; and *Monell* liability of CCS and Macomb County. She states a claim against all but the COs as

individuals and Dr. Sherman as a supervisor in her proposed amended complaint.

## A. Individual Liability

Preston seeks to add factual allegations against Deview, Bishop, and Lubanski, add defendant COs to the litigation, and bring Dr. Sherman back into the litigation as an individual because they were deliberately indifferent to her right to adequate medical care. Deliberate indifference claims based on inadequate medical care brought by pretrial detainees, although brought under the Fourteenth Amendment, "are analyzed under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 566, 568 (6th Cir. 2013). "Deliberate indifference 'is a stringent standard of fault[.]'" *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). A defendant's "deliberate indifference violates these rights '[w]hen the indifference is manifested by . . . [the defendants] intentionally denying or delaying access to medical care [ ]' for a serious medical need." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate

indifference claims have two components: objective and subjective.[5]
*Villegas*, 709 F.3d at 568 (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th
Cir. 2008)).

The objective component "requires that the deprivation alleged be
of a sufficiently serious [medical] need." *Darrah v. Krisher*, 865 F.3d 361,
367 (6th Cir. 2017) (citing *Farmer v. Brennan*, 511 U.S. 294, 297 (1994)).
A serious medical need is "one 'that has been diagnosed by a physician as
mandating treatment or one that is so obvious that even a lay person
would easily recognize the necessity for a doctor's attention.'" *Jones v.*

---

[5] The parties filed supplemental briefs addressing whether a pretrial detainee's inadequate medical care claim under the Fourteenth Amendment should be governed by the two-component deliberate indifference test under the Eighth Amendment for the same claims brought by prisoners. Preston asks the Court to apply an objective reasonableness standard, removing the subjective component, asking: whether the "defendants 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or *should have known*, that the condition posed an excessive risk to health or safety.'" *Love v. Franklin Cty.*, No. 3:18-cv-00023, 2019 U.S. Dist. LEXIS 51190, at *14 (E.D. Ky. Mar. 27, 2019) (emphasis added) (quoting *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018)) (considering *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)). The Court need not decide this issue because it has no impact on the outcome for the only individual defendants against whom Preston fails to state a claim—the COs. Although the claims against the COs falter at the subjective component, Preston pleads that the CO defendants knew all that reasonable COs should have known. The only question, then, is whether defendants' conduct demonstrates recklessness given that knowledge. Because the COs knew all they should have here, the recklessness inquiry is the same under either approach. This determination does not foreclose Preston from raising this argument again later.

*Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (quoting *Harrison*, 539 F.3d at 518).

Under the subjective component, a plaintiff must plead facts that if true would prove a defendant acted with "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing cases). The subjective component "must be addressed for each [defendant] individually." *Phillips v. Roane Cty.*, 534 F.3d 531, 542 (6th Cir. 2008) (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)). A plaintiff satisfies the subjective component if she pleads that the defendant "(1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Jones*, 625 F.3d at 941 (citing cases).

As to the second prong of the subjective component, a plaintiff can plead that an official "had the requisite knowledge of a substantial risk"

based on inferences from circumstantial evidence or "from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (internal citations and quotations omitted). Courts also consider "the expected level of knowledge of the particular official." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 484 (6th Cir. 2014) (citing cases).

And as to the third prong, a plaintiff must plead that the defendant consciously disregarded the risk to the plaintiff. A plaintiff does not need to plead that a "defendant acted with the very purpose of causing harm[.] The standard . . . has generally been equated with . . . 'recklessness.'" *Winkler*, 893 F.3d at 891 (citations omitted) (quoting *Farmer*, 511 U.S. at 842). Courts are "deferential to the judgment of medical professionals," *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018), and so mere negligence, or medical malpractice, is insufficient. *Winkler*, 893 F.3d at 892 (citing cases). This includes misdiagnosis. *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 447 (quoting *Comstock*, 273 F.3d at 703). Similarly, "a desire for additional or different treatment," *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Anthony v. Swanson*, 701 F. App'x 460,

464 (6th Cir. 2017)), or a delay without more will not suffice for deliberate indifference, *Santiago v. Ringle*, 734 F.3d 585, 593 (6th Cir. 2013).

However, "a complete denial of medical care" or "inadequate medical treatment" will demonstrate conscious disregard. *Rhinehart*, 894 F.3d at 740 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). Inadequate care is care that is "so cursory as to amount to no treatment at all." *Terrance*, 286 F.3d at 843–44 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)). Medical staff "has a duty to do more than simply provide *some* medical treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).

In her proposed amended complaint, Preston rectifies many, though not all, of the deficiencies the Court identified in her operative complaint regarding individual liability. Her amendments as to Deview, Bishop, Lubanski, and Dr. Sherman are not futile, but her amendments as to CO Holmes and the John Doe COs are because she fails to state a claim against them for the reasons set forth below.

### i. Deview

In her proposed amended complaint, Preston alleges that Deview failed to examine her cervix and apply a fetal monitor when Preston came to the medical unit bleeding and that Deview delayed her transfer to the hospital on March 20. (ECF No. 46-1, PageID.567–568, PageID.575–77.) These amendments will be allowed because they further support what the Court already held—Preston successfully states a claim of inadequate medical care against Deview.

As before, the objective prong is satisfied under the obviousness standard. Even a lay person without medical training would know that a late-term, high-risk pregnant woman with symptoms of labor, escalating from contractions, pain, and bleeding, to water breaking and crowning, requires a doctor's attention.[6] (*See* ECF No. 42, PageID.456–60.)

---

[6] In its brief opposing amendments as to CO Holmes, Macomb County argues that because Preston was receiving "ongoing treatment" she does not satisfy the objective component (ECF No. 48, PageID.612–13), but this argument is inapplicable. Where a plaintiff is receiving ongoing treatment for a latent or minor health complaint, she must plead that the treatment given was inadequate, the desired treatment was necessary, and the delay in the desired treatment was harmful. *Santiago*, 734 F.3d at 590–91; *see also Rhinehart*, 894 F.3d at 737–38. This is far from the situation Preston faced, and she adequately pleads that her medical need was obvious.

Preston also continues to satisfy the subjective prong as to Deview. Nothing that Preston pleads changes the Court's earlier determination that Deview knew Preston's pregnancy was late-term and high-risk, that Preston was scheduled for a C-section and that Preston was exhibiting various symptoms of labor for the last five days, including two new, obvious symptoms—a bloody show, and later, water breaking—or that Deview would have inferred that the risk to Preston was substantial given Deview's medical training. Preston's proposed amendments further qualify how Deview consciously disregarded the risk by rendering constitutionally deficient medical care.

The CCS defendants argue that Preston's amended allegations specifying how the care Deview gave Preston was constitutionally deficient should be struck as redundant (*see* ECF No. 51, PageID.702–03), but these amendments are proper. Under the subjective component, a delay in adequate treatment of an objectively serious medical need amounts to a constitutional violation itself. *Darrah*, 865 F.3d at 368–69; *see also Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (emphasis added) (quoting *Blackmore*, 390 F.3d at 899) (distinguishing between the role of a delay in treatment under the

objective component as to latent medical needs and under the subjective component). Preston pleads not only that she was denied access to timely adequate medical treatment, she also pleads that she received inadequate medical treatment until Dr. Sherman called for an ambulance.

Preston can succeed in pleading a delay in adequate treatment, such as calling an ambulance, because she pleads that Deview only rendered constitutionally inadequate care beforehand. When Preston first came to the medical unit bleeding, Deview at best visually examined Preston, determined that Preston was having her bloody show, called Dr. Sherman, and then took no further action other than placing Preston in a medical unit cell. Despite observing an unmistakable sign of labor in a late-term, high-risk pregnancy where a surgical delivery was planned, Deview did not assess Preston's labor in any meaningful way, such as by applying a fetal monitor or examining Preston's cervix. Preston plausibly pleads that Deview was reckless when she failed to meaningfully assess Preston's labor given her medical training and subjective knowledge about Preston's medical history at the jail and her specific pregnancy. In

the light most favorable to Preston, Deview's conduct amounts to treatment that was so inadequate that it was no treatment at all.

The same analysis applies to Deview's conduct when Preston's water broke. Even in the face of a second symptom of imminent labor, Deview still did not physically examine Preston or use a fetal monitor to check Preston's baby. Even though she had plenty of time to measure Preston's contractions,[7] she did not call Dr. Sherman back or make her own medical assessment based on her timing of the contractions. Timing contractions is a useless exercise unless it is used as a diagnostic tool for a medical professional to make an assessment based on the timing. It therefore amounts to no medical care at all. For these reasons, Preston's proposed amendments are not redundant because they state a plausible claim against Deview for deliberate indifference based on inadequate medical care as well as delaying adequate medical care.

### ii. Bishop and Lubanski

Preston's additional factual allegations as to Bishop and Lubanski are not futile. She alleges that Bishop took no action when Preston came

---

[7] Preston alleges that the timing of one cycle of her contractions was three minutes, meaning that prior to Preston's son crowning, Deview timed at least eight full contractions.

to the medical unit around 12:20 p.m. and that she did not call an ambulance at 2:00 p.m. when Preston's water broke. (ECF No. 46-1 at PageID.557, PageID.564, PageID.567–68, PageID.575–79.) And Preston adds that Lubanski did not examine her cervix, apply a fetal monitor, or call an ambulance at 12:20 p.m. when Lubanski applied the pulse oximeter and at 1:00 p.m. when Lubanski was passing out medications. (*Id.* at PageID.564–66, PageID.575–79.) Because Preston has already stated a claim of deliberate indifference against Bishop and Lubanski, these amendments are not futile; rather, they add more detail to support her claims in terms of when and how the LPNs were deliberately indifferent. Therefore, the amendments as to Bishop are not futile and will be permitted.

### iii.  *CO Holmes and John Doe COs*

In her proposed amended complaint, Preston replaces CO Rattray with CO Holmes, who escorted Preston from her cell to the medical unit on March 20 from 1:30 p.m. to 2:00 p.m., and adds two John Doe COs, one who escorted her to and from the medical unit beginning at 12:20 p.m. and one who was present while Lubanski was passing out

medications on March 20 at 1:00 p.m.[8] Preston claims they were deliberately indifferent to her serious medical needs because they unreasonably relied upon CCS personnel's medical decisions. (ECF No. 46-1, PageID.577–79.) She fails to state a claim as to the three COs because they are entitled to qualified immunity.

Corrections officers may be entitled to qualified immunity, *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that "government officials performing discretionary functions[ ] generally are shielded from liability for civil damages"). Once a defendant officer asserts qualified immunity, the plaintiff must shoulder the burden to show that the defendant is not qualified to assert that defense. *Rafferty v. Trumbull Cty.*, 915 F.3d 1087, 1093 (6th Cir. 2019) (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)). To do so, a plaintiff must plead facts that show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (6th Cir. 2011)).

---

[8] To the extent Preston seeks to add other John Doe COs besides these two, her proposed amended complaint fails to state a claim as to any other John Doe COs because she does not plead how any other COs were involved.

The underlying constitutional right that Preston alleges the officers violated was her right to adequate medical care, which she claims they violated through their deliberate indifference. Because her complaint regarding the COs does not satisfy the subjective component of the deliberate indifference test, she fails to plead that the COs violated her constitutional right to adequate medical care.

As before, only the subjective component is at issue. Preston alleges that Holmes and the John Doe COs were deliberately indifferent when they unreasonably deferred to the medical opinions of the individual CCS defendants. Correctional officers are generally entitled to rely upon medical staff's medical assessments. *Winkler*, 894 F.3d at 895 (citing *McGaw v. Sevier Cty.*, 715 F. App'x 495, 498 (6th Cir. 2017); *see also Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009). In other words, "an officer does not act with subjective deliberate indifference when he does not override a medical recommendation that he reasonably believes to be appropriate, even if in retrospect that recommendation was inappropriate." *McGaw*, 715 F. App'x at 498 (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not

treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eight Amendment scienter requirement of deliberate indifference." *Id.* (same).

Although Preston pleads that Holmes and the John Doe COs knew of facts from which they could infer a substantial risk of harm to her, she fails to plead that they unreasonably deferred to the decisions of CCS staff. Preston argues that the COs knew of the denial of medical care by CCS staff and that they knew Preston required different treatment based on the obviousness of her medical condition and that this is a reason they should have doubted the CCS defendants' medical decisions. (ECF No. 46, PageID.529.) These are arguments are unpersuasive.

First, Preston alleges that the COs knew Preston was receiving inadequate treatment (ECF No. 46-1, PageID.578), but her pleadings are conclusory. Although it is a fair inference that the COs knew Preston had been in and out of the medical unit for several days in March 2016, she does not plead that the COs were present in the medical unit with Preston, *see Colson v. City of Alcoa*, No. 3:16-CV-377, 2018 WL 1512946, at *12 (E.D. Tenn. Mar. 26, 2017) (holding what an officer observed while present in an exam room gave her reason to know that the nurse's

treatment was inappropriate); that they had spoken to CCS staff about Preston; that COs at Macomb County Jail read detainees' medical records; or that they otherwise knew of the particularities of her pregnancy. Therefore, Preston does not plead that the COs had any reason to doubt the medical treatment of the CCS defendants based on the treatment they were aware of.

Second, Preston fails to plead facts that show that a CO would have reason to think that the CCS defendants' decision to send Preston to the medical unit at 12:20 p.m., Lubanski's decision to wait to send Preston to the medical unit at 1:00 pm., or Lubanski's decision to send her to the medical unit at 1:30 p.m. rather than calling an ambulance, was inadequate because of the obviousness of Preston's distress. Although the CCS defendants were deliberately indifferent given their medical training and knowledge of Preston's high-risk pregnancy and her symptoms of labor over the previous days, Preston does not plead that the COs had any comparable training or knowledge that would inform their lay observation of Preston's condition at any stage.

At 12:20 p.m., Preston was in pain, but she was not bleeding. It is not plausible that the non-medically trained John Doe CO had a reason

to think that taking Preston to the medical unit was inadequate. Even in the light most favorable to Preston, the John Doe CO only knew that she was in a later stage of a presumably normal pregnancy and that she was possibly beginning to go into labor. However, there is no indication that the CO knew anything about Preston's condition that would make it unreasonable to defer to the CCS defendants' determination to send her to the medical unit—presumably to receive treatment—and not override it by calling an ambulance himself. The CO surely knew of a substantial risk to Preston based on her possible labor symptoms, but Preston does not plead that the CO knew about any aggravating factors, such as that her pregnancy was high-risk, that would give the CO a reason to believe the decision to send her to the medical unit was inappropriate.

The same is true of the second John Doe CO at 1:00 p.m. who deferred to Lubanski's decision not to immediately assess Preston. This is a close call, but Preston must plead facts that would prove a non-medically trained CO was unreasonable when he did not override Lubanski's decision based only on Preston's observable condition. At that point, the CO knew that she was in pain, bleeding onto a tissue, and was in a later stage of her pregnancy. But Preston does not plead that the CO

knew her pregnancy was high-risk or that she was scheduled for a C-section. Based on her proposed amended complaint, the CO knew that Preston was responsive, she was able to speak via intercom to the medical unit, and Lubanski was nearby passing out medications. Preston cannot conflate the CO's deliberate indifference with Lubanski's because they do not, and there is no indication that they should, share the same training and knowledge. Accordingly, it is not plausible that the CO unreasonably deferred to a medical professional's determination when he did not call an ambulance instead.

Finally, the same reasoning applies to the second John Doe and CO Holmes when Preston was transferred to the medical unit around 1:30 p.m. At this point, it is a fair inference that Preston is bleeding more heavily and in greater pain based on the state Deview found her in when she arrived at the medical unit. But Preston does not plausibly plead that nonmedically trained COs had reason to believe sending Preston to the medical unit at this stage was inappropriate based on the obviousness of her condition, or that her state was so dire that a layperson would believe that calling an ambulance was the only non-reckless decision. Although she was in pain and bleeding, Preston was conscious, able to walk, and

able to lift her belongs unassisted. And although Preston verbalized her distress, the COs knew that she was on her way to the medical unit—and Preston has failed to plead that the COs knew she would not receive adequate treatment at the medical unit. Therefore, she does not successfully allege that the non-medically trained COs unreasonably relied upon an inappropriate medical determination.

For these reasons, Preston fails to plead that the COs violated her right to adequate medical care, and so the Court need not discuss whether the right is clearly established. The COs are entitled to qualified immunity and so Preston's proposed amendments are futile.[9]

### iv. Dr. Sherman (Individual Capacity)

Preston argues that her proposed amended complaint is adequate to bring Dr. Sherman back into the litigation as an individual. (ECF No. 46, PageID.525.) Preston newly alleges that Dr. Sherman took no action

---

[9] Preston makes a relation-back argument under Federal Rule of Civil Rule 15(c)(1), but it is unclear why. The statute of limitations is three years for her claims. *Havard v. Puntuer*, 600 F. Supp. 2d 845, 856 (E.D. Mich. 2009). Thus, she had until March 20, 2019, to amend her complaint without facing relation back issues, and Preston filed this motion and amended complaint on March 11, 2019. If she was anticipating issues with naming the John Doe COs in a second proposed amended complaint, the issue is moot. *See generally Renier v. Canale*, 301 F. Supp. 3d 727, 738 (E.D. Mich. 2018) (noting the lack of clarity of the relation back of previously unnamed John Doe defendants).

in response to the first phone call he received about Preston's bloody show and that after the second phone call Dr. Sherman failed to call back and determine the medical situation after he ordered staff to time Preston's contractions. (ECF No. 46-1, PageID.567–69, PageID.571–75.) Preston now states a viable claim for individual liability against Dr. Sherman because his conduct in response to the first phone call satisfies the subjective component of a deliberate indifference claim.[10]

Preston's new allegations allege that Dr. Sherman knew facts from which he could infer that she had a serious medical risk, he drew the inference that the risk was substantial, and he then consciously disregarded that risk. During the first phone call, Dr. Sherman knew that Preston had a late-stage, high-risk pregnancy, she was scheduled for a C-Section, she had been in and out of the medical unit over the course of

---

[10] CCS defendants argue that Preston's proposed amended complaint as to Dr. Sherman fails to satisfy Federal Rule of Procedure 8, but this argument is without merit. Under Rule 8, the dispositive inquiry is whether the defendants can file an answer to the allegations and the Court can "conduct orderly litigation." *Vicom, Inc. v. Harbridge Merch. Sevs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994). Although Preston confuses individual and official capacity suits with individual and supervisory theories of liability, she clearly means to sue Dr. Sherman in his personal capacity as an individual and a supervisor. *See also Johnson v. City of Shelby*, 574 U.S. 10, 346–47 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *cf. Jacobson v. Schwarzenegger*, 226 F.R.D. 395, 397 (C.D. Cal. 2005) (dismissing a complaint under Rule 8 because it was written like a "magazine story" and was "replete with hyperbole and punctuated by references to the Merchant of Venice").

several days for symptoms of labor, and now she was experiencing an obvious symptom of imminent labor—a bloody show. Given his medical training, it is reasonable to infer that he would have drawn the conclusion that a substantial medical risk to Preston existed. Despite this, he took no action in response to the first telephone call, such as instructing the nurses, calling an ambulance, ordering treatment, or verifying underlying facts. This amounts to a complete denial and a delay of adequate medical care. Therefore, she has pled a plausible deliberate indifference claim against Dr. Sherman, and so her amendments related to her claim of individual capacity liability against Dr. Sherman are not futile and will be permitted.

### B. Supervisory Liability – Dr. Sherman

Preston also alleges new legal theories regarding her supervisory liability claim for deliberate indifference against Dr. Sherman. She claims that he "delegate[ed] . . . his medical assessment, observation obligations and treatment" (ECF NO. 46-1; PageID.552), "acquiesced in the unconstitutional conduct by directing it, tacitly authorizing it, [and] fail[ed] to train or supervise their subordinates," (*id.* at PageID.591).

Although Preston has provided more facts about Dr. Sherman's conduct on March 20, she does not state a claim for supervisory liability.

A supervisor cannot be liable on a theory of *respondeat superior*, or merely because he supervises an employee who has violated an inmate's constitutional rights. *Winkler*, 893 F.3d at 898 (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). Rather, he must actively participate in the unconstitutional conduct to be liable as a supervisor under § 1983. *Peatross v. City of Memphis*, 818 F.3d 233, 241–42 (6th Cir. 2016). A plaintiff must plead "[a]t a minimum . . . that a supervisory official at least implicitly authorized, approved of or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Coley v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015) (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). The failure to act is insufficient to give rise to supervisory liability. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Preston alleges that Dr. Sherman (1) failed to train his subordinates, (2) abandoned his specific duties, and (3) acquiesced in his subordinates' unconstitutional conduct, but under each theory she fails to state a claim.

First, Preston does not plausibly plead that Dr. Sherman failed to train his subordinates. For supervisory liability to attach, the key question is whether *this supervisor* failed to train his subordinates. *Phillips*, 534 F.3d at 543–44. Preston only alleges a general theory that the nursing staff were not properly trained by CCS, which is apparent from Preston's allegations; nowhere else in her proposed amended complaint does she plead with specificity how Dr. Sherman personally failed to train his nursing staff. (*Cf.* ECF No. 46-1, PageID.591 (generally referring to individual defendants failing to train, among other broadly asserted theories of supervisory liability).) In such cases where a plaintiff does not make specific allegations about an individual defendant's failure to train, a *Monell* failure to train theory against a municipal entity is more appropriate than one against a supervisor. *See Phillips*, 534 F.3d at 543–44.

Second, Preston fails to allege that Dr. Sherman tacitly approved of and acquiesced to Deview's, Bishop's, and Lubanski's unconstitutional conduct by failing to instruct them. Rather, Preston only pleads that Dr. Sherman failed to act. As to the first phone call, she characterizes this failure to act as a failure to instruct, but without more, this is a mere

failure to act. *Shehee*, 199 F.3d at 300 ("Shehee's only claim is Luttrell's alleged failure to intervene on Shehee's behalf. There is no allegation that any of these defendants directly participated, encouraged, authorized, or acquiesced [in the unconstitutional conduct].")." This allegation reduces to Preston's individual liability claim against Dr. Sherman that he took no action himself in response to the first phone call. However, Preston does not include any factual allegations that Dr. Sherman knew of his subordinates' conduct; she only pleads that he did nothing: "By failing to do anything after learning of Plaintiff's bloody show . . . Dr. Sherman left Defendants Deview, Bishop, and Lubanski to make medical decisions for which they were ill-equipped and ill-trained[.]" (ECF No. 46-1, PageID.571.) Preston asserts in her brief that Dr. Sherman knew that the nurses did not transfer Preston to the hospital (ECF No. 46, PageID.526), but the Court can only consider what is pleaded in the complaint, and so the allegation itself is conclusory. Preston does not plead enough in her proposed amended complaint to move beyond allegations that are based on *respondeat superior*.

The same is true of the second phone call. Dr. Sherman ordered that the defendant nurses time Preston's contractions, but this goes directly

to Dr. Sherman's actions as an individual—ordering the timing of contractions—rather than acquiescing to Deview's and Bishop's decisions not to order a transfer or call an ambulance. Supervisory liability, or liability as a supervisor for the unconstitutional actions of a subordinate, only attaches where the supervisor participates in that underlying unconstitutional conduct. Here, Dr. Sherman does not have a hand in Deview's and Bishop's conduct. Instead, he is acting as an individual who happens to also be a supervisor.

Finally, Preston does not state a supervisory liability claim against Dr. Sherman based on a theory that he abandoned his duties as a supervisor.

> [A] supervisor may be liable under § 1983 if he "abandon[s] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department. This liability . . . exists only where some "execution of the supervisors' job function result[s] in [the p]laintiff's injury." In other words, the supervisor must have abdicated his specific job responsibility, with the '*active performance* of the [supervisor's] individual job . . . function directly result[ing] in the[ ] constitutional injury.

*Winkler*, 893 F.3d at 898–90 (citations omitted). For example, in *Taylor*, the warden was liable as a supervisor when he stopped managing the transfer process of inmates—his specific duty—and knew that a deputy

warden was delegating the process to low-level staff without any oversight. *Taylor*, 69 F.3d at 81.

Preston fails to state a claim based on this theory because she does not specify what duty Dr. Sherman had that would cause his department to utterly cease to work properly if he did not fulfill it. She asserts that he delegated "his medical assessment, observational obligations, and treatment" responsibilities (ECF No. 46-1, PageID.552), but this is too vague. Without more, the Court cannot discern where Dr. Sherman's responsibilities end and where the nurses' begin. There is no doubt that the nurses also had medical assessment, observational, and treatment responsibilities—that is why Preston can state a claim for inadequate medical care against them as individuals. For example, Preston has gone to great lengths in her proposed amended complaint to assert that the nursing staff could have called an ambulance themselves, which is ultimately what Preston alleges the defendants should have done in the first place. At best, her complaint permits an inference that under some circumstances, Dr. Sherman as a supervisor could make certain decisions that his subordinates could not. But there is no indication *what* those responsibilities were and *how* the abdication of those responsibilities led

to a breakdown in the department. In effect, Preston's allegations either bolster the allegations against Dr. Sherman as an individual or seek to hold him liable for the defendant nurses' conduct because he is their supervisor. Thus, Preston sets forth allegations that are sufficient to state a claim that Dr. Sherman and the defendant nurses are constitutionally liable for their own, individual conduct, which happened to overlap with one another. For these reasons, she fails to state a claim for supervisory liability against Dr. Sherman, and so these amendments are futile.

### C. *Monell* Liability

In her proposed amended complaint, Preston adds allegations regarding CCS and adds specificity to her allegations regarding Macomb County. Municipal entities, including contractors, cannot be held liable on a theory of *respondeat superior*; rather, the plaintiff must show the entity is the moving force behind the constitutional violation which is done by pointing to a policy or custom. *Winkler*, 893 F.3d at 904 (quoting *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). There are four ways a plaintiff may plead *Monell* liability, including (1) a policy of a failure to train and (2) a

custom or policy of acquiescence of constitutional violations, also known as a theory of inaction. *Jackson v. City of Cleveland*, 920 F.3d 340, 374 (6th Cir. 2019). Preston appears to raise a failure to train and policy of inaction claims. Because she states a claim as to CCS and Macomb County based on the failure to train, the amendments are not futile.[11]

### i. CCS

To plead a claim of inadequate training, a plaintiff must allege: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Deliberate indifference can be pled through a single incident or through a pattern of constitutional violations. *Id.* at 903 (quoting *Ellis*, 455 F.3d at 700–01). Preston plausibly pleads that CCS failed to train its LPNs based on a single-incident—her own experience in Macomb.

---

[11] CCS defendants argue that Preston's amended complaint as to CCS is insufficient under Rule 8, but the Court disagrees as it did earlier. *See supra* Section III.A.iv n.9.

Failure to train based on a single incident "is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Winkler*, 893 F.3d at 903 (quoting *Shadrick*, 805 F.3d at 739). In other words,

> it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton v. Harris*, 489 U.S. 387, 390 (1989). Obviousness has also been characterized as a "high degree of predictability" that such situations will reoccur and that inadequately trained employees will probably violate a person's federal rights. *Shadrick*, 805 F.3d at 739 (quoting *Bryan Cty.*, 520 U.S. at 409–10). "The high degree of predictability may also support an inference of causation[.]" *Id.* (same). For example, "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," and so training on "the constitutional limitations on the use of deadly force" is "so obvious"

that the failure to provide such training amounts to "deliberate indifference to constitutional rights." *Harris*, 489 U.S. at 390 n.10 (citations and quotations omitted).

In *Shadrick* the government contractor was deliberately indifferent "to the highly predictable consequence that an LPN nurse will commit a constitutional violation" given the relatively "limited set of medical skills" that LPNs possess because no ongoing training was provided to the LPNs. 805 F.3d at 740 (citing *Bryan Cty.*, 520 U.S. at 409). The training was inadequate because

> there [was] no proof of a training program that was designed to guide LPN[s] [ ] in assessing and documenting medical conditions of inmates, obtaining physician orders, providing ordered treatments to inmates, monitoring patient progress, or providing necessary emergency care to inmates within the jail environment in order to avoid constitutional violations.

*Id.* And it was obvious that the LPNs would commit constitutional violations without additional training because LPNs had little training to begin with, demonstrating that the contractor was deliberately indifferent. *Id.* at 740, 743. The failure of the contractor to investigate the cause of the incident, an inmate's death, further evinced deliberate indifference. *Id.* Finally, the plaintiff satisfied causation because the

need for LPNs to be trained on their constitutional obligations was so obvious. *Id.* at 744.

Here, Preston has pled facts that, if true, would satisfy the three elements of a failure to train claim related to the LPNs administering emergency medical care and knowing when to initiate hospital transfers,[12] specifically under a single incident theory. First, she alleges that LPNs receive less than two weeks of shadowing other nursing staff and that they received no training related to emergencies or acute conditions. (ECF No. 46-1, PageID.580–81.) Although this program does not amount to no training as in *Shadrick*, it is plausibly pled that the training was not ongoing and did not expose the LPNs to providing treatment in a variety of emergency or acute situations, such as pregnancy, which was crucial in *Shadrick*. Moreover, given the general

---

[12] Preston argues that Dr. Sherman, Deview, Bishop, and Lubanski, were inadequately trained (ECF No. 46, PageID.541), but the Court only finds that this claim is plausible based on the lack of training of Bishop and Lubanski, the LPNs. A medical doctor's education and training necessarily appraises him of his constitutional obligations to provide adequate medical care because doctors are presumably trained to avoid malpractice, or negligence, which is insufficient to give rise to constitutional liability. This is analogous to the reasoning in *Connick v. Thompson*, which held that it was not a failure to train prosecutors as to their constitutional obligations to turn over exculpatory information because their education and training would teach them about this duty. 563 U.S. 51, 64–68 (2011).

level of training that the LPNs receive, it is also plausible that shadowing other CCS nursing staff was itself inadequate.

Second, it is an obvious consequence that without training, the LPNs would violate detainees' right to adequate medical care in the face of highly predictable situations—medical emergencies and acute conditions. Although CCS argues that Preston must show that late-term pregnancies are a recurrent situation (ECF No. 51 at 21), there is no indication that the right at issue must be construed so narrowly. In *Shadrick*, the recurrent situation was the need for medical treatment, not specific infections or sepsis. 805 F.3d at 742–43. *See also Garretson*, 407 F.3d at 796 (examining an alleged "pattern of mishandled medical emergencies). In this case, it is as inevitable as a police officer using deadly force to detain a fleeing felon that LPNs and other staff will need to provide adequate medical care in the face of medical emergencies and acute conditions, and so the failure to provide training about this constitutional obligation shows deliberate indifference. As in *Shadrick*, Preston pleads that CCS's subsequent failure to investigate also shows recklessness. (ECF No. 46-1, PageID.581.)

Finally, the obviousness of the risk, not providing LPNs with adequate medical training so that they know their constitutional responsibilities, gives rise to an inference of causation as it did in *Shadrick*. It is plausible that the inadequate training caused or is closely related to Preston's injuries. *See Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). On March 20, Preston's pregnancy, as pled, was obviously an acute condition and a medical emergency. The failure by at least the LPNs to render constitutionally adequate treatment, and in some instances to render any treatment at all, at various points during the day and at various stages of Preston's early labor, is a plausible outcome of inadequate training. For these reasons, Preston successfully states a claim against CCS that brings it back into the litigation.

### ii. Macomb County

Macomb County answered Preston's operative complaint and does not oppose Preston's proposed amendments in its brief. Preston states a claim against the County. She pleads a catalogue of proposed amendments as to Macomb County, including (1) the failure to monitor the medical care provided by individual CCS defendants to inmates with serious, acute, or emergency conditions that may require transfer; (2) for

tolerating unconstitutional medical care by the individual CCS defendants; (3) allowing CCS customs and policies that denied inmates with serious, acute, or emergency conditions the right to adequate medical care; (4) tolerating a custom or policy of permitting COs to unreasonably rely on the medical decisions of CCS personnel; and (5) ratifying CCS's and the individual CCS defendants' unconstitutional conduct by failing to investigate the acts of CCS defendants and COs who denied inmates their rights to adequate medical care. (ECF No. 46-1, PageID.552–53.) Each of these theories of liability appear to be based on a policy of inaction, but Preston's first theory could also be construed as a failure to train or supervise claim because she also describes it as Macomb County's failure to monitor CCS's contractual performance. (*Id.* at PageID.585.) Under a failure to train or supervise theory, Preston states a claim against Macomb County.

To plead that Macomb County failed to train or supervise CCS's performance as it rendered care to inmates with acute conditions and during medical emergencies, Preston must plead that Macomb County's supervision over CCS was inadequate, the inadequacy was due to Macomb County's deliberate indifference, and this inadequacy caused

Preston's injury. *See* Section III.C.i. Preston properly identifies how Macomb County's monitoring of CCS was deficient—there was no monitoring whatsoever of CCS's performance (ECF No. 46-1, PageID.585)—and that this caused her injures (*id.* at PageID.588). She also pleads that Macomb County was deliberately indifferent.

Preston pleads that two other inmates at Macomb County Jail also suffered, and in those cases died, from inadequate medical care of an acute condition in July 2013 and June 2014. (*Id.* at PageID.582.) *See also Hubble v. Cty. of Macomb*, No. 2:16-cv-13504, 2019 U.S. Dist. LEXIS 68465, at *1, *7 (E.D. Mich. Apr. 23, 2019) (finding that Jennifer Myers died on July 7, 2013, from acute sepsis after serving nine days of her thirty-day sentence); *Stojcevski v. Cty. of Macomb*, 143 F. Supp. 3d 675, 680 (E.D. Mich. 2015) (finding that David Stojcevski died on June 27, 2014, from acute withdrawal after serving sixteen days of his thirty-day sentence). However, the Court need not decide whether Preston pleads a policy of a failure to train or supervise through a pattern of incidents because she succeeds in pleading a policy through a single incident. *See Jones*, 625 F.3d at 946 (holding that such a pattern must be pervasive, or one that is "so widespread, permanent, and well settled as to have the

46

force of law" and that five instances of inmate medical requests being ignored over two months was insufficient (quoting *Kinzer v. City of W. Carrollton*, No. 3:07-cv-111, 2008 U.S. Dist. LEXIS 61203, at * 14 (S.D. Ohio Aug. 5, 2008))).

A single incident may demonstrate deliberate indifference where it is obvious the failure to supervise would lead to that constitutional violation. *See Shadrick*, 805 F.3d at 740 (citing *Bryan Cty.*, 520 U.S. at 409). To find the County liable, the focus must be on the County's policy, the failure to supervise CCS—not CCS's failure to train its LPNs. *Id.* at 737 (citing cases). Municipalities may not simply contract away their constitutional obligations by securing private contractors. *Stojcevski*, 143 F. Supp. 3d at 687; *see also Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010).

Here, it is plausible that a municipality's failure to provide *any* oversight of a corporate medical contractor would inevitably lead to constitutional violations in the face of medical emergencies or acute medical conditions. To find that this was implausible would be tantamount to finding that municipalities may in fact avoid their constitutional obligations to provide adequate care to inmates by relying

on a private contractor. Thus, Preston's proposed amended complaint states a claim against Macomb County.

## IV. Motion to Strike and for a More Definite Statement

The CCS defendants argue that Preston's proposed amendments regarding the CCS nurses should be stricken under Rule 12(f) and that Preston should provide a more definite statement under Rule 12(e). (ECF No. 51, PageID.697–98, PageID.702–03.) CCS fails on both counts.

### A. Motion to Strike

In its discretion, "the court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter," Fed. R. Civ. P. 12(f), but such motions are disfavored and infrequently granted, *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citing cases). The purpose "of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Kennedy v. City of Cleveland*, 797 F.2d 297, 305 (6th Cir. 1986) (quoting *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983)).

The Court declines to exercise its discretion to strike the allegations. Because Preston states a claim against the individual CCS defendants in her proposed amended complaint, her allegations are neither spurious nor impertinent. Impertinent allegations are "immaterial allegations that have no bearing on the subject matter of the litigation." *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 776 (E.D. Mich. 2014) (citing *Reeves v. Wallington*, No. 06-10326, 2008 WL 5060400, at *3 (E.D. Mich. Nov. 24, 2008)). Preston's allegations further qualify defendants' deliberate indifference or point to other possible theories of liability and so they have substantial bearing on the subject matter of Preston's claims. The Court is not required to assess every word in Preston's proposed amended complaint once she pleads a viable legal theory as to those allegations, and the CCS defendants may not seize upon this to strike allegations that may lead to other theories of liability. Even as to Olagbaiye, who has since been dismissed, the factual allegations about his care add detail to the treatment that Preston received at the Macomb County Jail.

Preston's allegations that go to legal theories that do not survive also will not be stricken. Rule 12(f) is a relatively high threshold to cross;

allegations are only stricken for impertinence if "it appears to a certainty that [defendants] would succeed despite any state of the facts which could be provided in support of the [claim] and are inferable from the pleadings." *Operating Eng'rs*, 783 F.3d at 1050 (quoting *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991)) (analyzing counterclaims). So even though Preston may not state a viable claim against CCS based on a theory of inaction or against Dr. Sherman based on his conduct in response to the second phone call, it does not appear to a certainty that CCS would succeed in defeating this litigation despite any set of facts.

Finally, Preston's allegations are not scandalous. "Scandalous" allegations are those "that unnecessarily reflect[ ] on moral character of an individual or state[ ] anything in repulsive language that detracts from the dignity of the court." *Id.* (quoting *Pigord v. Veneman*, 215 F.R.D. 2, 4 (D.D.C. 2003)). Preston's complaint is appropriately adversarial, and she goes no further than alleging what her deliberate indifference claims require, which is conscious disregard. Moreover, Preston uses no repulsive language. Because the CCS defendants' motion fails to point to any specific allegations, the Court surmises that Preston's use of female

anatomical terms and the description of her labor symptoms are what is in dispute. But they are not only appropriate in this case, they are necessary to set forth a plausible claim for relief under these facts. For these reasons, the motion to strike is denied.

## B. Motion for a More Definite Statement

A district court may grant a Rule 12(e) motion for a more definite statement if the pleading "is so vague and ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e); *see Goad v. Mitchell*, 297 F.3d 497, 503–04 (6th Cir. 2002) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 597–98 (1998)) (considering the effect of discretionary actions by district courts on qualified immunity defenses). Motions for more a definite statement are disfavored and are granted "only if there is a major ambiguity or omission in the complaint that renders it unanswerable." *Farah v. Martin*, 122 F.R.D. 24, 25 (E.D. Mich. 1988). The Court declines to exercise its discretion to grant the motion.

Preston's claims against Deview, Bishop, Lubanski, Dr. Sherman as an individual, CCS, and Macomb County withstand a motion to dismiss, and so the complaint is not so vague as to be unanswerable. CCS defendants may wish for a more specific or better organized complaint,

but a more definite statement is unnecessary. The motion for a more definite statement is denied.[13]

## V.    Conclusion

Preston's proposed amended complaint states a claim for which relief can be granted as to Deview, Bishop, Lubanski, and Dr. Sherman for individual liability, and CCS and Macomb County for *Monell* liability. Therefore, those amendments are not futile, and granting leave to amend is in the interests of justice. However, Preston does not state a claim as to Dr. Sherman for supervisory liability or the COs for individual liability, and so leave to amend to add these claims is denied. Additionally, CCS defendants' motions to strike and for a more definite statement are denied.

---

[13] The CCS defendants' motions to strike and for a more definite statement are halfhearted. CCS defendants do not even identify the offending allegations, much less apply the rules to them. In fact, they direct the Court to comb through their response brief for allegations "including, but not limited to, all of the passages from the proposed Amended Complaint that are quoted in this brief." (ECF No. 51, PageID.703.) This is an inadequate showing.

Accordingly, Preston's motion seeking leave to amend (ECF No. 46)

is **GRANTED IN PART** and **DENIED IN PART**.

IT IS SO ORDERED.

Dated: July 24, 2019          s/Judith E. Levy
    Ann Arbor, Michigan       JUDITH E. LEVY
                            United States District Judge