## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Jessica Lynne Preston,

               Plaintiff,        Case No. 18-12158

v.                           Judith E. Levy
                           United States District Judge

County of Macomb, *et al.*,

                           Mag. Judge Elizabeth A. Stafford

               Defendants.

_____/

## OPINION AND ORDER GRANTING THE CCS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [103] AND GRANTING DEFENDANT MACOMB COUNTY'S MOTION FOR SUMMARY JUDGMENT [107]

Before the Court are two motions for summary judgment brought by Defendant Macomb County (ECF No. 107) and Defendants Correct Care Solutions, L.L.C. (hereinafter, individually "Defendant CCS"); Lawrence Sherman, M.D.; Cynthia Deview, R.N.; Amanda Bishop, L.P.N.; and Jacyln Lubanski, L.P.N. (hereinafter, collectively the "CCS Defendants") (ECF No. 103). Plaintiff Jessica Lynn Preston alleges that Defendants were deliberately indifferent to her serious medical needs in violation of her Fourteenth Amendment due process rights during the

labor and delivery of her child while she was in detention at the Macomb County Jail. Preston brought her claims against Defendant Macomb County (who operates the jail where the events at issue occurred); Defendant CCS, which is Macomb County's medical care contractor; and certain of Defendant CCS' employees.

For the reasons set forth below, the Court grants both Defendant Macomb and the CCS Defendants' motions for summary judgment. The Court recognizes that Preston was subject to a frightening and traumatic experience. However, because there is no genuine dispute of fact that the actions of the CCS Defendants and Defendant Macomb did not rise to the level of a constitutional violation, Preston's claims must be dismissed. The law can be an unsatisfactory vehicle for resolving many societal problems.

## I.    Background

### A. Timeline of events at Macomb County Jail

The following sections outline the relevant timeline of events during Preston's detainment at the Macomb County Jail.

#### a. March 15, 2016 to March 20, 2016

On March 15, 2016, Preston was arrested for driving on a suspended license, and a state district judge ordered her to be detained at the Macomb County Jail, even though she was eight months pregnant.[1] (ECF No. 104, PageID.3323.) Preston's pregnancy was "high risk" because she had placental abruption[2] during her previous pregnancy, which required an emergency C-section. (ECF No. 106, PageID.3441; ECF No. 107-2, PageID.3495.) For this pregnancy, she was scheduled for a C-section just over a month later on April 26, 2016, at a local hospital. (ECF No. 106, PageID.3441.)

At 5:50 p.m. that day, Preston was medically screened by Defendant Cynthia Deview, a registered nurse ("R.N."). (ECF No. 105, PageID.3363, 3369; ECF No. 107-2, PageID.3483.) Deview noted that Preston used

---

[1] At the hearing on January 14, 2019, Preston's attorney clarified that the state judge set her bail at $10,000.00, even though this was her first offense. Because Preston was unable to afford bond, she was ordered detained until the hearing on her suspended-license charge. However, some of the record evidence suggests that the bail was $5,000.00. (ECF No. 104, PageID.3323.)

[2] "Placental abruption occurs when the placenta partly or completely separates from the inner wall of the uterus before delivery. This can decrease or block the baby's supply of oxygen and nutrients and cause heavy bleeding in the mother." *Placental abruption*, Mayo Clinic (Feb. 25, 2022) *https://www.mayoclinic.org/diseases-conditions/placental-abruption/symptoms-causes/syc-20376458* [https://perma.cc/7ZQZ-WRP7].

heroin daily (with a last reported use as of March 14, 2016), had been treated for substance abuse previously, and was eight months pregnant. (ECF No. 105, PageID.3363–3364.) Deview designated Preston's pregnancy as a "Supplementary Normal Pregnancy" and "Acute" medical condition. (*Id.*) The Receiving Screening Form, recording this initial screening, includes a checkmark for the category "Education provided orally and in writing on Access to Healthcare[;]" Preston also confirmed with her signature the following: "I have been instructed on and received information on how to obtain/access medical services." (*Id.* at PageID.3365, PageID.3367.) Additionally, Deview referred Preston for chronic care evaluations with a medical provider while she was detained. (*Id.* at PageID.3367.) Preston was placed in the general population. (*Id.*) Additionally, Deview ordered a "high calorie/protein" diet for Preston; ordered "Prenatal Plus" tablets for her; and sent a memo to jail command indicating that Preston was to receive a lower bunk without stairs. (*Id.* at PageID.3370, 3374–3375.)

At 6:07 p.m., Preston believed she was having contractions that were lasting for 15 seconds. (*Id.* at PageID.3371.) Deview examined her in the medical unit. (*Id.*) Deview recommended that Preston "drink fluids

and report to a nurse if contractions changed." (*Id.*) About five minutes later, Preston reported to an unnamed nurse (likely Deview) that her contractions were lasting about one minute. (*Id.*) Deview documented that Preston was then "sent to medical and care transferred to nurse in medical regarding contractions." (*Id.*) At that time, Preston appeared alert and oriented; denied nausea, vomiting, and diarrhea; and presented no symptoms of detox. (*Id.*)

Another registered nurse, Monica Franks, documented at 6:16 p.m. that Preston's contractions lasted for fifteen to thirty seconds but there was no hardening of her abdomen at the time contractions were said to start by Preston. (*Id.* at PageID.3372.) Franks ultimately documented that Preston was to return to the unit and advised Preston to inform officers if she needed to return to the medical unit. (*Id.*)

At approximately 6:30 p.m., Preston thought her water broke. (*Id.* at PageID.3376; ECF No. 107-2, PageID.3484.) Defendant Amanda Bishop, a Licensed Practical Nurse ("L.P.N."), examined her in the medical unit. (*Id.*) Preston was calm but came to the door with wetness in the front of her pants; Preston later testified that she believes she may have urinated on herself as a result of her pregnancy. (*Id.*; ECF No. 107-

5

2, PageID.3484.) Bishop found no amniotic fluid, and a litmus test confirmed there was none. (ECF No. 105, PageID.3376.) Bishop determined that Preston's water had not broken, and Preston was sent back to her cell in the general population "without difficulty" and "appeared to be in no distress." (*Id.*)

On March 16, 2016, Preston filed a health service request indicating that she was having bloodwork done through her OBGYN provider Dr. Kaur before her incarceration and requested a continuation of that bloodwork. (ECF No. 105, PageID.3377.) Deview included a comment dated March 17, 2016, indicating that Preston's chronic care appointment was scheduled for March 17, 2016. (*Id.*)

On March 17, 2016, Temitipe Olagbaiye, a nurse practitioner, examined Preston. (ECF No. 106, PageID.3441–3443; ECF No. 107-2, PageID.3484.) This is the first instance in Preston's jail medical records where it is mentioned that Preston suffered a placental abruption and required an emergency C-section for her last pregnancy. (ECF No. 106, PageID.3441.) Her scheduled C-section date is also noted at this point, as well as the fact that she had had two ultrasounds that were both "reassuring" during this pregnancy. (*Id.*)

6

Additionally, Olagbaiye recorded notes regarding Preston's reporting condition. He noted that Preston had "ongoing whitish vaginal discharge" and what Olagbaiye diagnosed as "abnormal false contraction[s]." (*Id.*) He also noted that Preston had been feeling "adequate" "fetal kick" and had no urinary symptoms, in addition to denying pelvic pain or fever; her vitals indicated a blood pressure of 120/80, a pulse of 72, and 14 respirations per minute. (*Id.* at PageID.3441–3442.) Olagbaiye also recorded that Preston's urinalysis was not positive for opiates at the time of her incarceration, although Preston informed Olagbaiye that she had used heroin until her arrest. (*Id.* at PageID.3441.) Preston is reported as having "den[ied] any chronic medical problem in this pregnancy." (*Id.*) Preston later testified that her pregnancy had indeed been normal up until that point and, at the time of her meeting with Olagbaiye, she believed she might have been having Braxton Hicks contractions,[3] but she was not sure. (ECF No. 107-2, PageID.3485.)

---

[3] "Braxton Hicks" or "Braxton-Hicks" "contractions, also known as prodromal or false labor pains, are contractions of the uterus that typically are not felt until the second or third trimester of the pregnancy. Braxton-Hicks contractions are the body's way of preparing for true labor, but they do not indicate that labor has begun." *Braxton Hicks Contractions*, StatPearls Publishing LLC (Dec. 16, 2021)

Olagbaiye created what the form calls a "treatment plan," which stated: "[p]atient pregnancy will be uneventful while in incarceration 'till delivery." (*Id.* at PageID.3443.) Olagbaiye indicated that Preston's weight was to be monitored weekly until delivery and ordered that she be given Tylenol. (ECF No. 105, PageID.3378, 3385.) That same day, Preston also had a vaginal culture and urinalysis taken; she received normal results a few days later on March 22, 2016 (after the baby's birth on March 20, 2016). (ECF No. 105, PageID.3386–3387, 3411.)

### b. March 20, 2016—Day of the Baby's birth[4]

Three days later, on March 20, 2016, Preston awoke and realized that her contractions were "very regular" and "close enough together" that she wanted to be observed in the medical unit. (ECF No. 107-2,

---

*https://www.ncbi.nlm.nih.gov/books/NBK470546/* [https://perma.cc/7ZQZ-WRP7]. Furthermore, "Braxton Hicks contractions are irregular in duration and intensity, occur infrequently, are unpredictable and non-rhythmic, and are more uncomfortable than painful. Unlike true labor contractions, Braxton Hicks contractions do not increase in frequency, duration, or intensity." *Id.*

[4] Exhibit 1 to Preston's response to the CCS Defendants' motion for summary judgment (*see* ECF Nos. 120, 120-2, 129) depicts footage taken from various cameras in the medical unit of the Macomb County Jail, all from various times on March 20, 2016. There are nine total videos. Throughout this opinion, the following citation system is used to indicate portions of the video footage, with "XX:XX:XX" referring to a time stamp: "(ECF No. 120-1, [File name], [XX:XX:XX] – [XX:XX:XX].)".

PageID.3485.) She buzzed in her cell and was subsequently taken to the medical unit. (*Id*.) Preston later testified that she was "certain" that these were labor contractions because "[t]hey were timeable": she noted by using the clock on the phone in her cell that "they were about three to four minutes apart at that time and lasting about a minute, 30 seconds to a minute[.]" (ECF No. 107-2, PageID.3485–3486.)

At approximately 7:45 a.m., Preston was examined in an examining room by Deview after Preston reported contractions occurring every three minutes and lasting 30 seconds. (ECF No. 120-1, [Med Hall 2.exe], [07:44:19] – [07:44:25]; ECF No. 103-8, PageID.2493, 2501–2503; ECF No. 105, PageID.3391, 3397; ECF No. 107-2, PageID.3485–3486.) She told Deview that her pain was intense (an eight out of ten on the pain scale), and she reported good fetal movement. (ECF No. 103-8, PageID.2491, 2501; ECF No. 105, PageID.3397.) Deview determined that Preston was not having contractions or in labor because her abdomen was not tightening (which would be caused by the uterus contracting); her skin was "warm and dry[;]" there was no grimacing of her face; and she was not visibly in pain. (*See* ECF No. 103-8, PageID.2482–2483, 2501–2503.) Deview also took Preston's vitals, which Deview suggests

were in a normal range: (1) her heart rate was 61 bpm (ECF No. 105, PageID.3393), and for heart rate, "[a]nywhere from 60 to a hundred is normal" (ECF No. 103-8, PageID.2420); (2) her blood pressure was 128/86 (ECF No. 105, PageID.3393), and for blood pressure, "120 over 80 is what they consider normal blood pressure[,] [b]ut if they're having pain it's going to be higher." (ECF No. 103-8, PageID.2420.) Deview told Preston to let staff know if her pain increased and sent her back to her cell. (ECF No. 105, PageID.3397; ECF No. 103-8, PageID.2503.) Deview later testified that she "believed" Preston's reports that she was experiencing contractions but thought that Preston could be having Braxton-Hicks contractions. (ECF No. 103-8, PageID.2492.)

The medical records suggest that a few hours later around 11:00 a.m., a John Doe Corrections Officer ("CO") escorted her to the medical unit because Preston again reported contractions. (ECF No. 107-2, PageID.3486–3487; ECF No. 103-10, PageID.2568; ECF No. 105, PageID.3422.) However, the video evidence suggests that this might have been closer to 12:20 p.m. (ECF No. 120-1, [Infirmiry 2.exe], [12:22:03] – [12:34:42].) Defendant Jaclyn Lubanski, an L.P.N., sat with Preston outside of the medical unit on a bench in the main area. (ECF No. 107-2,

PageID.3486.*)* Lubanski and Bishop conducted the examination, including a litmus test that indicated no amniotic fluid was present, and an abdomen assessment wherein they determined that Preston was not having contractions. (ECF No. 103-9, PageID.2528; ECF No. 107-2, PageID.3487; ECF No. 103-10, PageID.2568; ECF No. 105, PageID.3422.) They also noted that Preston did not have facial grimacing. (*Id.*) Lubanski indicated that she and Bishop "educat[ed Preston] upon [sic] Braxton Hicks contractions" and water breakage, although she did not remember exactly what was said. (ECF No. 103-9, PageID.2528.) Preston later testified that both nurses expressed that she was having fake contractions "and this is all in [her] head," despite Preston's disagreement. (ECF No. 107-2, PageID.3487.) Lubanski believed that Preston was not having contractions at this time. (ECF No. 103-9, PageID.2530.) Deview was told that they did not find any contractions at this time. (ECF No. 103-8, PageID.2484.) Preston returned to her cell around 12:35 p.m.

At an indeterminate time after Preston returned to her cell (known to be after lunchtime), Diana Williamson (an inmate and former nurse), obtained a latex glove from a John Doe CO and examined Preston while

11

Preston laid on her back and her knees were spread. (ECF No. 107-2, PageID.3487, 3498.) Williamson inserted two fingers into Preston's vagina and noted that the baby's head was "right there[;]" she could feel the baby's head pressing down against Preston's cervix. (*Id.*) Shortly after, another inmate noticed that Preston had "a heavy bloody" vaginal discharge; Preston clarified that it was not a small amount of discharge because "blood [was] running down my legs." (*Id.* at PageID.3488, 3498.)

At some time before 1:28 p.m.,[5] Preston buzzed to go down to the medical unit because she had begun to bleed from her vagina. (ECF No. 107-2, PageID.3504.) Bishop and a John Doe CO were in Preston's unit passing out medications on a "med pass" at a "med cart," and Preston told them she was bleeding from her vagina. (ECF No. 103-8, PageID.2285; ECF No. 103-9, PageID.2522; ECF No. 103-10, PageID.2577.) Bishop, however, indicated that she did not examine to see if there was blood on Preston's pants because she was "not exposing [Preston] to a bunch of

---

[5] The timing here is unclear. Lubanski testified that Bishop was at the medical cart (alternatively referred to as the "med cart") at the 1:30 p.m. rounds (ECF No. 103-9, PageID.2522), but the medical records indicate that Preston arrived at the medical unit at 1:28 p.m. (ECF No. 105, PageID.3409.)

other people." (ECF No. 103-10, PageID.2577.) Bishop sent Preston to the medical unit accompanied by a CO. (ECF No. 103-8, PageID.2285.)

At 1:28 p.m., Preston arrived in the medical unit, where Deview and Bishop were present; Lubanski was out on rounds. (ECF No. 107-2, PageID.3488; ECF No. 103-10, PageID.2577; ECF No. 105, PageID.3409; ECF No. 103-9, PageID.2524; ECF No. 120-1, [Med Hall 5.exe], [01:29:14] – [01:29:20].) Preston complained of vaginal bleeding (as she testified, "more than a bloody show"[6]) (ECF No. 107-2, PageID.3488), and contractions. (ECF No. 107-2, PageID.3488.) Preston testified that she pulled down the outside of her pants to show an unnamed nurse (likely Deview) that her inner thighs were covered with blood; Preston testified that this was the "closest thing" to a pelvic exam she experienced during the time before her baby's birth.[7] (ECF No. 107-2, PageID.3502–3503.) Deview testified that Preston's mucus plug had passed at this point, but

---

[6] A "bloody show" is a medical term for when a pregnant woman passes the cervical mucus plug and it is one of the signs that labor is imminent. *See* Christine Stewart, MD & Betty Brutman, MD, JD, 9 Attorney's Medical Advisor § 14:143, Westlaw (database updated Sept. 2018).

[7] Indeed, Lubanski testified that under "CCS policy" and nursing licensure, she was not allowed to examine Preston's cervix. (ECF No. 103-9, PageID.2525.) Only the medical provider was able to determine cervix dilation. (*Id*. at PageID.2530.)

Bishop did not check it; Deview "agree[d]" that Bishop should have checked this. (ECF No. 103-8, PageID.2419.) Preston was placed in a medical unit cell (i.e., "ME 6").

There are two sets of Progress Notes that are part of the Macomb County Jail medical records[8] with regard to the events starting at 1:28 p.m.: (1) one set filed on March 20, 2016 at 5:24 p.m. prepared by Bishop, and signed by Lubanski and Deview (ECF No. 105, PageID.3399–3407); and (2) a late entry clarification filed on March 22, 2016—two days after the baby's birth—prepared by Deview and not signed onto by any other provider (*id.* at PageID.3409). According to the March 20 Progress Notes (ECF No. 105, PageID.3406), Deview looked at Preston in ME6 at 1:28 p.m. and determined that Preston was having her bloody show. (ECF No. 103-10, PageID.2577; ECF No. 103-8, PageID.2462.) The March 22 Progress note includes a "[c]larification" added by Deview that at 1:28 p.m., Preston reported "vaginal bleeding[,]" which was confirmed by Deview. (*Id.* at PageID.3409.) Deview later testified that this vaginal discharge was of a small to moderate amount and was a pinkish color (as

---

[8] The record occasionally refers to this as the "Nursing Pathway." (ECF No. 103-9, PageID.2521.)

14

opposed to a bright red). (ECF No. 103-8, PageID.2405, 2424.) Deview also testified that at this time, Preston had no contractions, was not in any distress, and did not have any other complaints; accordingly, in Deview's medical opinion, Preston was not in labor. (ECF No. 103-8, PageID.2462.) However, Preston testified that she complained of contractions. (ECF No. 107-2, PageID.3488.)

At approximately 1:30 p.m., Deview made a telephone call to Dr. Lawrence Sherman,[9] the Chief Medical Director of Macomb County Jail, to notify him of this development. (ECF No. 105, PageID.3406; ECF No. 103-8, PageID.2436; ECF No. 103-10, PageID.2577; ECF No. 103-11, PageID.2624.) Dr. Sherman was not onsite but was available by telephone. (ECF No. 103-8, PageID.2250.) Dr. Sherman remembered being told that Preston had had a bloody show. (ECF No. 103-11, PageID.2624.) Dr. Sherman told Deview that Preston needed to be housed in the medical unit at the jail, to be observed in a cell with a camera where she could be observed, and to have her vital signs checked. (ECF No. 105, PageID.3406; ECF No. 103-10, PageID.2577; ECF No. 103-

---

[9] References to "HCP" in the medical records refer to Dr. Sherman, the health care provider. (ECF No. 103-9, PageID.2527.)

11, PageID.2624.) Deview understood that the monitoring was for symptoms of contractions, pain, or water breakage. (ECF No. 103-8, PageID.2439.) Additionally, Dr. Sherman indicated that it was "implicit" in his instructions, and Deview would know independently, that Deview and the other staff were to contact Dr. Sherman were there need to report any change in her condition. (ECF No. 103-11, PageID.2624–2625.)

Between 1:34 p.m. and 1:59 p.m., Preston was left in a medical unit cell ME6. (ECF No. 107-2, PageID.3488; ECF No. 103-9, PageID.2522; ECF No. 120-1, ME 6, [01:34:31 – [01:59:58].)) Cells such as this include a camera in which a deputy—not CCS staff—could watch the camera, though there is also a window in the door for CCS staff to visually check in on the patient. (ECF No. 103-8, PageID.2264, 2268–2269.) While the cell had a camera, Preston testified—and the video confirms—that no medical staff physically checked on Preston during this time. (ECF No. 107-2, PageID.3488.) Lubanski returned from her medical rounds at some point during this time. (ECF No. 103-9, PageID.2524.)

At 1:58 p.m., Preston's water broke while she was sitting on the toilet, and she yelled for assistance. (ECF No. 105, PageID.3406, 3409; ECF No. 107-2, PageID.3488.) Deview, Bishop, and Lubanski entered the

16

cell at various times over the next four minutes to assist her and helped bring Preston to a nearby mat. (ECF No. 103-10, PageID.2574; ECF No. 103-8, PageID.2287, 2348; ECF No. 103-9, PageID.2522; ECF No. 120-1, ME 6, [01:59:58] – [02:02:23].) Preston reported feeling a "ten out of ten" as a pain rating. (ECF No. 103-8, PageID.2414; ECF No. 103-9, PageID.2526.) Preston remembers Deview pulling apart her legs and saying "Oh my God. Call the ambulance." (ECF No. 107-2, PageID.3488.) Deview remained in the cell (and generally stayed in the room until the baby's birth),[10] while Bishop and Lubanski left the room. (*Id.*; ECF No. 103-8, PageID.2348, 2416; ECF No. 103-10, PageID.2585.)

At 2:02 p.m., Bishop went back to the medical office and called Dr. Sherman to tell him that Preston's water had broken and that she was bleeding with mucous. (ECF No. 105, PageID.3406, 3409; ECF No. 103-10, PageID.2583; ECF No. 103-11, PageID.2624.) Bishop indicated that she reviewed at least some of Preston's medical paperwork before calling Dr. Sherman, including anything from her intake screen, her chronic care visit, and any outside visits she would have had with a specialty provider.

---

[10] As a note, while Bishop testified that Deview was with Preston the entire time after Preston's water broke (ECF No. 103-10, PageID.2585), the video contradicts this.

(ECF No. 103-10, PageID.2571–2572.) Bishop admitted that she learned through the Macomb County Jail's Pathway system that the system labeled Preston as having a higher-risk pregnancy because of her prior C-section, and believes she communicated this to Dr. Sherman.[11] (*Id.* at PageID.2563–2564, 2571, 2573.) However, Bishop also testified that she relied on Olaigbaye's notation that Preston previously had reassuring ultrasounds and that the pregnancy was expected to be uneventful while she was detained, because he "has a higher licensure" than her; she also stated that the medical staff "would not have treated her any differently, whether she was high risk or lower risk[.]" (ECF No. 103-10, PageID.2575–2576, 2585.) The March 20 Progress Note indicates that, during the 2:02 p.m. call, Dr. Sherman ordered the nurses to time her contractions and call him back. (*Id.*)

Additionally, Dr. Sherman and Bishop separately testified[12] that Dr. Sherman told Bishop to have Preston taken to a hospital; however,

---

[11] However, Lubanski later testified that she did not know that Preston had a high-risk pregnancy until after the baby's birth. (ECF No. 103-9, PageID.2519.) Similarly, Bishop did not know this until filling out Preston's chart as part of the process for filling out the ER/IP referral form. (ECF No. 103-10, PageID.2563–2564.)

[12] Deview, however, testified that Preston's water breaking was an emergent situation. (ECF No. 103-8, PageID.2332.)

18

because Dr. Sherman believed this was an elective transfer (as water breaking was an urgent, as opposed to emergent, condition) and not an emergency situation, the CCS staff were required to fill out a form (i.e., the "ER/IP referral form") to effectuate Preston's transfer. (ECF No. 103-10, PageID.2583; ECF No. 103-11, PageID.2627, 2629; ECF No. 105, PageID.3408; ECF No. 103-9, PageID.2523, 2527; ECF No. 103-8, PageID.2354–2345.) Dr. Sherman was aware at that time that Preston had a high-risk pregnancy, though it appears that he believed it was due to the scheduled C-section and not the past placental abruption. (ECF No. 103-11, PageID.2630, 2641.) He believed the nurses should follow the on-call provider contact policy to provide the necessary background on Preston's condition and applicable nursing data in order to obtain a recommendation from him as the provider. (ECF No. 103-11, PageID.2639.)

As a result, Bishop went to ME6 and told Deview of Dr. Sherman's instructions. (ECF No. 103-10, PageID.2583.) Bishop went back to the office and began preparing paperwork to allow Preston to go to the hospital. (*Id.* at PageID.2583–2585; ECF No. 103-9, PageID.2524.) She wrote "possible labor" "eight months, due date 4-23-16, second pregnancy,

19

no complications (first preg had placental abruption)" as the reason on the ER/IP referral form, based on Preston's water breakage and contractions. (ECF No. 103-10, PageID.2569, 2576–2577.) Bishop later testified that she checked off the emergency room portion of the form because, at the time this form was filled out, she believed it was an emergency. (ECF No. 103-10, PageID.2569.)

Separately in ME6, according to the medical records and testimony,[13] the two nurses timed Preston's contractions between 2:05 p.m. to 2:20 p.m. and found them to be one minute long and two minutes apart. (ECF No. 105, PageID.3406, 3409; ECF No. 103-8, PageID.2504; ECF No. 103-9, PageID.2524, 2533.) Deview testified that she timed five contractions. (ECF No. 103-8, PageID.2504.) Based on this timing,

---

[13] The video footage indicates that Lubanski reentered the cell at 2:03 p.m. and joined Deview; she is seen giving Deview some sort of device to place on Preston's wrist; the two appear to use the device, then the device is removed from Preston's wrist and Lubanski left the room with the device. (ECF No. 120-1, ME 6, [02:03:00] – [02:04:30].) Lubanski reentered at 2:06 p.m. with an unknown item that she opened and handed the contents to Deview. (ECF No. 120-1, ME 6, [02:06:09] – [02:06:22].) Lubanski held on to the container and appears to hold a stopwatch. Preston laid on her side; Deview appears to reach between her legs. (ECF No. 120-1, ME 6, [02:06:09] – [02:06:27].) Over the next few minutes, Lubanski frequently leaves and reenters the room; Deview is generally in the room although she leaves for approximately one minute and returns. (ECF No. 120-1, ME 6, [02:06:00] – [02:21:28].) Bishop comes in at one point with a towel or blanket that she drapes over Preston but is otherwise not in the cell. (ECF No. 120-1, ME 6, [02:19:06] – [02:19:09].)

Deview and Lubanski did not believe that birth was imminent, although Lubanski did believe that labor had begun after Preston's water broke and Deview believed labor began at 2:05 p.m. once Preston's contractions became regular. (ECF No. 103-8, PageID.2337, 2504; ECF No. 103-9, PageID.2524, 2530.) Lubanski testified that she helped Bishop get paperwork together for the E.R. by reporting back to her the times of contraction so that it could be recorded on that paperwork. (ECF No. 103-9, PageID.2533.)

At 2:22 p.m., Deview testified that she saw the baby's head crowning—23 minutes after Preston's water broke. (ECF No. 105, PageID.3409; ECF No. 103-8, PageID.2293; ECF No. 120-1, ME 6, [02:21:44] – [02:22:44].) Deview testified that she was alarmed because this was inconsistent with the timing of Preston's contractions. (ECF No. 103-8, PageID.2505.) Deview wiped Preston's buttocks as it appears that she had a bowel movement. (ECF No. 120-1, ME 6, [02:25:25] – [02:25:43].) Bishop testified that at some point after they saw the baby crowning, someone used the cell's emergency button to call the ambulance. (ECF No. 103-10, PageID.2586.)

At approximately 2:25 p.m., Lubanski called Dr. Sherman. (ECF No. 103-11, PageID.2627; ECF No. 103-9, PageID.2522.) Once the baby's head start crowning, that was when Dr. Sherman believed that this had become an emergency. (ECF No. 103-11, PageID.2629.) Dr. Sherman went through information on how to have the baby delivered, though he believed Deview would be the nurse delivering the child. (ECF No. 103-11, PageID.2631.) Dr. Sherman gave the order to Lubanski to call an ambulance immediately. (ECF No. 103-9, PageID.2522.) In contrast, Deview claims that she and Bishop told Lubanski to call for the ambulance. (ECF No. 103-8, PageID.2432.) Lubanski called booking command to obtain an ambulance around 2:25 p.m., but an ambulance was already on its way at that time (ECF No. 103-9, PageID.2522, 2524), likely due to Bishop having used the cell's emergency button to get the ambulance. (ECF No. 103-10, PageID.2586.)

Lubanski returned to the cell, where Bishop was poised ready to catch the baby's head as the baby was born and Deview was on Preston's side. (ECF No. 103-9, PageID.2522; ECF No. 103-8, PageID.2289; ECF No. 103-10, PageID.2555.) At 2:30 p.m., Bishop, Lubanski, and Deview open what appears to be the OB kit. Deview went to Preston's side, while

22

Bishop went in front of her, and Lubanski hovered nearby Bishop. (ECF No. 103-8, PageID.2293; ECF No. 120-1, ME 6, [02:29:10] – [02:34:58].) At some point during this time, Preston was informed by one of the nurses that she would have to deliver her baby at the jail before she could be taken to the hospital. (ECF No. 107-2, PageID.3489; ECF No. 103-9, PageID.2522.)

At 2:35 p.m., Med Star EMS arrived; two EMS providers eventually enter the room. (ECF No. 106, PageID.3444; ECF No. 120-1, ME 6, [02:34:58] – [02:35:06].) According to Deview, when the EMS arrived, they indicated that the birth would have to occur in the jail based on the progression of delivery. (ECF No. 103-8, PageID.2479.) Bishop and an EMS provider helped catch and support the baby's head; her child was born at 2:38 p.m. (ECF No. 103-10, PageID.2579; ECF No. 106, PageID.3444; ECF No. 120-1, ME 6, [02:38:00] – [02:40:00].) Following the baby's birth, EMS suctioned out the baby's nose and mouth, cut the umbilical cord, attempted on two occasions to establish an IV but were unsuccessful, placed Preston on a monitor to oversee her vitals, lifted Preston to a cot, and transported her out of the jail. (ECF No. 105, PageID.3406; ECF No. 106, PageID.3444.)

Preston was subsequently taken to McLaren Hospital and successfully delivered the placenta with no complications. (ECF No. 107-2, PageID.3489.) Both Preston and her baby did not sustain physical injuries stemming from his birth. (*Id.*) However, Preston states that she continues to suffer from nightmares and emotional distress caused by the events surrounding her labor and delivery. (ECF No. 107-2, PageID.3489. Preston testified that she was sent back to Macomb County Jail at some point after the birth of her child (at least as of March 28, 2016) and that she remained detained there until at least May 30, 2016. (ECF No. 105, PageID.3423–3431.)

## B. Procedural Posture

On July 10, 2018, Preston filed this complaint against Defendant Macomb, Sheriff Anthony Wickersham, Officer Jeffrey Rattray, the CCS Defendants, and other Defendant CCS employees (David Arft, Temitipe Olagbaiye, and Monica Cueny). (ECF No. 1.)

On July 18, 2018, Wickersham filed a motion to dismiss. (ECF No. 6.) On July 24, 2018, Rattray filed a motion to dismiss (ECF No. 11); Rattray later filed a motion for summary judgment (and an amended version) in August of 2018. (ECF Nos. 29, 31.) On July 25, 2018,

Defendant Macomb filed an answer. (ECF No. 13.) On August 9, 2018, the CCS Defendants, Arft, Cueny, and Olagbaiye filed a joint motion to dismiss. (ECF No. 27.)

On August 21, 2018, the parties filed a stipulation to dismiss Rattray with prejudice. (ECF No. 33.) On December 14, 2018, the Court granted Wickersham's motion to dismiss, finding that Preston's claims against Wickersham in his official capacity were redundant because of Defendant Macomb's status as a defendant, and dismissed Wickersham as a party. (ECF No. 41.) Additionally, following a hearing on January 14, 2019, the Court granted in part the joint motion to dismiss filed by the CCS Defendants, Arft, Cueny, and Olagbaiye. (ECF No. 42.) The Court found that Preston had stated a claim of deliberate indifference to her right to adequate medical care against Defendants Deview, Bishop, and Lubanski, but had failed to state a claim against Defendant CCS, Defendant Sherman, Arft, Cueny, and Olagbaiye. (*Id.*) On March 4, 2019, Defendants Deview, Bishop, and Lubanski filed a joint answer. (ECF No. 43.)

On March 11, 2019, Preston filed a motion to amend the complaint. (ECF No. 46.) Preston sought to amend the complaint to further support

25

her claims against Defendant CCS and Defendant Sherman; to add two correctional officers (i.e., CO Holmes and John Doe COs) as defendants; and to expand upon earlier allegations against Defendants Deview, Bishop, Lubanski, and Macomb. (*Id.*) Defendant Macomb County opposed the proposed amendments regarding CO Holmes but was silent as to the John Doe COs and Macomb County itself. (ECF No. 48.) The CCS Defendants opposed the amendments regarding Defendants Sherman and CCS on the grounds that such amendments were futile or failed to satisfy Federal Rule of Civil Procedure 8 and that they should be stricken under Federal Rule of Civil Procedure 12(f). (ECF No. 51.) They also moved for a more definite statement under Rule 12(e). (*Id.*)

On May 7, 2019, Defendants Deview, Bishop, and Lubanski filed a motion for a scheduling order or in the alternative for expedited discovery (ECF No. 54), which the Court denied the next day. (ECF No. 55.) On May 15, 2019, Preston's motion for leave to file a supplemental brief (ECF No. 56) was granted, and the Court allowed any interested parties to file a supplemental brief on whether the Court should adopt an objective standard for deliberate indifference to adequate medical care claims brought by pretrial detainees. (ECF No. 58.) Preston, Defendants Bishop,

26

Deview, and Lubanski, and Defendant Macomb all did so. (ECF Nos. 59–61.)

On July 24, 2019, the Court granted Preston's motion to amend the complaint in part. (ECF No. 62.) The Court found that Preston's proposed amended complaint stated a claim for which relief could be granted as to Defendants Deview, Bishop, Lubanski, and Dr. Sherman for individual liability, and CCS and Macomb County for *Monell* liability. (*Id.* at PageID.934.) Because the amendments were not futile, granting leave to amend with regard to those allegations was in the interests of justice. (*Id.*) However, the Court found that Preston did not state a claim against Dr. Sherman for supervisory liability or the COs for individual liability, and therefore denied leave to amend to add these claims. (*Id.*) Additionally, the CCS Defendants' motions to strike and for a more definite statement were denied. (*Id.*)

On August 27, 2019, Preston filed her first amended complaint, bringing counts of (1) failure to train or supervise Defendant CCS, leading to violation of Preston's Fourteenth Amendment right to adequate and timely medical care for her serious medical needs, under 42 U.S.C. Section 1983, against Defendant Macomb; (2) unconstitutional

27

polices and customs, leading to violation of Preston's Fourteenth Amendment right to adequate and timely medical care for her serious medical needs, under 42 U.S.C. Section 1983, against Defendant CCS; and (3) violation of Preston's Fourteenth Amendment right to adequate and timely medical care for her serious medical needs, under 42 U.S.C. Section 1983, against all individual Defendants. (ECF No. 63.) Preston sought compensatory and punitive damages, attorney fees and costs, prejudgment interest as appropriate, and any other such relief deemed just by the Court. (*Id.*) On September 10 and 13, 2019, Defendants Macomb and the CCS Defendants filed answers to the first amended complaint. (ECF Nos. 64, 66.)

Following several adjournments to the scheduling order and numerous discovery disputes (*see* ECF Nos. 73, 75, 81, 84–93, 95–97, 99, 112), the CCS Defendants filed a motion for summary judgment on September 13, 2021 (ECF No. 103), as well as a motion to seal related exhibits (ECF No. 102). That same day, Defendant Macomb filed a motion for summary judgment and a request to file an exhibit under seal. (ECF No. 107.) On September 22, 2021, Defendant Macomb filed a response to the CCS Defendants' motion for summary judgment. (ECF No. 110.) On

October 13, 2021, the Court entered an order requiring supplemental briefing by Defendant Macomb and the CCS Defendants addressing the *Shane Group* factors to allow the Court to adjudicate their motions to seal exhibits. (ECF No. 111.) This supplemental briefing was subsequently filed on October 22, 2021. (ECF Nos. 117, 118.) Preston filed responses to the CCS Defendants' and Defendant Macomb's motions for summary judgment (ECF Nos. 119–120), to which Defendant Macomb and the CCS Defendants replied. (ECF Nos. 121, 123.)

Additionally, on February 1, 2022, the Court set a supplemental briefing schedule for the parties to address the impact of *Brawner v. Scott Cty., Tennessee*, 14 F.4th 585 (6th Cir. 2021) and *Greene v. Crawford Cty., Michigan*, 22 F.4th 593 (6th Cir. 2022) on the appropriate standard to assess deliberate indifference to adequate medical care claims brought by pretrial detainees. (ECF No. 24.) Preston filed a supplemental brief on February 11, 2022 (ECF No. 126), to which the CCS Defendants and Defendant Macomb responded on February 17, 2022 (ECF No. 127) and February 18 (ECF No. 128), respectively.

Defendant Macomb submitted an amended supplemental brief on March 30, 2022, to address the newly-released Sixth Circuit decision in

29

*Trozzi v. Lake Cty., Ohio*, 29 F.4th 745 (6th Cir. 2022), which further clarified the changed standard as outlined in *Brawner* and *Greene*. (ECF No. 130.) The next day, Preston filed a motion to strike Defendant Macomb's amended supplemental briefing (ECF No. 131), requesting the Court strike this briefing or, in the alternative, reschedule the scheduled hearing to allow supplemental briefing from Preston. Following the Court's order denying Preston's motion to strike and setting a schedule for permissive supplemental briefing on April 2, 2022 (ECF No. 132), both the CCS Defendants (ECF No. 134) and Preston (ECF No. 135) filed more briefing.

On April 11, 2022, a hearing was held on Defendant Macomb's and the CCS Defendants' motions for summary judgment. At that time, Defendant Macomb withdrew its request to seal Exhibit 4 (*see* ECF Nos. 100, 118). On April 12, 2022, the Court entered an order denying the CCS Defendants' motion to seal for the reasons stated on the record. (ECF No. 137.)

## II.   Legal Standard

## A. Summary judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

Additionally, "a court may properly consider videotape evidence at the summary-judgment stage." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010). "To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court "may not adopt a version of the facts that is 'blatantly contradicted' by video footage." *Laplante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Scott,* 550 U.S. at 378–80).

31

However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits*, 878 F.3d at 547 (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

### B. 42 U.S.C. § 1983

Preston pursues claims for inadequate medical care under 42 U.S.C. § 1983. To succeed, she must establish "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing cases). It is undisputed that the CCS Defendants were acting under color of state law. *See Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (corporate entity); *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (corporate employees). Accordingly, the only issue is whether Defendants violated Preston's right to adequate medical care under the Fourteenth Amendment.

Although "the Constitution 'generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life,

32

liberty or property interests[,]' . . . 'in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Trozzi*, 29 F.4th at 751 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196–98 (1989)) (internal citations omitted). One such situation is for pretrial detainees: "the government has a constitutional obligation to provide medical care to those whom it detains." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "The Eighth Amendment protects an inmate from 'cruel and unusual punishments,' U.S. CONST. amend. VIII, which includes a right to be free from deliberate indifference to an inmate's serious medical needs, *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)." *Brawner*, 14 F.4th at 591. "The Fourteenth Amendment similarly protects pretrial detainees." *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 463 (6th Cir. 2021) (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Winkler*, 893 F.3d at 890); *see also Griffith*, 975 F.3d at 566 (6th Cir. 2020) (quoting *City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983)) (A pretrial detainee's "due process rights to medical care 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'").

Additionally, "[d]eliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983." *Burwell*, 7 F.4th at 463 (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)).

Because Preston was a pretrial detainee and not an inmate during her detention, Preston's claims are based on the Fourteenth Amendment, and not the Eighth Amendment.[14] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), adopted a two-part test for when a prison official has an affirmative duty to protect a prisoner: (1) "the underlying deprivation suffered by the prisoner, measured objectively, must be sufficiently serious[;]" and (2) "the prison official's omission must be the product of a sufficiently culpable state of mind: deliberate indifference[.]" *Trozzi*, 29 F.4th at 752. The Eighth Amendment requires both a subjective and objective component to the deliberate indifference analysis, although the Court previously accepted supplemental briefing from the parties in this case at the motion to dismiss stage regarding whether to include a

---

[14] The CCS Defendants occasionally characterize Preston's claim against them as deliberate indifference to her serious medical needs in violation of the Eighth Amendment. (*See* ECF No. 103, PageID.2044.) This is incorrect: Preston's claim as articulated in her amended complaint is correctly based upon the Fourteenth Amendment. (*See* ECF No. 63, PageID.938.)

subjective component here for Preston's Fourteenth Amendment claim in light of the developing law following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), which altered the *Farmer* test. (*See* ECF Nos. 56–61.)

Up until recently, the Sixth Circuit analyzed such Fourteenth and Eighth Amendment claims under the same rubric. But not anymore: in *Brawner*, 14 F.4th at 596, the Sixth Circuit answered the question left open based on *Kingsley* to find that *Kingsley* required "modification of the subjective prong of the deliberate-indifference test for pretrial detainees." *Brawner*, 14 F.4th at 596 ("Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable."). For a few months after that decision was released, there was a question of whether *Brawner*'s statements on this were a holding or dicta, but that question has now been answered by the Sixth Circuit's decision in *Greene*, 22 F.4th at 593, which conclusively found *Brawner*'s extension of *Kingsley* to be binding. *Id.* at 607.

*Brawner* (and *Greene*) resulted in a significant change to the deliberate-indifference analysis for Fourteenth Amendment-based claims, although the "objectively serious medical need" prong was not affected. However, subsequent Sixth Circuit case law has made clear that the changed standard outlined in *Brawner* and *Greene* was, to put it lightly, unclear: the language in *Brawner* created some uncertainty regarding how to apply the modified subjective standard. *See*, *e.g.*, *Trozzi*, 29 F.4th at 753 ("And in so doing, the [*Brawner*] opinion articulates the modified subjective standard in a sentence only a lawyer could love: the jail official must either act intentionally or 'recklessly fail[ ] to act reasonably to mitigate the risk the serious medical need posed . . . even though a reasonable official . . . would have known that the serious medical need posed an excessive risk . . . .' [*Brawner*, 14 F.4th] at 597."); *see also Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) ("While *Brawner* is far from clear, we can distill a couple of principles from it."). For example, were subjective considerations to be fully ignored as part of this modified standard? A batch of recent Sixth Circuit cases have addressed this evolving standard. *See Britt v. Hamilton Cty.*, No. 21-3424, 2022 WL 405847, at *6 (6th Cir. Feb. 10, 2022); *Hyman*, 27 F.4th

36

at 1233; *Westmoreland v. Butler County*, 29 F.4th 721 (6th Cir. 2022); *Trozzi*, 29 F.4th at 753.

In response to this need for clarity, the Sixth Circuit freshly evaluated *Farmer*, *Kingsley*, *Brawner*, and *Greene* in tandem to clarify the elements required for deliberate indifference claims based on inadequate medical care brought by pretrial detainees under the Fourteenth Amendment. *Trozzi*, 29 F.4th at 757–58. As most recently summarized, a plaintiff must satisfy the following three elements to meet the "*Farmer-Brawner* test":

> (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

*Id*. This standard still "ensur[es] that there is a sufficiently culpable mental state to satisfy the 'high bar' for constitutional torts grounded in a substantive due process violation." *Id* at 758. "In practice, that may mean that a prison official who lacks an awareness of the risks of her inaction (because, for example, another official takes responsibility for medical care, a medical professional reasonably advised the official to not

act, the official lacked authority to act, etc.) cannot have violated the detainee's constitutional rights." *Id*. And it remains true that the Court "cannot 'impute knowledge from one defendant to another[,]' [rather it] must 'evaluate each defendant individually[.]'" *Greene*, 22 F.4th at 607 (quoting *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).

### C. *Monell* liability

Municipal entities, including contractors, cannot be held liable on a theory of *respondeat superior*; rather, the plaintiff must show that the entity is the moving force behind the constitutional violation which is done by pointing to a policy or custom. *Winkler v. Madison Cnty.*, 893 F.3d at 904 (quoting *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). A plaintiff demonstrates the municipality had such a policy or custom by proving "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of*

38

*Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)); *see also Winkler*, 893 F.3d at 901.

## III.  Analysis

Preston brings a Section 1983 claim alleging that Defendants violated her Fourteenth Amendment due process rights. (ECF No. 63, PageID.958–964, 971–974.) She claims that Dr. Sherman, Bishop, Lubanski, and Deview (hereinafter, collectively the "Individual Defendants") were deliberately indifferent to her serious medical needs. She also argues that Defendant Macomb and Defendant CCS are liable for maintaining unconstitutional policies that caused her constitutional rights to be violated by the Individual Defendants. (*Id.* at PageID.964–971.) None of Preston's claims survive summary judgment.

### A. Deliberate indifference – Individual Defendants

While Preston established the existence of an objectively serious medical need—as required for the first prong of the *Farmer-Brawner* test—Preston's claims against all the Individual Defendants fail based on an inability to meet the third prong of that same test. *Trozzi*, 29 F.4th at 757–58. There is no genuine issue of material fact that the Individual

39

Defendants did not know that their failure to respond would pose a serious risk to Preston and ignored that risk. *Id.*

### a. Prong 1 – Objectively serious medical need

The objective component of a due process claim requires that "the medical need at issue is sufficiently serious." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Blackmore*, 390 F.3d at 896). In order to allege that the medical need at issue is sufficiently serious, a pre-trial detainee must show that she is incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897).

As the Court has previously recognized in its opinion granting in part and denying in part the CCS Defendants' motion to dismiss (ECF No. 42, PageID.457–459),[15] the main question before the Court is not

---

[15] That opinion indicates that, at the time the opinion was written, there was "no dispute" between the parties "that plaintiff had a serious medical need when she began to bleed and was obviously in labor beginning at noon on March 20" (ECF No.

whether Preston had a serious medical need, but *when*. "The virtually inevitable result of pregnancy and labor is the birth of a child. The birth of a child always presents a risk of serious injury to both mother and child." *Havard v. Wayne Cty.*, 436 F. App'x 451, 454 & n.5 (6th Cir. 2011) (noting the right at issue is "[a] prisoner's right to adequate medical care" and noting that hospitals are appropriate places for births in defining what is a serious medical risk—the objective component of the deliberate indifference test). But "simply being pregnant—without more—does not constitute a serious medical condition." *Webb v. Jessamine Cnty Fiscal Ct*, 802 F. Supp.2d 870, 878 (E.D. Ky. Aug. 5, 2011). "[T]he general condition of being pregnant does not necessarily constitute a serious medical need at any given moment in time during incarceration . . . ." *Patterson v. Carroll Cty. Det. Ctr.*, No. 05-101-DLB, 2006 U.S. Dist. LEXIS 92057, at *12 n.5 (E.D. Ky. Dec. 20, 2006) (citing *Smith v. Franklin Cty.*, 227 F. Supp. 2d 667, 667 n.10 (E.D. Ky. 2002); *Coleman v. Rahija*, 114 F.3d 778, 784–85 (8th Cir. 1997); *Hogan v. Wellstar Health*

---

42, PageID.457), but that depiction does not comport with the evidence of the timeline of Preston's symptoms as obtained during discovery and does not reflect the parties' current arguments (e.g., whether the point at which Preston had a serious medical need was as of the time her water broke at 2:00 p.m.).

*Network, Inc.*, No. 1:12-CV-1418-RWS, 2013 U.S. Dist. LEXIS 35841, at

*22 (N.D. Ga. Apr. 15, 2015) (citing *Webb*, 802 F. Supp. 2d at 878).

Typically, it requires "a development that 'must require immediate

attention.'" *Patterson*, 2006 U.S. Dist. LEXIS 92057, at *12 n.5 (quoting

*Smith*, 227 F. Supp. 2d t 677 n.10). Labor is an example of such a

development. *Coleman*, 114 F.3d at 784 (finding pre-term labor,

including symptoms such as a bloody show, was a serious medical risk);

*Hogan*, No. 1:12-CV-1418-RWS, 2013 U.S. Dist. LEXIS 35841, at *22)

(citing *Webb*, 802 F. Supp. 2d at 878) (finding labor was a serious medical

risk); *see also Bingham v. Webster Cty.*, No. 1:05CV220-D-D, 2007 U.S.

Dist. LEXIS 7333, at *23 (N.D. Miss. Oct. 1, 2007) (finding bleeding

absent labor during pregnancy was a serious medical risk).

Because there is no allegation that a physician diagnosed Preston's

pre-term labor and mandated treatment, the Court must determine

whether her medical need was so obvious that a lay person would easily

recognize the need for immediate medical attention. "The question is, at

what point does it become obvious to a layperson that a woman is in

labor?" *Hogan*, 2013 U.S. Dist. LEXIS 35841, at *23. For guidance, the

Court previously looked to *Coleman* (ECF No. 42, PageID.458–459),

where the Eight Circuit looked at "(1) an increase in vaginal discharge; (2) a 'bloody show'; (3) uterine contractions six minutes apart; and (4) abdominal pain possibly attributable to a tightening of her pelvis and earlier complaints of lower back pain." 114 F.3d at 784. The Court also previously looked to the district court's opinion in *Webb* (*id.*), which examined more general factors: "the amount of time left before a pregnant inmate reaches the full term of her pregnancy, the symptoms of labor that she has exhibited, [and] any previous or prenatal complications with respect the inmate's pregnancy . . . ." 802 F. Supp. 2d at 880[16] (citing cases). The Court continues to find this caselaw useful guidance to determining when it is obvious to a layperson that a pregnant woman is in labor. Furthermore, "*Brawner* left the 'objectively serious medical need' prong untouched." *Hyman*, 27 F.4th at 1237.

As a preliminary matter, Preston's supplemental briefing confusingly asserts that "[n]either the CCS Defendants' [sic] nor Macomb County have disputed that Preston was suffering from an objectively

---

[16] The *Webb* court also considered "the reaction of jail officials." *Id.* Here, the individual defendants are medical professionals, not lay people, and so their reaction does not inform the objective component analysis as the corrections officers did in *Webb*.

serious medical condition prior to her baby being born in the Jail on March 20, 2016." (ECF No. 126, PageID.6964.) This is an oversimplification. There is a dispute between the parties as to when Preston was suffering from an objectively serious medical condition—specifically, *when* it was obvious on March 20, 2016 that Preston was in labor. (See ECF No. 103, PageID.2056–2057; ECF No. 120, PageID.6506–6507; ECF No. 123, PageID.6906.)

Preston appears to argue that there is no genuine dispute of fact that Preston had an objectively serious medical need *at all times* on March 20, 2016 prior to the baby's birth. Preston highlights that "[1] [Preston] was just over eight months pregnant, [2] her pregnancy was obvious[,]" and "[3] Defendants were aware that the pregnancy was deemed a high-risk pregnancy." (ECF No. 126, PageID.6968.) Preston also makes general reference to "the symptoms" as of that day, without delving into timeframes or specific symptoms. (*Id.*)

In contrast, the "CCS Defendants maintain that Preston did not have an objectively serious medical need until her membranes had ruptured (i.e., water broke) at 13:59 on March 20, 2016." (ECF No. 127, PageID.6986; *see also* ECF No. 103-14, PageID.2901–2902; ECF No. 103-

44

15, PageID.3061.) They point to their own medical expert, Dr. Ameigh Worley, M.D. F.A.C.O.G., who indicates that "[u]p until the moment of ruptured membranes, there was no evidence that Ms. Preston was in labor." (ECF No. 103-5, PageID.2095.) However, the CCS Defendants do not engage with precedent on this issue, instead relying on their expert[17] to counter the testimony of Preston's expert, Dr. Steven B. Powers, M.D. F.A.C.O.G., that Dr. Sherman should have activated EMS and transported Preston to a labor and delivery unit once Preston presented with a bloody show at 1:30 p.m., and that failure to do so was a denial of medical care. (ECF No. 103-13, PageID.2804.) The CCS Defendants continually suggest that "there was no objective medical evidence supporting labor or pregnancy complications" (ECF No. 123, PageID.6908), but offer no precedent suggesting what constitutes

---

[17] As a note, the CCS Defendants generally point to the report of Dr. Worley (ECF No. 103-5), for the contention that "a 'bloody show' is common in pregnancies and does not constitute an emergency, nor does it signal imminent labor." (ECF No. 103, PageID.2056.) However, the Court cannot find this in Dr. Worley's report; the references may mistake Dr. Worley's report for language in the report from the CCS Defendants' expert Kathryn J. Wild, RN, MPA, CCHP-RN. (ECF No. 103-15, PageID.3061) ("It usually occurs in late pregnancy, as the body prepares for labor. Every pregnancy is unique, so it is difficult to say exactly when a woman will enter labor after the bloody show occurs. Some women may enter labor a few hours or a few days or more after having a bloody show.").

objective medical evidence; presumably it means something found by examination or by measurements as opposed to subjective complaints, a sign as opposed to a symptom. Nor do they offer precedent indicating such so-called "objective" evidence is even necessary for this prong. Indeed, it appears that there is not "a bright line in the course of labor" for courts to evaluate, *Webb*, 802 F. Supp. 2d at 880, but, instead, the court engages in a general evaluation of presenting symptoms and the history and characteristics of the pregnancy itself (e.g., past complications in the current pregnancy or former pregnancies) to determine when labor was obvious—including subjective complaints like pain.

Preston did not have a serious medical need at any time before March 20, 2016, because there was no development in her pregnancy; although Preston was eight months pregnant with a high-risk pregnancy, as considered in *Webb*, she did not display any of the factors from *Coleman* prior to that date. Accordingly, the relevant inquiry is limited to when she had a serious medical need on March 20, 2016 (the day of her child's birth). Before her water broke at 2:00 p.m. that day, Preston had four interactions with medical providers:

(1) at 7:30 a.m. with Deview, where Preston reported contractions occurring every three minutes lasting 30 seconds and intense pain, but Deview determined Preston was having Braxton-Hicks contractions because her abdomen was not tightening, her skin was warm and dry, and she was not visibly in pain (ECF No. 105, PageID.3397);

(2) at approximately 12:20 p.m. with Lubanski and Bishop, where Preston reported contractions and had white vaginal discharge, but a litmus test indicated no amniotic fluid was present, an abdomen assessment did not indicate that it was contracting when Preston stated it was, and there was no facial grimacing (ECF No. 107-2, PageID.3486–3487; ECF No. 105, PageID.3422);

(3) at some time before 1:28 p.m. with Bishop, where Preston told Bishop that she was bleeding from her vagina, but Bishop did not examine to see blood if there was on Preston's pants because she was "not exposing her to a bunch of other people" (ECF No. 103-8, PageID.2285; ECF No. 103-9, PageID.2522; ECF No. 103-10, PageID.2577); and

47

(4) at 1:28 p.m. with Deview and Bishop, when Preston reported having contractions and a possible bloody show, and Deview admitted that Preston had passed the mucus plug at that point, but Deview later testified that Preston did not have contractions and was not in any distress (ECF No. 103-10, PageID.2577; ECF No. 103-8, PageID.2419, 2462; ECF No. 107-2, PageID.3488).

Here, viewing the evidence in the light most favorable to Preston, a reasonable jury could conclude that it would be obvious to a layperson that Preston was in labor starting at 1:30 p.m. on March 20, 2016. As the Court has noted previously, at all times during her detention, Preston was eight months pregnant, scheduled for a C-section about a month later, and had a history of labor complications, resulting in a high-risk designation—which was recorded in the Pathways medical files. Furthermore, Preston also had a history of heroin use during her pregnancy. *Cf. Townsend v. Jefferson Cnty.*, 601 F.3d 1152 (11th Cir. 2010) (noting a serious medical need existed where the plaintiff admitted using crack cocaine and smoking cigarettes daily during her pregnancy and experienced abdominal pain and vaginal bleeding for over eight

48

hours). Looking at the *Coleman* factors, 114 F.3d at 784, Preston had exhibited uterine contractions faster than six minutes apart and abdominal pain as of 7:30 a.m.; continued contractions, vaginal discharge, and pain at 12:20 p.m.; and continued contractions and a bloody show at 1:30 p.m.—all progressing over the course of six hours.

While the CCS Defendants contend that Deview, Bishop, and Lubanski determined that Preston's complaints of contractions were Braxton-Hicks contractions based on the lack of abdominal tightening and that "[a] bloody show, without more, does not constitute an objectively serious medical need" (ECF No. 103, PageID.2057), this is unavailing. The standard is whether a *layperson* would think Preston needed a doctor's attention. A layperson would not know if Preston was having false contractions and could consider a bloody show a crucial sign of labor. The medical records are properly considered under the subjective component because they reflect Defendants' medical treatment, which is the conduct evaluated to determine if the Individual Defendants consciously disregarded a serious medical risk. Furthermore, in *Webb*, there is no discussion of whether the back pain and cramping experienced by the plaintiff were real contractions as opposed to Braxton-

49

Hicks contractions. Rather, the discussion is phrased in terms of the plaintiff's reported symptoms: "[S]he experienced sharp back pain and severe cramping, i.e., contractions, and had the sensation that she was 'burning up.'" *Webb*, 802 F. Supp. 2d at 880–81. *Webb* also noted that "labor can be subtle at its outset with symptoms that are hard for anyone, including the woman who is experiencing those symptoms, to recognize as labor. Nonetheless, it seems that the vast majority of women experiencing labor (and those around them) figure out that they are in labor in advance of the delivery of their babies by virtue of these symptoms *as they accumulate and intensify*." *Id.* at 880 n. 10 (emphasis added).

Even excepting the contractions from the list of accumulated symptoms, Preston reported symptoms of vaginal discharge, vaginal bleeding, and pain that accumulated over the course of several hours on March 20, 2016. As the Court found previously (ECF No. 42, PageID.459–460), these developments to her late-stage, high-risk pregnancy were either considered explicitly by *Coleman* or amount to a symptom of labor as noted in *Webb*. A reasonable jury could thus find that a layperson

would believe Preston's labor had begun as of (at least) 1:30 p.m.[18] Accordingly, there is a genuine issue of material fact as to whether Preston's condition was so serious that an "objectively, 'sufficiently serious'" deprivation of medical care could occur. *See Farmer*, 511 U.S. at 834.

### b. Prong 2 & 3 – Modified subjective component

The Court now must consider the modified deliberate indifference inquiry for all of the Individual Defendants, separately. *See Greene*, 22 F.4th at 607 (noting that the court must "evaluate each defendant individually" under *Brawner*'s modified subjective prong). Preston must demonstrate the following for each of the individual defendants: "(2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of

---

[18] Furthermore, other courts have previously found that a pregnant woman's complaints of vaginal bleeding, even without signs of labor, constitutes a serious medical need. *See Bingham*, No. 1:05CV220-D-D, 2007 U.S. Dist. LEXIS 7333, at *23. The Court agrees with this as an alternative basis for finding that Preston met the objective medical need prong: Even were a layperson to not believe that Preston's symptoms constituted the onset of labor, a layperson would find that her late-term pregnancy alongside her reported symptoms would constitute a serious medical need in itself.

harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi*, 29 F.4th at 757–58.

Previously with regard to the subjective prong(s), "a 'strong showing on the objective component' [could have] create[d] a genuine issue of material fact to defeat summary judgment[;]" now, this "has little import in a world where the subjective prong no longer directly parallels the objective prong's focus on the risks posed by the detainee's medical needs." *Id.* at 760. The Sixth Circuit recognized that "even a strong showing that the detainee needed medical attention does not necessarily tell anything about a prison official's state of mind with respect to the need to intervene." *Id.* Accordingly, while previously it was stated that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious[,]" *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002), it is in some ways unclear exactly what proofs are sufficient to demonstrate state of mind.

Furthermore, the Sixth Circuit has made clear that it is proper to rely on pre-*Brawner* cases to the extent the Court still applies the post-*Brawner* recklessness test for determining the existence of deliberate indifference. *See Britt*, No. 21-3424, 2022 WL 405847, at *6 ("That we have relied on pre-*Brawner* cases for other aspects of the deliberate-indifference inquiry is hardly unusual. What would be unusual would be to assume that *Brawner* overruled all of these cases, even those that dealt with other issues and even those that relied on alternative grounds when they addressed the state-of-mind inquiry.").

Because "[c]ourts are generally reluctant to second guess the medical judgment of prison officials . . . this court has found deliberate indifference on the part of medical staff . . . only where 'medical care . . . is so cursory as to amount to no treatment at all.'" *Winkler*, 893 F.3d at 892 (citations omitted). Negligence, carelessness, ineffectiveness, or misdiagnoses does not meet this standard. *Id.* at 891. "[A] mere difference of opinion about the proper course of treatment . . . is not enough to establish deliberate indifference under *Brawner*'s modified approach." *Trozzi*, 29 F.4th at 759.

### i. Dr. Sherman[19]

Having identified an objectively serious medical need as of at least 1:30 p.m. on March 20, 2016, *Trozzi* next requires evaluation of whether a reasonable officer at the scene, knowing what Dr. Sherman knew at the time, would have understood that Preston's medical needs subjected her to an excessive risk of harm. Dr. Sherman's background as a medical professional with the knowledge and training to diagnose a late-term pregnant person affects the inquiry into his state of mind. *See Trozzi*, 29 F.4th at 757–58; *see also Greene*, 22 F.4th at 614 (applying *Brawner* and considering inquiries into the defendant's state of mind, including a prison official's professional background, in assessing deliberate indifference).

There were three phone calls with Dr. Sherman on March 20 before Preston gave birth. Deview spoke with Dr. Sherman at 1:30 p.m., which was Dr. Sherman's first introduction to Preston's condition on the day of the baby's birth. Deview informed him that Preston had a bloody show. Additionally, Deview had previously called after Preston's intake

---

[19] The Court previously found that Preston could bring a claim against Dr. Sherman in his individual capacity (ECF No. 62, PageID.912–914), but *not* in a supervisory capacity (*id*. at PageID.914–920).

screening on March 15 to inform him about Preston's self-reported recent use of heroin and her negative drug screen; it is unclear if more was communicated. (ECF No. 103-8, PageID.2315.)

However, the "'modified subjective prong' . . . considers whether [Preston's] medical need would have been apparent or detectable to a reasonable official at the scene armed with [Dr. Sherman's] actual knowledge," *Trozzi*, 29 F.4th at 760, and thus Dr. Sherman's actual knowledge is crucial to the determination here. The record is unclear as to how much, exactly, was known by Dr. Sherman at 1:30 p.m. It is uncertain from the record when exactly Dr. Sherman was aware of Preston's high-risk pregnancy status because Deview herself did not learn about Preston's high risk pregnancy status until after the birth. There is no evidence that Preston communicated her scheduled C-section and former placental abruption to any CCS staff until her March 16 appointment with Olaigbaiye, which did not involve any other medical staff, and it is uncertain when Dr. Sherman reviewed these records before the 1:58 p.m. call with Bishop.[20] Dr. Sherman testifies that he knew

---

[20] There is a medical note from March 18, 2016, including an order from Dr. Sherman to weigh Preston weekly until delivery, which suggests that Dr. Sherman may have reviewed Olagbaiye's notes before March 20. (ECF No. 105, PageID.3436.)

Preston had a high-risk pregnancy at least before 1:30 p.m. (ECF No. 103-11, PageID.2641.) Additionally, based on Deview's testimony, it appears that Dr. Sherman was not told that Preston was complaining of contractions at 1:30 p.m. on March 20 because Deview herself testified that Preston did not have any contractions at 1:30 p.m. (ECF No. 103-8, PageID.2440)—although Preston testifies otherwise.

In sum, at 1:30 p.m., the evidence reveals that Dr. Sherman knew Preston had a late-term, high-risk pregnancy and was experiencing a bloody show. Based on that information, Dr. Sherman told Deview that Preston needed to be kept housed in the medical unit at the jail, to be observed in a cell with a camera where she could be observed, and to have her vital signs taken; he was to be contacted were any changes to occur.

The second call was at 2:02 p.m., when Bishop called Dr. Sherman to tell him that Preston's water had broken and that she was bleeding with mucous. Bishop believes she communicated Preston's higher-risk pregnancy status because of her prior C-section to Dr. Sherman. Dr. Sherman ordered the nurses to time her contractions, start the process for an urgent but non-emergent transfer to the hospital, and call him back. As of this time, Dr. Sherman was definitely aware that Preston had

a high-risk pregnancy, though it appears that he believed it was due to the scheduled C-section and not the past placental abruption.

Finally, the third call was at 2:22 p.m., when the baby's head crowned. Dr. Sherman communicated with Lubanski as to how to safely deliver the baby in the jail, because Preston could not be transferred at this point.

While Preston's argument is unclear, it appears that Preston contends Dr. Sherman should have called (or had the nursing staff call) 911 for emergency transfer after Preston presented with a bloody show (both starting at 1:30 p.m. and also as of 2:00 p.m., when her water broke), considering the knowledge that she had a late-term pregnancy. This is analogous in many ways to the assertion by the plaintiff in *Trozzi*: the inaction is not calling for immediate emergency transport. The Sixth Circuit in *Brawner* relied on testimony from the plaintiff's medical expert and treating physician to determine that, based on the defendant nurse's "additional medical training and [relevant] experience . . . as compared to a layperson, a jury could even more easily infer that she recognized the need for a doctor's attention and responded unreasonably. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 846 (6th Cir. 2002)

(determining that the evidence supported a finding of deliberate indifference by a nurse based on the information known by the nurse or what would have been obvious to her)." *Brawner*, 14 F.4th at 598.

Dr. Powers, Preston's expert, testified that Dr. Sherman denied Preston medical care[21] by not sending her to the hospital when she presented with a bloody show at 1:30 p.m. and again when her water broke at 1:58 p.m. (ECF No. 103-13, PageID.2804.) Dr. Powers states in his report[22] that labor and placental abruption can occur at any time during pregnancy, and that the only official way to diagnose labor onset is to examine the cervix for contractions (which CCS nursing staff could not do) and monitoring the contractions and fetal heart rate on a fetal heart monitoring machine (which the Jail did not have). (ECF No. 120-6, PageID.6591.) With any signs or symptoms of labor with Preston's

---

[21] To the extent Dr. Powers' report suggests that Dr. Sherman's or any nurse's care was "grossly negligent" and fell "below the standard of care," this is unavailing. This is relevant to medical malpractice claims but is insufficient to create a genuine dispute as to recklessness for purposes of a constitutional deliberate indifference claim. *See Britt*, 2022 WL 405847, at *3.

[22] However, there are some issues with Dr. Powers' report—for example, he appears to outline a timeline that is based on allegations presented in the amended complaint, as opposed to the testimonial and documentary evidence. For example, Dr. Powers indicates that Dr. Sherman "took no action" as of the 1:30 p.m. call, but this contradicts the testimony. (ECF No. 120-6, PageID.6592.)

history, it was a "mandatory emergency" to immediately transfer her to the hospital or otherwise it would pose risks of life-threatening bleeding and infant resuscitation and care. (*Id.*) He testifies that a reasonable person in Dr. Sherman's shoes, knowing about the bloody show and her history of a C-section, would find that not calling an ambulance to get her to a proper facility exposed Preston to an excessive risk of harm, meeting the second prong.

In contrast, the CCS Defendants' expert Nurse Wild testified that the response to a bloody show is to monitor the patient, and that a bloody show is not a sign that labor has begun (ECF No. 103-14, PageID.2889–2890, 2901–2902), while their other expert, Dr. Worley, reported that Dr. Sherman followed the standard of care by advising those onsite to monitor Preston in a video-monitored cell upon presentation of the bloody show, and that there was no evidence of labor until Ms. Preston's water broke. (ECF No. 103-5, PageID.2095.) Nevertheless, Dr. Powers' testimony creates a genuine issue of fact regarding whether a reasonable officer at the scene, knowing what Dr. Sherman knew at the time, would have understood that Preston's medical needs subjected her to an excessive risk of harm as of 1:30 p.m. and 2:00 p.m.

However, Preston must also demonstrate that Dr. Sherman knew that his failure to respond would pose a serious risk to Preston and ignored that risk. The question for the Court, then, is whether Dr. Sherman's conduct was merely negligent ("[m]ere negligence is insufficient[,]" *Brawner*, 14 F.4th at 596) or "recklessness [that] . . . concern[s] a failure to act with respect to mitigating certain medical risks." *Trozzi*, 29 F.4th at 753; *see also Brawner*, 14 F.4th at 597 ("recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the pretrial detainee]").

This is where Preston's argument fails. For one, as the CCS Defendants recognize in their second supplemental brief, Dr. Sherman testified directly that he does not believe that a bloody show is an emergency and, in Preston's case, he thought it was an initial sign of labor. (ECF No. 103-11, PageID.2640.) We now know that Dr. Sherman's understanding was a misdiagnosis. "*Brawner'*s civil recklessness standard does not require [medical providers] to correctly diagnose a pretrial detainee's condition. To the contrary, a mistaken diagnosis will not amount to deliberate indifference unless it is both 'clearly inconsistent' with the detainee's symptoms and reflective of a failure to

rule out other explanations. *See Britt*, 2022 WL 405847, at *3." *Howell v. NaphCare, Inc.*, No. 1:19-CV-373, 2022 WL 740928, at *7 (S.D. Ohio Mar. 11, 2022). Dr. Sherman's belief that Preston had just begun the early stages of labor was ultimately mistaken, but it was not "clearly inconsistent" with the symptoms the nurses perceived and reported at the time. Dr. Sherman also attempted to confirm this diagnosis by seeking more information about Preston's condition before ordering further treatment during the first and second calls.

Furthermore, as the CCS Defendants point out (ECF No. 134, PageID.7111), Dr. Sherman did not fail to intervene: he *did* respond to the news he received at 1:30 p.m. and 2:00 p.m. During the 1:30 p.m. call, he was collecting more information before deciding how to treat Preston. It may have amounted to negligence given the progress of labor not to order an ambulance as of the 1:30 p.m. call., but the law requires more. And Dr. Sherman ordered the staff to call him back with more information so that he could make a decision about Preston's care. With regard to the second call, Dr. Sherman acted on the available information to start the process for obtaining an ambulance transport and he requested that the nursing staff gather more information about Preston's

61

symptoms of labor (e.g., timing contractions), which was information necessary to transition Preston's care to a nearby hospital. By authorizing the ambulance, he also halted the allegedly unconstitutional delay in Preston's transfer to the hospital.

There is perhaps a question of whether Dr. Sherman should have ordered an immediate emergency transport as opposed to the urgent process he used and whether this was negligent. But there is no evidence to meet the high bar that Dr. Sherman viewed, or a reasonable doctor in his shoes would view, his failure to call 911 as creating unjustifiably high risks to Preston as of the 2:00 p.m. call. *Cf. Trozzi,* 29 F.4th at 759 ("Either way, [the official] did not ignore Trozzi. Far from it, in fact. [The official] took affirmative actions to help Trozzi—he called his supervisor and helped transport Trozzi for medical care. Perhaps [the official] should have pursued more serious intervention. At most, that failing amounts to negligence. Far more is required to establish a constitutional violation."). Accordingly, there is no genuine issue of material fact that Dr. Sherman did not know that his failure to respond would pose a serious risk to Preston and ignored that risk. *Trozzi*, 29 F.4th at 757–58.

### ii. Deview

The same analysis applies to Preston's claim against Deview: it is necessary to evaluate whether a reasonable officer at the scene, knowing what Deview knew as of 1:30 p.m. on March 20, 2016, would have understood that Preston's medical needs subjected her to an excessive risk of harm. *See Trozzi*, 29 F.4th at 757–58. Her background as a medical professional again affects the inquiry. *Id*.

Under the subjective component, a delay in adequate treatment of an objectively serious medical need amounts to a constitutional violation itself. *Darrah*, 865 F.3d at 368–69; *see also Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (emphasis added) (quoting *Blackmore*, 390 F.3d at 899) (distinguishing between the role of a delay in treatment under the objective component as to latent medical needs and under the subjective component). Preston argues that Deview denied her access to timely adequate medical treatment and that she received inadequate medical treatment until an ambulance was called.

Deview was involved in several stages of Preston's care as of March 20. She examined Preston around 7:45 a.m. when Preston reported to the medical unit with intense pain and an indication that she was experiencing contractions capable of being timed. Around 1:30 p.m.,

Deview examined Preston, determined that she was having a bloody show, and almost immediately called Dr. Sherman. She testifies that Preston was *not* complaining of contractions at that time (despite Preston's assertions to the contrary). Based on Dr. Sherman's instructions, she left Preston alone in a monitored cell for approximately 30 minutes. Deview assisted Preston around 2:00 p.m. when her water broke and started timing her contractions. She also participated in the decision to call Dr. Sherman again. Deview saw the baby crowning at 2:25 p.m. and assisted in delivering Preston's baby. Deview was also part of the decision to call Dr. Sherman that third time, after the crowning.

Deview testified that before the baby was born, she did not know that Preston's pregnancy was high-risk nor that she was scheduled for a C-section; Deview knew that Preston was late term, because Deview conducted Preston's initial screening. (ECF No. 103-8, PageID.2386, 2454.). Deview agreed that Olaigbaiye's March 17, 2016 note included a reference to the scheduled C-section but she testified that she did not look at his Pathways note until the baby was born. (ECF No. 103-8, PageID.2454–2455.) Deview alternatively testified that the first time she believed Preston was exhibiting signs of labor was either when her water

64

broke or when the baby was crowning. (ECF No. 103-8, PageID.2387, 2461.)

Deview's testimony that she did not know about Preston's high-risk status poses a problem for Preston's proofs under the new modified subjective prong. The parties' experts' testimony and reports do not differentiate their findings for doctors or nurses—in other words, both sets of experts appear to suggest that a reasonable nurse of any certification level (in addition to a reasonable doctor) would know the same background on this issue of high-risk pregnant women, generally. Dr. Powers also testifies about Deview. The problem is that Dr. Powers' testimony and expert report appears to be premised on the contention that a medical provider would know of the excessive risk of harm to a late-term pregnant woman displaying these symptoms *who had previously had a placental abruption.* (*See, e.g.*, ECF No. 120-7, PageID.6611.) Deview did not know that Preston had that medical history. Accordingly, there is no evidence that a reasonable person *with Deview's knowledge* would thus find that not calling an emergency ambulance to get her to a proper facility as of 1:30 p.m. or 2:00 p.m.

exposed Preston to an excessive risk of harm, as required to meet the second prong.

Furthermore, to demonstrate deliberate indifference as to Deview, Preston must also demonstrate that Deview knew that her failure to respond would pose a serious risk to Preston and ignored that risk. Preston has not demonstrated this element as it pertains to Deview— regardless of whether it is considered an issue with access to timely adequate medical treatment or that she received inadequate medical treatment until an ambulance was called.

When Preston first came to the medical unit bleeding at 1:30 p.m., Deview visually examined Preston, determined that Preston was having her bloody show, called Dr. Sherman, and then took no further action other than placing Preston in a medical unit cell as ordered by Dr. Sherman. Despite Preston's indication that she reported experiencing contractions, Deview alleges that Preston did not report contractions at that time and further implies that she did not physically examine Preston (e.g., touch her abdomen) before Preston was placed in ME 6. (ECF No. 103-8, PageID.2439–2441.)

66

There are gaps in the care Deview provided to Preston that concern the Court. Despite observing a commonly known sign of labor in a late-term pregnancy (even though she did not know a surgical delivery was planned), Deview did not assess Preston's labor in any meaningful way. Deview testified that there was no one on site qualified to examine Preston's cervix (neither her nor Bishop or Lubanski were qualified, while Sherman and Olaigbaiye were qualified to do so but were not on site) and that there was no fetal monitor on site. (ECF No. 103-8, PageID.2439, 2467.) Deview thus knew that she was incapable of applying a fetal monitor and was not qualified to examine Preston's cervix. She also appears to not have reviewed Preston's full medical records before calling Dr. Sherman. Additionally, instead of actively checking in on Preston, she left her to more passive monitoring.

Yet this is not the inquiry at issue in the *Farmer-Brawner* third prong. The relevant inquiry is not whether she objectively should have called 911 immediately or provided different care (and thus was negligent to not do so). Regardless of whether there was more care that could (or even should) be provided, what matters is whether Deview *knew* that her failure to respond would pose a serious risk to Preston and *ignored* that

67

risk. Crucially, when Deview examined Preston and determined that she was having a bloody show, she almost immediately called Dr. Sherman. It was based on Dr. Sherman's instructions that she left Preston alone in a cell for approximately 30 minutes and did not appear to take her vitals at that time. The CCS Defendants argue (ECF No. 134, PageID.7112) based on reference to *Trozzi* that "no reasonable [nurse] in [Deview's] position would be expected to second guess" Dr. Sherman's orders. *Trozzi*, 29 F.4th at 759 (citing *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009)). In both *Trozzi* and *Spears*, an officer without medical training relied on a medical diagnosis from a medical professional to proceed, such that there was no evidence that the officer was aware of facts from which the inference could be drawn that a substantial risk of harm existed or that he did draw the inference. In both cases, however, this pertained to an individual without medical training relying on the instructions or determinations of another who did have such training. Perhaps the same could be said here where Deview had less medical training and certification than Dr. Sherman and was required to follow his orders. There is an argument to be made that this hierarchical system permits an inference that Deview similarly did not think her failure to respond

68

would pose a serious risk to Preston (or even, as the CCS Defendants suggest, that Preston cannot present evidence to the contrary of the idea that a reasonable nurse in her position would not have known that Preston was even suffering a serious medical condition).

The Court need not decide that question because Preston has not offered evidence from which a reasonable jury could find that Deview knew that her failure to respond would pose a serious risk to Preston. Her direct testimony indicates she did not believe there was any risk to Preston by not calling 911 at that time; that she believed labor had not yet started; and that time was of the essence to call Dr. Sherman in those circumstances. There is no evidence in the record that suggests her subjective belief was otherwise.

The same is true for when Deview assisted Preston around 2:00 p.m. when her water broke and Deview started timing her contractions. Again, Deview followed Dr. Sherman's instructions. At that time, while she did not call an ambulance herself, Deview was informed that the process for obtaining an urgent (but non-emergent) hospital transfer had begun. These are not facts that demonstrate cursory care such that it was no medical treatment at all. *See Winkler*, 898 F.3d at 892. Accordingly,

Preston has failed to demonstrate a genuine issue of material fact that Deview was deliberately indifferent, necessitating summary judgment on claims against Deview.

### iii.  Bishop and Lubanski

The last two Defendants are Bishop and Lubanski, who each have L.P.N. certifications. Once again, to survive summary judgment, Preston must proffer evidence that a reasonable officer at the scene, knowing what Bishop and Lubanski separately knew at the time, would have understood that Preston's medical needs subjected her to an excessive risk of harm. Their background as medical professionals again affects the inquiry. Preston must also demonstrate that Bishop and Lubanski each knew that her individual failure to respond would pose a serious risk to Preston and ignored that risk.

Bishop and Lubanski both evaluated Preston at approximately 12:20 p.m. when she came to the medical unit complaining of contractions. They evaluated her for facial grimacing or other signs of pain, did an abdomen assessment for contractions, and a did a litmus test for amniotic fluid. They educated her on Braxton-Hicks contractions. At 1:30 p.m., when Bishop was on med pass and Preston approached her to

70

inform her that she was bleeding from her vagina, Bishop sent her to the medical unit. Bishop did not evaluate her physically at that time, and it is unclear whether there was any delay between their conversation and Bishop sending Preston to the medical unit. Neither Bishop nor Lubanski returned to be involved with Preston's care until at 2:00 p.m., when her water broke. At that time, Bishop called Dr. Sherman to inform him of the updates and Preston's history, and, based on his instructions, started the process for an elective hospital transfer. Bishop communicated this to Deview, who was with Preston. Meanwhile, Lubanski went in and out of ME 6 to obtain items for Preston and later to help time contractions and communicate the timing to Bishop. Lubanski later testified that she did not know that Preston had a high-risk pregnancy until after the baby's birth. (ECF No. 103-9, PageID.2519.) Similarly, Bishop did not know until filling out Preston's chart as part of the process for filling out the ER/IP form. (ECF No. 103-10, PageID.2563–2564.)

For many of the same reasons as Preston's claim against Deview, the claims against Bishop and Lubanski must fail. Bishop and Lubanski also testified that they were unaware of Preston's high-risk status until Dr. Sherman ordered the non-emergent ambulance or after the baby was

born, respectively. Again, Dr. Powers' testimony and expert report assumes that a medical provider knows they are faced with a late-term pregnant woman who previously had a placental abruption. (*See*, *e.g.*, ECF No. 120-7, PageID.6611.) Preston has thus offered no evidence that a reasonable L.P.N. knowing what Bishop and Lubanski knew about Preston's condition would have known that Preston's medical needs subjected her to an excessive risk of harm.

Nor is there evidence that Bishop and Lubanski separately knew that any individual failure to respond in a particular manner would pose a serious risk to Preston and ignored such risk. As for Bishop's conversation with Preston at the med pass at 1:30 p.m., even assuming for the sake of argument that Bishop understood that Preston's medical needs subjected her to an excessive risk of harm, Bishop responded—she sent Preston to the medical unit. There is no evidence that Bishop held a subjective belief that failure to act in another matter would pose a serious risk to Preston. Indeed, this action makes intuitive sense: the medical unit was likely better equipped to evaluate Preston.

As for Bishop and Lubanski's actions after 2:00 p.m., these actions were guided by Dr. Sherman's instructions—the only exception being

that Dr. Sherman anticipated that Deview would deliver the baby as opposed to Bishop. However, Preston does not claim deliberate indifference based on Bishop's assistance with delivering the baby; Preston argues that Bishop was deliberately indifferent for failing to timely transfer Preston to the hospital. (ECF No. 120, PageID.6529.) Additionally, the same debate about whether "no reasonable [nurse] in [Bishop or Lubanski's] position would be expected to second guess" Dr. Sherman's orders is even more potent here with regard to Bishop and Lubanski, who have L.P.N. credentials as opposed to Deview's R.N. credentials. *Trozzi*, 29 F.4th at 759.

Preston also argues that the video footage shows that Lubanski "acted as if she was assessing [Preston]'s condition but was in fact providing no care[,]" which demonstrates deliberate indifference. (*Id.* at PageID.6530.) The Court understands Preston's argument to reference Lubanski's conduct as exhibited in the video footage from ME 6 after Preston's water broke at 2:00 p.m. Even viewing the video footage in the light most favorable to Preston and operating under the impression that Lubanski was not obtaining items for Preston or timing contractions, *see Latits*, 878 F.3d at 547, Preston's argument fails to address the pertinent

73

inquiry: whether Lubanski knew that her failure to act posed a serious risk to Preston. Yet again, Preston offers no evidence that either Bishop or Lubanski was subjectively aware of a serious risk to Preston based on the failure to request emergency transfer to the hospital as of that time or the failure to provide other care to Preston. Accordingly, the claims against Bishop and Lubanski also fail.

### B. *Monell* claims

Preston's *Monell* claims against Defendant CCS and Defendant Macomb are not automatically precluded by the Court's finding that none of the Individual Defendants committed a constitutional violation. Nevertheless, Preston's *Monell* claims against both entities fail.

### a. Defendant CCS

Preston's amended complaint includes a claim premised under *Monell* liability for Defendant CCS. (ECF No. 63, PageID.964–967.) Specifically, Preston's claim is premised on a failure to train allegation *see Jackson*, 925 F.3d at 828, and is one stemming from a single incident, as opposed to a pattern of constitutional violations. The Court's previous opinion granting in part Preston's motion to amend the complaint

outlined the law governing Preston's failure to train based on a single

incident theory. Specifically, Preston must prove:

> "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Deliberate indifference can be pled through a single incident or through a pattern of constitutional violations. *Id.* at 903 (quoting *Ellis*, 455 F.3d at 700–01).
>
> Failure to train based on a single incident "is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Winkler*, 893 F.3d at 903 (quoting *Shadrick*, 805 F.3d at 739). In other words,
>
>> it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.
>
> *City of Canton v. Harris*, 489 U.S. 387, 390 (1989). Obviousness has also been characterized as a "high degree of predictability" that such situations will reoccur and that

inadequately trained employees will probably violate a person's federal rights. *Shadrick*, 805 F.3d at 739 (quoting *Bryan Cty.*, 520 U.S. at 409–10). "The high degree of predictability may also support an inference of causation[.]" *Id.* (same). For example, "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," and so training on "the constitutional limitations on the use of deadly force" is "so obvious" that the failure to provide such training amounts to "deliberate indifference to constitutional rights." *Harris*, 489 U.S. at 390 n.10 (citations and quotations omitted).

In *Shadrick* the government contractor was deliberately indifferent "to the highly predictable consequence that an LPN nurse will commit a constitutional violation" given the relatively "limited set of medical skills" that LPNs possess because no ongoing training was provided to the LPNs. 805 F.3d at 740 (citing *Bryan Cty.*, 520 U.S. at 409). The training was inadequate because

> there [was] no proof of a training program that was designed to guide LPN[s] [ ] in assessing and documenting medical conditions of inmates, obtaining physician orders, providing ordered treatments to inmates, monitoring patient progress, or providing necessary emergency care to inmates within the jail environment in order to avoid constitutional violations.

*Id.* And it was obvious that the LPNs would commit constitutional violations without additional training because LPNs had little training to begin with, demonstrating that the contractor was deliberately indifferent. *Id.* at 740, 743. The failure of the contractor to investigate the cause of the incident, an inmate's death, further evinced deliberate

indifference. *Id.* Finally, the plaintiff satisfied causation because the need for LPNs to be trained on their constitutional obligations was so obvious. *Id.* at 744.

(ECF No. 62, PageID.921–926; *see also* ECF No. 42, PageID.480–482.)

First, Preston's amended complaint includes allegations of failure to train Dr. Sherman, Deview, Bishop, and Lubanski. (*See* ECF No. 63, PageID.965–966.) For example: Preston pleads that the Individual Defendants' unconstitutional conduct is "indicative of a widespread lack of training by Defendant CCS across all medical disciplines within CCS, including Defendants—a registered nurse, two licensed practical nurses, and a medical doctor." (*Id.* at PageID.965.) While Preston's briefing predominantly focuses on the failure to train Bishop and Lubanski (the L.P.N.s), some arguments appear to relate to Sherman and Deview. (ECF No. 120, PageID.6525) ("In *Shadrick*, it appears that CCS registered nurses are provided adequate training for their employment. As concerns Defendant Dr. Sherman, the sparse records indicate that from 2014 to 2017 his involvement in on-going training was nominal, at best."). However, the Court has previously found that *only* the claims against Bishop and Lubanski are plausible under a single incident theory as outlined in *Shadrick*:

77

> Preston argues that Dr. Sherman, Deview, Bishop, and Lubanski, were inadequately trained (ECF No. 46, PageID.541), but the Court only finds that this claim is plausible based on the lack of training of Bishop and Lubanski, the LPNs. A medical doctor's education and training necessarily appraises him of his constitutional obligations to provide adequate medical care because doctors are presumably trained to avoid malpractice, or negligence, which is insufficient to give rise to constitutional liability. This is analogous to the reasoning in *Connick v. Thompson*, which held that it was not a failure to train prosecutors as to their constitutional obligations to turn over exculpatory information because their education and training would teach them about this duty. 563 U.S. 51, 64–68 (2011).

(ECF No. 62, PageID.924.) Accordingly, to the extent Preston continues to premise a *Monell* claim analogous to *Shadrick* against Defendant CCS based on failure to train Sherman and Deview, Preston cannot do so.

Second, Defendant CCS argues that it cannot be liable as an entity under Section 1983 if there is no constitutional violation by the Individual Defendants based upon *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). (ECF No. 103, PageID.2064.) Yet, as helpfully summarized by another court in this district in *Woodall v. Wayne Cty.*, this is not necessarily the full story:

> In *Watkins v. City of Battle Creek*, the Sixth Circuit held that if "no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." 273 F.3d [at] 687[.] The reasoning behind this broad rule

78

is that to proceed with a § 1983 claim, a plaintiff must show a deprivation of a constitutional or federal right caused by a person acting under the color of state law. *See Shadrick*[], 805 F.3d [at] 736[.] Generally, if no constitutional violation can be attributed to an individual municipal actor, it is unlikely that the plaintiff was deprived of a constitutional right at all. *See North*[ *v. Cuyahoga Cnty.*], 754 F. App'x 380[, 390 (6th Cir. 2018)].

But more recently, the Sixth Circuit has recognized that "in certain unusual circumstances, a municipality might be liable for a constitutional violation even in the absence of a liable individual." *Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 645 (6th Cir. 2020). The Sixth Circuit has not yet decided whether an individual defendant must be liable before municipal liability can be found. *Winkler*[], 893 F.3d [at] 901[] ("But we need not decide whether, under our court's precedent, a municipality's liability under § 1983 is always contingent on a finding that an individual defendant is liable for having committed a constitutional violation."). In *Brawner*[], however, the Sixth Circuit proceeded with its analysis of whether a jail nurse violated Brawner's constitutional rights, even though no individual officer remained as a defendant in the suit per a stipulation by the parties. 14 F.4th [at] 597[]. The Court noted that the Sixth Circuit has "not always been consistent in discussing" whether a *Monell* claim "depends on [plaintiff] showing that a county actor violated [plaintiff's] constitutional rights," but it made no difference there because "Brawner presented evidence from which a reasonable jury could find that [the jail nurse] violated Brawner's constitutional rights, and that this violation was the result of the County's policies." *Id.*

No. 17-13707, 2022 WL 737502, at *10 (E.D. Mich. Mar. 10, 2022).

Indeed, the Sixth Circuit's decision in *Hart* (cited by *Woodall*) appears to

suggest that Preston's case here may be one of those unusual

circumstances where a municipality might nonetheless be liable. 973 F.3d at 645. *Hart* considered the circumstance where the municipal defendants (Hillsdale County and the City of Hillsdale) were put on notice of changes made to the Sex Offender Registration Act ("SORA") that narrowed the category of individuals required to register under SORA. The result of these changes was that there were individuals listed in the registry who were no longer subject to the Act. However, there remained a question of whether the responsibility to undertake the action to avoid inevitable wrongful listing (that implicated constitutional concerns) lay with the municipal defendants. *Hart* recognized *Shadrick* to find that: "[I]f no official is responsible for compliance with a constitutional mandate, liability for a foreseeable violation of that mandate might lie not with the individuals (who bore no personal responsibility) but with the municipality (which failed to prepare its employees for the situation)." *Id*. at 646. The *Hart* court left the question to be decided by the district court: "If the district court determines that the wrongful arrest was foreseeable and that the municipality failed to prepare its officers for that foreseeable risk, municipal liability may result." *Id*.

Although this case presents a different set of constitutional concerns than the imposition of punishment by SORA, there nevertheless may be the same "unusual circumstances" here, where "a violation of federal rights may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Id.* (citing *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997) and *Shadrick*, 805 F.3d at 739–40). Accordingly, there is an open question of whether Defendant CCS could be liable for failure to train Lubanski and Bishop despite the finding that no Individual Defendant is liable for having committed a constitutional violation.

Preliminary matters aside, it is necessary to evaluate whether Preston has met her burden to prove the three elements of a failure to train claim related to the L.P.N.s' administration of emergency medical care and knowing when to initiate hospital transfers, specifically under a single incident theory.

First, there is the question of whether the training for L.P.N.s was inadequate for the tasks performed. *See Winkler*, 893 F.3d at 902. Defendant CCS points to the report of Nurse Wild (ECF No. 103-15), in support of its contention that the training for L.P.N.s was adequate. (ECF

No. 103, PageID.2064–2065.) Some of the references in Nurse Wild's report are to more general training: she notes the L.P.N.s' general licensure requirements for the state of Michigan (and concomitant requirements to attend an accredited nursing program and pass the licensure examination), CCS' new employee orientation, monthly/informal trainings, and ongoing annual education in unspecified "high-risk areas[.]" (ECF No. 103-15, PageID.3062.) However, without further explanation of the curriculum and educational components of these facets of the L.P.N.s' general training background, it is hard to distinguish whether this training was inadequate *for the tasks performed* relatedto Preston's labor and delivery. Additionally, while the CCS Defendants contend that "each CCS nurse has been trained by their accredited colleges in the profession of nursing[,]" including "OB rotations and classes on labor and delivery" (ECF No. 103, PageID.2065), this does not distinguish Lubanski's and Bishop's training from that in *Shadrick*, where the court based its rationale on the relatively "limited set of medical skills" that L.P.N.s possess *generally* in the absence of further training. 805 F.3d at 740.

Nevertheless, Nurse Wild's report also indicates that "[a]ll CCS nurses have been trained in care of the pregnant patient" and, based on Bishop's deposition, she determined that all CCS nurses participate in "yearly training with skills stations that go over multiple emergency scenarios such as child birthing and chest pain." (*Id.*) *See Shadwick*, 805 F.3d at 741 (quoting *Russo v. Cty of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992)) ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of . . . training procedures."). Furthermore, the CCS Defendants highlight specific evidence of the L.P.N.'s training,[23] including the following:

> (1) Lubanski testified that she had received at least a training on
>     the OB kit, although she did not recall specific OB training as

---

[23] The CCS Defendants also include reference to training received by R.N.s or other nursing staff—for example, they cited to Deview's training experience shadowing other nurses and her participations in discussions with Monica Cueny about delivery and proper care of the newborn during delivery, but she indicated that she did not know whether L.P.N.s had any sort of training or whether they participated in discussions in this regard. (*See* ECF No. 103-8, PageID.2234, 2296–2297, 2301.) However, the Court will not consider any evidence cited by the CCS Defendants where it was unclear if the training also applied to L.P.N.s.

part of the yearly trainings she received (ECF No. 103-9, PageID.2517);

(2) Lubanski testified that she had received trainings on emergencies "that [they] encounter every day" (e.g., diabetes-related complications, detox) and emergency response practices, including how to contact the doctor for orders, how to handle an emergency up until a provider was needed if the doctor was not present, and "when to send a patient out" (ECF No. 103-9, PageID.2517);

(3) Lubanski testified that when she was hired, she received classroom training for about a week, followed by shadowing a nurse "for about a month" before they could transition to working alone (ECF No. 103-9, PageID.2517–2518), whereas Bishop confirmed that she also shadowed a nurse but could not recall how long (ECF No. 103-10, PageID.2560);

(4) Lubanski testified that she was trained at least once on the procedures for sending someone out to the hospital during an emergency, including an L.P.N.'s ability to immediately call an ambulance during an emergency or to contact the doctor for

orders in a non-emergency scenario (ECF No. 103-9, PageID.2518–2519); and

(5) Monica Cueny, the Macomb County Jail Director of Nursing, testified that new L.P.N.s can shadow either R.N.s or L.P.N.s and that there is no set time period for shadowing but that it is always longer than two weeks (ECF No. 103-12, PageID.2694–2695).

Preston's response to the Defendant CCS' argument is incomplete. Preston mainly summarizes the documents produced in relation to L.P.N.s' training through CCS (ECF No. 120, PageID.6523–6525) to conclude that "[t]here are no documents in those training materials that relate to Defendant L.P.N.'s Bishop and Lubanski's involvement in ongoing training" nor to Bishop and Lubanski's orientation or initial nurse shadowing. (*Id.* at PageID.6524.) Preston's expert, Dr. Powers, concludes that the "staff CCS at Macomb County jail" (without reference to the L.P.N.s, specifically) "were not prepared or trained in taking care of obstetrical patients, especially; [sic] those with high risk factors like" Preston. (ECF No. 120-6, PageID.6593.) In support of the contention that training was inadequate, Dr. Powers does not discuss specific

inadequacies in the training but relies on reference to allegedly inaccurate medical knowledge displayed by the medical staff to evidence that whatever training was received was inadequate. For example, he highlights Lubanski's "incorrect[]" testimony that "a bloody show is not a sign of labor and that labor starts when a pregnant women's [sic] water breaks." (ECF No. 120-6, PageID.6583.) Dr. Powers also notes that Cueny "could not provide any evidence of any training or updated training about obstetrical care" but instead, CCS relied "on the . . . [L.P.N.] basic nursing training in providing obstetrical care[.]" (*Id.*)

Preston argues that this supports the conclusion that CCS documents an R.N.'s training but fails to do so for L.P.N.s beyond their initial orientation. (*Id.* at PageID.6525.) According to Preston, this lack of evidence suggests that there is a lack of L.P.N. training analogous to the facts in *Shadrick*. (*Id.* at PageID.6525.)

However, although Preston does not discuss testimonial evidence,[24] there is nevertheless testimony in support of the contention that L.P.N.s

---

[24] Preston highlights portions of Nurse Franks' deposition (ECF No. 120, PageID.6523) but, as CCS points out, Franks was hired by CCS' predecessor CMS in 2011 (ECF No. 103-6, PageID.2102). Nevertheless, the concepts for which Preston cites Franks—the contention that she was not trained to recognize symptoms of a potential emergency because "if you've graduated from an accredited school of

do not receive training on how to address a variety of emergency or acute situations, such as pregnancy. Lubanski testified that she never received training from CCS on the stages of labor. (ECF No. 103-9, PageID.2517.) Deview agreed that she never received any formal education or training from CCS from 2012 through April 1, 2016 related to childbirth or prenatal care; although Deview is an R.N., this is possibly the same for L.P.N.s. (ECF No. 103-8, PageID.2299.) When asked to review the 2016 training record for Bishop, Cueny indicated that the only training that could possibly relate to acute or emergency medical care was "dental[,]" which "could turn into a dental emergency." (ECF No. 103-12, PageID.2699.) She further indicated that L.P.N.s do not receive specific training on emergency or acute medical conditions because "coming in, nurses know how to triage a situation, look at it, and decide whether or not that is urgent or emergent." (ECF No. 103-12, PageID.2701.)

---

nursing, you should already be able to recognize what signs and symptoms you're looking for" (ECF No. 103-6, PageID.2112)—in many ways echoes testimony from Cueny, who is the Director of Nursing, who indicated that L.P.N.s do not receive specific training on emergency or acute medical conditions because "coming in, nurses know how to triage a situation, look at it, and decide whether or not that is urgent or emergent." (ECF No. 103-12, PageID.2701.)

In summary, the record reveals that there is little to no training provided to L.P.N.s on labor or prenatal care, but there is at least some training regarding how to handle emergency scenarios generally (not specifically related to OB care) and some exposure to emergency situations through the shadowing process. Despite the existence of some emergency-related training, it is unclear how frequent this training is. Overall, the degree of training provided to L.P.N.s through CCS is unquestionably more than the total lack of training as in *Shadrick*, although the lack of formal training regarding emergencies arguably did not expose the L.P.N.s to providing treatment in a variety of emergency or acute situations, such as pregnancy, which was crucial in *Shadrick*. The *Shadrick* theory of liability may not require a showing of effectively nonexistent training but, theoretically, could be premised on situations where more comprehensive training was provided to L.P.N.s but the training was nevertheless inadequate.[25]

---

[25] Even assuming for the sake of argument that *Shadwick* supports a finding of liability for training that is more than nominal but nevertheless inadequate, the Court would not be inclined to find that such circumstances are present here. *Shadrick*'s conclusion that the entity "did not have a training program" was premised on the finding that there was "limited on-the-job training" at the beginning of L.P.N.'s employment and "there [was] no proof of a training program that was designed to guide L.P.N. nurses in assessing and documenting medical conditions of inmates,

Preston and CCS also inadequately address the second and third elements as outlined in *Winkler* for a failure to train theory based on a single incident: (2) whether the inadequacy of the training for L.P.N.s was the result of Defendant CCS' deliberate indifference; and (3) whether the inadequacy was closely related to or actually caused the injury. *See Winkler*, 893 F.3d at 902. Preston does not argue these elements at all beyond stating that CCS' failure to train here is entirely analogous to *Shadrick*. (*See* ECF No. 120, PageID.6527–6528.)

---

obtaining physician orders, providing ordered treatments to inmates, monitoring patient progress, or providing necessary emergency care to inmates within the jail environment in order to avoid constitutional violations." 805 F.3d at 740. Lubanski's testimony about shadowing suggests that the initial on-the-job training for L.P.N.s at CCS was much more comprehensive than *Shadrick*, which was limited to the very basics "such as learning where supplies were kept[.]" *Id*. While Bishop in particular had difficulty discussing the requirements of her training and policies governing her work, this is quite different from the nurses in *Shadwick* who "professed ignorance of the written medical treatment protocols and policies purportedly drafted by [the entity] to guide their conduct" and "denied receiving ongoing training about their medical responsibilities within the jail setting[.]" *Id*. Cueny's testimony identifying the new-hire shadowing checklist that outlines what overseeing nurses should explain to new hires, and her testimony outlining the year-end clinical competencies and training from the corporation required for every nurse (ECF No. 103-12, PageID.2695 – 2696, 2700), is a far cry from the nursing manager in *Shadwick* who testified that "she was not familiar with the [entity] policies that she was specifically designated to enforce." *Id*. at 741. However, the Court need not answer this at this time, because—as set forth below—Preston has failed to demonstrate actual causation.

Defendant CCS does not address *Shadrick* at all. Instead, their argument appears to be based on the premise that the consequence here—Preston's delivery of her child in the jail—was not foreseeable because the Jail commonly has pregnant prisoners "yet no other female has ever delivered a baby in Macomb County Jail while CCS has provided healthcare services at the jail." (ECF No. 103, PageID.2066.) In essence, having a baby delivered at the jail has never happened before or since, so it was not foreseeable at the time. This argument is construed too broadly. For one, this tells us nothing about whether and to what degree pregnant women at the jail have late-term or high-risk pregnancies; perhaps most pregnant women at the Jail are in the early stages of pregnancies or are not high risk, such that the emergency scenario faced by Preston does not occur. But more importantly, as the Court previously wrote, the right in *Shadrick* was construed much more narrowly: "it is an obvious consequence that without training, the [L.P.N.]s would violate detainees' right to adequate medical care in the face of highly predictable situations—medical emergencies and acute conditions." (ECF No. 62, PageID.925.) CCS again indirectly argues that Preston must show that late-term pregnancies and subsequent deliveries at the jail are a

90

recurrent situation, but there is no indication that the right at issue must be construed so narrowly. Again, as the Court noted before:

> In *Shadrick*, the recurrent situation was the need for medical treatment, not specific infections or sepsis. 805 F.3d at 742–43. *See also Garretson*, 407 F.3d at 796 (examining an alleged "pattern of mishandled medical emergencies"). In this case, it is as inevitable as a police officer using deadly force to detain a fleeing felon that LPNs and other staff will need to provide adequate medical care in the face of medical emergencies and acute conditions, and so the failure to provide training about this constitutional obligation shows deliberate indifference.

(ECF No. 62, PageID.925.) Additionally, as in *Shadrick*, there is evidence that CCS did not engage in a subsequent investigation, and this failure to investigate could also show recklessness. (ECF No. 103-12, PageID.2702.)

However, Preston's claim fails on the third element: causation. The obviousness of the risk (i.e., not providing L.P.N.s with adequate medical training so that they know their constitutional responsibilities) can give rise to an inference of causation as it did in *Shadrick*. However, there is an issue with actual causation here based on the chain of events. Preston's pregnancy was an objectively serious medical need as of March 20, 2016, at 1:30 p.m. (and not before). Any analysis of whether Bishop's

and Lubanski's alleged inadequate training could be said to have caused a delay in care must be evaluated as of that time.

At approximately 1:30 p.m., Preston stopped Bishop on the med cart pass and told her about the vaginal bleeding. Deview testified that Preston's mucus plug had passed at this point, but Bishop did not check it; Deview "agree[d]" that Bishop should have checked this. (ECF No. 103-8, PageID.2419.) Nevertheless, Bishop sent Preston to the medical unit. At that time, it was Deview—an R.N.—who concluded that Preston had a bloody show, told Preston to go in the ME 6 cell, and called Dr. Sherman to inform him of the situation. Bishop and Lubanski arrived back in the unit from their respective med cart shifts at some time after 1:30 p.m. Accordingly, any inadequate care received between 1:30 p.m. (when Preston reported bleeding) to 2:00 p.m. (when her water broke) is attributable to Dr. Sherman and Deview—not the L.P.N.s. The decision to deny Preston care for the time between 1:30 and 2:00 p.m. (when Preston's water broke) was not *actually* caused by any deficiencies in Bishop and Lubanski's training on emergency situations.

At 2:02 p.m., Bishop went back to the medical office and called Dr. Sherman to tell him that Preston's water had broken and that she was

bleeding with mucous. At some point before this, Dr. Sherman had been told that this was a high-risk pregnancy. Dr. Sherman believed this was not an emergent situation, despite Preston's high-risk pregnancy, and he made the decision for Preston to be moved by a non-emergency transfer to the hospital. Accordingly, because Bishop appears to have communicated all of the relevant information regarding Preston's condition to Dr. Sherman, there is no causal relationship between Bishop's emergency training and any injured suffered by Preston.

Additionally, when Dr. Sherman was called after the baby's head started crowning, he communicated with Lubanski about how to safely deliver in the jail but believed that Deview—and not one of the L.P.N.s—would be the individual delivering the baby. However, it was not Lubanski, nor Deview, but *Bishop* who delivered the baby. Nevertheless, it was too late by this point for Preston to safely deliver in the hospital, and (thankfully) Preston and her baby suffered no injuries during his birth. Again, there is no causal relationship between any inadequacy in Bishop's training and the fact that Preston gave birth at the Jail.

### b. Macomb County

Preston improperly amended her complaint without the Court's permission after the Court's opinion and order on Preston's motion to amend (*see* ECF Nos. 46-1, 62, 63), which results in some confusion in the briefing related to Defendant Macomb's motion for summary judgment. To the extent that Preston's response to Defendant Macomb's motion for summary judgment suggests that she alleges a policy of inaction by Defendant Macomb, this is incorrect. (*See* ECF No. 119, PageID.6199, 6204.) Preston's only proper *Monell* claim against Defendant Macomb—the failure to monitor claim—cannot survive summary judgment.

### i. Amended Complaint and Prior Rulings

Preston filed a motion to amend the complaint and attached a proposed amended complaint. (ECF Nos. 46, 46-1.) Preston's proposed amended complaint contained five proposed theories of *Monell* liability.[26]

---

[26] Preston's proposed amended complaint included the following theories of liability:

(1) failing to monitor the substandard, constitutionally inadequate and delayed medical care provided by CCS personnel to inmates whose serious medical conditions require timely transfer to a hospital for adequate care; (2) tolerating such constitutionally inadequate medical care to continue even after Defendant Macomb County investigated two jail cell deaths in 2013 and 2014 that involved CCS' staff's intentional and reckless decisions to refuse transfer to the inmates to a hospital for emergency medical care consistent with the inmates' serious medical

94

When evaluating the allegations as written in the *proposed* amended complaint (ECF No. 46-1), the Court found that "[e]ach of these theories of liability appear to be based on a policy of inaction, but Preston's first theory could also be construed as a failure to train or supervise claim because she also describes it as Macomb County's failure to monitor CCS's contractual performance." (ECF No. 62, PageID.927.) The Court found that Preston had pleaded a plausible failure to train claim based on a single incident. While not made explicit in the opinion, it is clearly

---

needs; (3) knowingly and recklessly allowing CCS' customs and practices that denied inmates adequate and timely medical treatment to exist and persist in the Macomb County Jail by failing to demand changes in CCS policy and practices that would protect inmates' constitutional right to receive adequate and timely medical care for serious medical needs; (4) tolerating a custom and pattern of practice of its corrections officers to unreasonably rely on the medical decisions of CCS personnel even in circumstances when an inmate was suffering from obvious and acute medical conditions that demanded immediate medical intervention by a hospital, such as existed in two matters involving egregious and avoidable inmate deaths in the Macomb County Jail in July, 2013 and June, 2014[;] and (5) ratifying the unconstitutional conduct of its employees and subcontractors such as CCS by failing to meaningfully investigate the acts of Macomb County Corrections Officers and Defendant CCS personnel that denied inmates' right to medical care, including Defendant Macomb County's inadequate and conclusory investigation of two inmate jail cell deaths that occurred in 2013 and 2014.

(ECF No. 46-1, PageID.552–553.)

implied that the Court did not find that Preston had pleaded a plausible policy of inaction claim.[27]

In the Amended Complaint filed after the Court's opinion (ECF No. 63), Preston summarizes her claim for relief as follows: "As a result of the allegations contained in this First Amended Complaint, Defendant Macomb County is liable for a failure to train or supervise and/or monitor CCS' contractual performance, thereby allowing unconstitutional policies

---

[27] And this makes sense. "Where, as in this case, a plaintiff asserts a custom of inaction towards constitutional violations, we have required plaintiffs to show (1) a 'clear and persistent pattern' of misconduct [constitutional violations], (2) notice or constructive notice on the part of the municipality, (3) the defendant's tacit approval of the misconduct, and (4) a direct causal link to the violations." *Nouri v. Cty. of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015). Violations can be construed broadly. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (examining an alleged "pattern of mishandled medical emergencies"). Yet, despite this broad construing, a pervasive pattern is one that is "so widespread, permanent, and well settled as to have the force of law." *Jones*, 625 F.3d at 946 (quoting *Kinzer v. City of W. Carrollton*, No. 3:07-cv-111, 2008 U.S. Dist. LEXIS 61203, at *14 (S.D. Ohio Aug. 5, 2008)). For example, in *Jones*, five instances of inmate medical requests being ignored between September and November 2008 was insufficient. *Id.* at 946–47. But the Sixth Circuit as of has "never found notice of a pattern of misconduct (or the pattern itself) solely from the mistreatment of the plaintiff." *Nouri*, 615 F. App'x at 296 (6th Cir. 2015). Here, Preston's proposed amended complaint only initially included allegations of two other inmates to establish a pattern of inaction under the five theories articulated, and this is not enough to establish a pattern of inaction so pervasive as to have the effect of well-settled law. And, the amended complaint as filed after the Court's order granting in part Preston's motion to amend does not appear to have any allegations as to other inmates besides general references ("Macomb ratified the unconstitutional conduct of its employees, agents, and/or its subcontractor CCS, with regard to the unconstitutional conduct visited upon Plaintiff, and other inmates, by failing to monitor . . . ."). (ECF No. 63, PageID.969.)

and customs that resulted in the violation of Preston's clearly established Fourteenth Amendment right to adequate and timely medical care for her serious medical needs. As the direct cause of the Macomb County Defendant's unconstitutional acts and omissions, Preston experienced extreme physical pain and suffering, injury, severe mental anguish, and insults and indignities." (ECF No. 63, PageID.969–970.) This is properly in line with the Court's conclusion as found in the opinion granting in part Preston's motion to amend, where the Court found that Preston states a claim against Defendant Macomb under a failure to train or supervise theory stemming from a single incident. (ECF No. 62, PageID.927.)

However, Preston's amended complaint includes numerous additional allegations against Defendant Macomb, including: "(1) failing to monitor the substandard, constitutionally inadequate and delayed medical care provided by CCS personnel to inmates whose serious medical conditions require timely transfer to a hospital for adequate medical care; (2) tolerating unconstitutional and inadequate medical care by the individual CCS defendants; (3) allowing CCS customs and policies that denied inmates with serious, acute or emergency conditions the right

97

to adequate medical care; (4) knowingly and recklessly allowing CCS'

customs and practices that denied inmates adequate and timely medical

treatment to exist and persist in the Macomb County Jail by failing to

demand changes in CCS policy and practices that would protect inmates'

constitutional right to receive adequate and timely medical care for

serious medical needs; and (5) ratifying the unconstitutional conduct of

its employees and subcontractors such as CCS by failing to meaningfully

investigate the acts of Defendant CCS personnel that denied Plaintiffs

right to medical care." (ECF No. 63, PageID.938–940.)

Of note, these five sets of allegations have been changed from the

proposed amended complaint attached to Preston's motion to amend

(ECF No. 46-1)—and not just to take out any allegations that were found

to be futile. Instead, Preston, in her response briefing to Defendant

Macomb's motion for summary judgment now argues the following: "As

to the four theories that this court labeled as "policies of inaction" [the

original #2-5 as listed in the proposed amended complaint, *see* FN 3 in

this hearing memo], Preston contends that those policies of inaction grew

out of the County's decision to implement a policy that failed to

adequately    monitor    CCS'    ability    and    performance    to    provide

constitutionally protected medical care to the Jail's inmates for their serious medical conditions." (ECF No. 119, PageID.6204.)

Although Defendant Macomb does not address this issue in its motion for summary judgment, the Court notes that Preston's submission of an amended complaint that did not match the proposed amended complaint (and went beyond removing the allegations that would be futile) contravenes Federal Rule of Civil Procedure 15(a)(2), requiring amendment only with the opposing party's consent or the Court's leave. Regardless, even if the Court were to consider Preston's argument that this can be considered a policy of inaction theory in the alternative, this is nevertheless without merit. There are no allegations as to a clear and persistent pattern of misconduct as required for any iteration of a policy of inaction claim.

Accordingly, to the extent that Preston's response to Macomb's motion for summary judgment suggests that there are policy of inaction theories still alive in this case as relates to Defendant Macomb, this is incorrect. (*See* ECF No. 119, PageID.6199, 6204.)

### ii. How to conceptualize the *Monell* claim against Macomb County

Defendant Macomb separates Preston's *Monell* claim into three distinct theories of liability: (1) "[f]ailure to provide sufficient and timely medical care to female prisoners experiencing the onset of labor by timely transferring them to a hospital facility"; (2) "[f]ailure to train the Jail's medical staff to assess the onset of labor and transfer female prisoners experiencing labor to a hospital facility"; and (3) "[f]ailure to monitor Co-Defendant CCS' delivery of medical care services to the Jail's pregnant prisoner population". (ECF No. 107, PageID.3450, 3463.)

Yet Defendant Macomb's briefing (ECF No. 107, PageID.3461–3463) does not acknowledge the four separate ways a plaintiff may plead *Monell* liability: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson*, 925 F.3d at 828 (quoting *Burgess*, 735 F.3d at 478); *see also Winkler*, 893 F.3d at 901. Instead, their description of governing law appears to merge the theories together.

100

Furthermore, Defendant Macomb appears to be addressing Preston's improperly-added allegations in the amended complaint as filed, which, as read, does appear to allege a policy of inaction or ratification theories. However, as set forth above, because the Court finds that Preston did not plead a plausible policy of inaction claim (nor could any allegations in this improper amended complaint support such a claim, anyway), the Court will not address this portion of Defendant Macomb's brief.

### iii.  Failure to monitor

Nevertheless, even with the properly included failure to monitor claim, there are some preliminary issues that needs to be addressed. For one, Defendant Macomb improperly characterizes Preston's failure to monitor claim as related to pregnancy: specifically, Defendant Macomb states that Preston asserts "the County failed to adequately train Co-Defendant CCS' nursing staff to conduct OB/GYN assessments and diagnose the onset of active labor" or that the County "was deliberately indifferent to a need for labor and birth training[.]" (ECF No. 107, PageID.3466, 3468.) Preston's claim is not so limited: it is instead a failure to train or monitor all serious and emergency situations (*see* ECF

101

No. 63, PageID.967 – 970). This comports with the Court's finding at the motion to amend stage. (ECF No. 62, PageID.928–929.) Preston's theory as identified in the amended complaint is that Macomb County's monitoring of CCS was deficient because there was no monitoring *whatsoever* of CCS's performance (ECF No. 63, PageID.968), that this caused her injures (*id.* at PageID.969–970), and Macomb County engaged in acts that were "committed with malice or with reckless disregard for Plaintiff's constitutional rights." (*Id.* at PageID.970.)

More still, their briefing does not acknowledge the possibility—as explicitly discussed in the Court's opinion granting in part Preston's motion to amend (ECF No. 62, PageID.926–930)—that a plaintiff may have a claim of a failure to supervise based on a policy established through a single incident. Instead, Defendant Macomb argues that Preston must show prior instances of constitutional violations as a notice requirement. (ECF No. 107, PageID.3466–3467; ECF No. 130, PageID.7091.) This is incorrect.

Rather, as the Court previously recognized in its opinion granting in part Preston's motion to amend (ECF No. 62, PageID.927–928), in order to demonstrate that Macomb County failed to train or supervise

102

CCS's performance as it rendered care to inmates with acute conditions and during medical emergencies, Preston must prove that Macomb County's supervision over CCS was inadequate, the inadequacy was due to Macomb County's deliberate indifference, and this inadequacy caused Preston's injury. Additionally, Preston's claim must be understood as one in which she alleges the existence of deliberate indifference through a single incident. A single incident may demonstrate deliberate indifference where it is obvious the failure to supervise would lead to that constitutional violation. *See Shadrick*, 805 F.3d at 740 (citing *Bryan Cty.*, 520 U.S. at 409). To find the County liable, the focus must be on the County's policy, the failure to supervise CCS—not CCS's failure to train its L.P.N.s. *Id.* at 737 (citing cases). Municipalities may not simply contract away their constitutional obligations by securing private contractors. *Stojcevski*, 143 F. Supp. 3d at 687; *see also Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010).

Preston argues that Defendant Macomb County's top policymaker, Sheriff Anthony Wickersham, "implemented a policy that failed to supervise or monitor the actions of the County's contracted-for health care provider, Defendant CCS and allowed CCS to self-monitor its own

policies, practices and procedures that were not reviewed or approved by Macomb County before their implementation in the Jail[.]" (ECF No. 119, PageID.6200.) Preston contends that this constitutes constitutionally impermissible delegation of the duty to provide inmates (and we assume also pretrial detainees) adequate medical care for serious medical conditions to CCS. (*Id.*) Because it was obvious that a failure to supervise or monitor would lead to constitutional rights violations for a pretrial detainees' right to adequate medical care, Defendant Macomb County was deliberately indifferent. (*Id.* at PageID.6200–6201.)

For training and monitoring claims, the burden is on Preston to demonstrate inadequacy. *See*, *e.g.*, *Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 564 (6th Cir. 2011) ("[P]laintiff[] must come forward with evidence tending to show that [Macomb County's] training was inadequate. . . . [D]efendant[] [was] not required to support their motion for summary judgment with evidence negating [P]laintiff['s] claim[.]"). Here, Preston highlights deposition testimony from this case and from prior cases in the Eastern District—*Hubble v. Cty. of Macomb*, No. 2:16-CV-13504, 2019 WL 1778862, at *1 (E.D. Mich. Apr. 23, 2019) and

104

*Stojcevski v. Cty. of Macomb*, No. CV 15-11019, 2019 WL 4744432, at *1(E.D. Mich. Sept. 30, 2019)—in support.

But closer analysis suggests some of Preston's arguments are mischaracterizations of the record. The cited portion (ECF No. 119, PageID.6205) of former Macomb County Jail Administrator Michelle Sanborn's deposition from *Hubble* (in which Preston asserts that she stated "No" in response to "Do you monitor the way that CCS was providing medical treatment?") is taken out of context; following a clarification question, Sanborn thoroughly explains how she monitored day-to-day operations with CCS, including, for example, "[m]aking sure that when there's an all-call or a medical emergency that they're responding." (ECF No. 119-3, PageID.6278.) So, too, with Sheriff Wickersham's *Hubble* deposition testimony—he did not explicitly confirm that he delegated his policymaking authority to CCS. (ECF No. 119-4, PageID.6345.)

The evidence also suggests that Defendant Macomb engaged in at least some degree of supervision. Preston cites portions of Sanborn's

deposition testimony given in this litigation[28] in which she indicated that CCS engaged in self-assessment and self-monitoring of certain aspects of their work, including the training provided to their staff, and that she would not evaluate aspects that required medical judgment; she believed that this prohibited her from monitoring whether an inmate's medical care met constitutional standards. (ECF No. 119-2, PageID.6249, 6265–6266.) She testified that, in the Sheriff's department, no one other than CCS had the knowledge to monitor whether the provided healthcare was constitutionally adequate. (*Id*. at 6265.) She confirmed that accreditation by the National Commission on Correctional Health Care ("NCCHC") does not indicate that deliberate indifference will not or has not occurred in a given situation. (*Id*. at PageID.6261.) But she also indicated that she engaged in at least some oversight of aspects including "whether [CCS] is responding to call out[,]" "whether they're adhering to the requirements in the contract," "whether they're in compliance with DOC regulations," among others. (*Id*.) She took a hands-on approach to being

---

[28] Preston also challenges the credibility of Sanborn's deposition testimony given in this litigation by referencing the fact she now serves as a consultant in this case and was previously hired as an expert by former employer Defendant Macomb, but the Court does not evaluate a witness' credibility at the summary judgment stage. *See, e.g., Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019).

the liaison between the medical and security staff, observing clinical activities often daily; she hired an independent company to help the County oversee the contract; hosted monthly meetings with medical and prisoner program staff to discuss common concerns about delivery of program services to prisoners. (ECF No. 107-19, PageID.5116–5118.)

Additionally, Preston cites certain testimony from Sheriff Wickersham regarding the degree to which it can be said that Sheriff Wickersham and the County were unaware of the extent of their constitutional obligations and allowed CCS to make its own policies when it came to medical practices. Yet Preston only cites Sheriff Wickersham's testimony given in the *Hubble* and *Stojcevski* cases. His *Hubble* testimony appears to be possibly confined to practices as of June and July of 2013 (ECF No. 119-4, PageID.6346); the same is true for *Stojcevski*, but instead to the June of 2014 timeframe. (ECF No. 119-5, PageID.6352.) To that end, even though the *Hubble* and *Stojcevski* depositions were conducted after the events in this case, the Court cannot evaluate testimony given in these cases without a more explicit understanding of whether Sheriff Wickersham's answers were confined to those pre-March 2016 timeframes.

Regardless of what Macomb County does or does not do in terms of oversight, the problem with Preston's *Monell* claim is proving deliberate indifference. It is true that Defendant Macomb cannot completely abdicate its responsibility to supervise contractors as *Stojcevski* warns against. *See Stojcevski* No. CV 15-11019, 2019 WL 4744432, at *20 (E.D. Mich. Sept. 30, 2019) (collecting cases that "have held that where a municipality delegates the final authority to make decisions about inmate medical care to a private vendor, the vendor's policies or customs become those of the county."). And the rationale for the Court's opinion granting in part the motion to amend was based on the recognition "that it is plausible that a municipality's failure to provide *any* oversight of a corporate medical contractor would inevitably lead to constitutional violations in the face of medical emergencies or acute medical conditions. To find that this was implausible would be tantamount to finding that municipalities may in fact avoid their constitutional obligations to provide adequate care to inmates by relying on a private contractor." (ECF No. 62, PageID.929–930.) But it appears that that Defendant Macomb did not completely abdicate—and thus, it is not an obvious consequence that CCS was sure to violate a detainee's rights to adequate

medical care based on the level of oversight that was implemented. Without Sheriff Wickersham's allegedly blanket statements about completely delegating their constitutional rights, there is no genuine dispute of fact that there was at least some oversight of CCS' activities at the Jail.

Furthermore, Preston offers no evidence that the level of monitoring that was provided by Defendant Macomb over CCS presented an obvious risk to inmates' constitutional rights to adequate medical care such that a single incident would be sufficient to demonstrate deliberate indifference. This could be done through expert testimony, but a review of Preston's response (ECF No. 119, PageID.6223–6226) reveals Preston has not put forth any opinion from Dr. Powers (or another expert) that analyzes the weaknesses of *Macomb County's* monitoring policies as opposed to those of CCS. *C.f. Winkler*, 893 F.3d at 904[29] ("The opinion of

---

[29] The parties also debate the significance of *Winkler* and argue over how it impacts the *Monell* theory of liability. Contrary to Preston's contention that *Winkler* only stands for the contention that a corrections officer can reasonably rely on the opinion of a healthcare provider when it comes to a specific medical care issue (ECF No. 119, PageID.6217), *Winkler* goes beyond this to rebut the contention that contracting with a private medical provider for healthcare services at a detention center is facially unconstitutional. Specifically, *Winkler* looks to the previous holding in *Graham* that "it is not 'unconstitutional for municipalities and their employees 'to rely on medical judgments made by [private] medical professionals responsible for prisoner care[,]' " *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d

Winkler's medical expert that Healthcare's training program was inadequate is not, by itself, sufficient to show deliberate indifference because Winkler has neither provided evidence of past examples of constitutionally inadequate treatment of inmates by Healthcare's medical staff nor explained how the training program's alleged weaknesses were so obvious as to put Healthcare on notice that a constitutional violation was likely."). To find the County liable, the focus must be on Macomb County's policy, the failure to supervise CCS—not CCS's failure to train its L.P.N.s. Preston did not do so, and her *Monell* claim against Defendant Macomb must be dismissed.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS Defendant Macomb County's motion for summary judgment (ECF No. 107) and the CCS Defendants' motion for summary judgment (ECF No. 103).

IT IS SO ORDERED.

Dated: September 29, 2022          s/Judith E. Levy
Ann Arbor, Michigan               JUDITH E. Levy
                                  United States District Judge

---

377, 384 (6th Cir. 2004)," in order "to conclude that a municipality may constitutionally contract with a private medical company to provide healthcare services to inmates." *Winkler*, 893 F.3d at 901.